# 20-339(L)

**20-304(CON), 20-340(CON), 20-341(CON), 20-342(CON), 20-343(CON), 20-344(CON)**
_____

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT
DISCOUNT ANTITRUST LITIGATION
_____

On Appeal from the United States District Court
for the Eastern District of New York, No. 05-1720
_____

## PAGE PROOF JOINT BRIEF OF APPELLANTS GNARLYWOOD LLC, AND QUINCY WOODRIGHTS, LLC, (20-341 CON), AND UNLIMITED VACATIONS, CRUISES, INC., AND USA PETS LLC (20-343 CON)
_____

Kendrick Jan
Kendrick Jan, APC
402 West Broadway, Suite 1520
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

John J. Pentz
19 Widow Rites Lane
Sudbury, MA 01776
Tel: (978) 261-5725
jjpentz3@gmail.com

## CORPORATE DISCLOSURE STATEMENT

Appellants are all privately-held companies with no corporate parents or subsidiaries.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................1

JURISDICTIONAL STATEMENT ..........................................................3

STATEMENT OF ISSUES ......................................................................4

STATEMENT OF THE CASE ..................................................................6

SUMMARY OF ARGUMENT ................................................................17

I.     THE SETTLEMENT....................................................................17

II.    ATTORNEYS' FEES...................................................................19

III.    SERVICE AWARDS .................................................................23

ARGUMENT ........................................................................................25

I.    CLASS MEMBERS HAVE BEEN DISARMED OF A REMEDY FOR
FUTURE ANTITRUST VIOLATIONS ......................................................25

II.    THE SETTLEMENT AGREEMENT DISADVANTAGES NEWER
MERCHANTS RELATIVE TO OTHER CLASS MEMBERS AND IS
NOT FAIR WITHIN THE MEANING OF RULE 23...................................28

    A.    Rule 23(e)(2)(D): inequitable impact of release ..................29

    B.    The opt-out right does not relieve the court of the burden to
ensure the settlement is fair to all class members ..............31

    C.    The Class Plaintiffs failed to adequately represent the class
as required by Rule 23(a)(4)................................................33

III.    THE $523,269,585 ATTORNEYS' FEE AWARD IS GROSSLY
EXCESSIVE...................................................................................35

A.   The fee award forces the (b)(3) damages class to pay for
     legal services provided to a separate, adverse class that did
     not enhance the monetary recovery ..................................................... 35

B.   The district court failed to properly perform the required
     *Goldberger* analysis ............................................................................ 38

C.   Class Counsel's deliberate conflict of interest and subsequent
     overcharge of their clients requires they receive no fee for
     pre-remand conflicted services ............................................................ 47

D.   Class Counsel's claimed post-remand $52,000,000 lodestar
     is grossly overstated, carried no risk, and cost the class money ......... 50

IV.  THE CLASS PLAINTIFF SERVICE AWARDS ARE FLAGRANTLY
     EXCESSIVE AND COMPENSATE ACTIVITIES UNRELATED TO THE
     (b)(3) DAMAGES CLASS ....................................................................... 52

A.   Most of the time devoted by Class Plaintiffs related exclusively
     to injunctive relief, not damages ........................................................ 57

B.   The district court abused its discretion by failing to limit the
     service awards by the amount of time devoted to the case by
     CHS and Payless. ................................................................................. 60

C.   The district court abused its discretion in awarding multipliers
     on the reasonable value of time ........................................................... 61

CONCLUSION ..................................................................................................... 63

CERTIFICATE OF COMPLIANCE WITH FRAP 32 AND LOCAL
RULE 28.1.1 ......................................................................................................... 64

CERTIFICATE OF SERVICE ............................................................................. 65

iv

# TABLE OF AUTHORITIES

<u>CASES</u>

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)...........................................................................9, 33, 34

*American Exp. Co. v. Italian Colors Restaurant,*
    570 U.S. 228 (2013)..............................................................................17, 26

*CARCO GROUP, Inc. v. Maconachy,*
    718 F.3d 72 (2d Cir. 2013) ...........................................................................35

*Central Railroad & Banking Co. v. Pettus*,
    113 U.S. 116 (1885)......................................................................................35

*Charron v. Wiener*,
    F3d 241 (2d Cir. 2013) .................................................................................25

*Churchill Village, L.L.C.*,
    361 F.3d 566 (9th Cir. 2004) ........................................................................36

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ("*Grinnell I*")....................................................39

*City of Detroit v. Grinnell Corp.*,
    560 F.2d 1093 (2d Cir. 1977) ("*Grinnell II*") ...............................................39

*City of Providence v. Aeropostale*, *Inc.*,
    2014 U.S. Dist LEXIS 64517 (S.D.N.Y. May 9, 2014) ................................55

*Davis v. County of Los Angeles*,
    8 E.P.D. ¶ 9444, at 5049 (CD Cal.1974) ......................................................41

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)......................................................................................31

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ................................................................ PASSIM

*Gulino v. Symbol Techs., Inc.*,
    2007 U.S. Dist. LEXIS 76915 (E.D.N.Y. October 17, 2007) ......................53

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..............................................................................41, 43

*In re "Agent Orange" Prod. Liab. Litig.*,
    818 F.2d 226 (2d Cir. 1987) ...........................................................39

*In re AOL Time Warner ERISA Litig.*,
    2007 U.S. Dist. LEXIS 79545 ................................................................52, 55

*In re Auction Houses Antitrust Litigation*,
    2001 WL 17092 S.D.N.Y. 511 (2d Cir. 2002) .............................................31

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    2015 U.S. Dist. LEXIS 37052  (S.D.N.Y. March 24, 2015)........................55

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ...........................................................25

*In re IPO Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) .............................................56, 60, 62

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
    2018 U.S. Dist. LEXIS 137433  (S.D.N.Y. Aug. 14, 2018) ........................52

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) .................................................................33, 34

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
    827 F.3d 223 (2d. Cir. 2016) ........................................................... PASSIM

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
    911 F.Supp. 135 (S.D.N.Y. 1996) .................................................................35

vi

*In re Union Carbide Corp. Consumer Products Business Securities Litigation*,
    724 F.Supp. 160 (S.D.N.Y. 1989) ...................................................39

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F.Supp.2d 503 (E.D.N.Y. 2003) ......................................20, 49

*Information Superhighway, Inc. v. Talk America, Inc.*,
    274 F.Supp.2d 466 (S.D.N.Y. 2003) ...........................................27

*Lawlor v. National Screen Service Corp.*,
    349 U.S. 322 (1955).........................................................17, 25, 26

*Lindy Bros. Builders, Inc. v. American Radiator, Etc.*,
    540 F.2d 102 (3rd Cir.1976) ........................................................36

*Lobur v. Parker*,
    378 Fed. Appx. 63 (2d Cir. 2010).................................................52

*Lomeli v. Securities & Inv. Co. Bahrain*,
    546 Fed. Appx. 37 (2d. Cir. 2013)................................................25

*McDaniel v. County of Schenectady*,
    595 F.3d 411 (2d Cir. 2010) ........................................................35

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
    473 U.S. 614 (1985).....................................................................26

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) ........................................................25

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).....................................................................34

*Perdue v. Kenny A.*,
    559 U.S. 542 (2010).........................................................41, 49, 62

*Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.*,
    68 F.3d 1478 (2d Cir.1995) .........................................................27

*Rodriguez v. Disner*,
    688 F.3d 645 (9th Cir. 2012) ........................................................................47

*Salomon Analyst Metromedia Litg.*,
    544 F.3d 474 (2d Cir. 2008) ........................................................................25

*Silbiger v. Prudence Bonds Corp.*,
    180 F.2d 917 (2d Cir. 1950) ..............................................................21, 47

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ....................................................19, 31, 33, 46

*Winninger v. SI Management L.P.*,
    301 F.3d 1115 (9th Cir. 2002) ............................................................36, 43

STATUTES

28 U.S.C.A. § 2072 .......................................................................................17, 26

FRCP Rule 23 ..................................................................................... PASSIM

FRCP Rule 23(a)(4) ............................................................................... 8, 33

FRCP Rule 23(b)(2) ............................................................................. PASSIM

FRCP Rule 23(b)(3) ............................................................................. PASSIM

FRCP Rule 23(e)(2)(A) .................................................................................33

FRCP Rule 23(e)(2)(D) ....................................................................... PASSIM

# **PRELIMINARY STATEMENT**

This appeal marks the second time this case has been before this Court.  In 2016, this Court overturned approval of an earlier settlement in which Class Counsel represented two separate and conflicting classes: a damages class and an injunctive relief class.  *In re Payment Card Interchange Fee and Merchant Discount Litigation*, 827 D.3d 223 (2d. Cir. 2016).  On remand, separate counsel was appointed to represent each class, which resolved some aspects of the conflict.  A settlement has now been reached for the benefit of the damages class, and this appeal concerns lingering issues arising out of the earlier conflict.

In the earlier settlement, the extended release was paired with forward-looking injunctive relief against future antitrust violations.  In this new settlement, the extended release is not combined with injunctive relief; instead, it bars claims for future antitrust misconduct, is unclearly bounded, and affects members of the damages class unevenly.

Further, the conflicts flagged by this Court in 2016 continue to plague the case, this time through the attorneys' fee award.  With the new settlement, Class Counsel seek compensation for all of their work performed on behalf of two adverse clients, despite clear precedent establishing they cannot be paid for conflicted representation, or for services that did not benefit their current clients.

1

Finally, the district court here approved excessive service awards to Class Plaintiffs -- awards the district court had itself earlier rejected. These awards reward Class Plaintiffs for activities unrelated to recovery of damages, and – due to wildly varying multipliers unsupported by findings – bear no discernable relationship to either damages or time spent in class-related duties. These awards raise important issues and provide this Court ready opportunity to define the standards courts should observe in granting class representative service awards, including whether such awards are even permissible.

# JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and diversity jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). This Court has appellate jurisdiction pursuant to Federal Rules of Civil Procedure rule 54(b) and 28 U.S.C. § 1291.

The district court issued its: Final Approval Order (approving Superseding Settlement Agreement) on December 13, 2019 (ECF 7818); Memorandum & Order (approving Superseding Settlement Agreement, Notice Plan, Class Notices, Plan of Administration and Distribution, and Class Certification) on December 16, 2019 (ECF 7821); Memorandum & Order (granting attorneys' fees and expenses) on December 16, 2019 (ECF 7822); Order (approving service awards) on December 16, 2019 (ECF 7823); and Judgment on December 20, 2019 (ECF 7832). Appellants Gnarlywood LLC and Quincy Woodrights, LLC timely filed their Notice of Appeal on January 8, 2020, and appellants Unlimited Vacations and Cruises, Inc., and USA Pets LLC timely filed their Notices of Appeal on January 10, 2020. ECF 7844 and 7848.

3

## STATEMENT OF ISSUES

1.      Did the district court abuse its discretion in approving the release of future claims for an undetermined period of time of at least six years, especially where no injunction has been achieved to prevent future violations?

2.      Does the settlement fail to treat "class members equitably relative to each other" as required by FRCP Rule 23(e)(2)(D)?

3.      Did Class Counsel and Class Plaintiffs provide inadequate representation by negotiating a settlement that favors older merchant class members over newer ones?

4.      Did the district court abuse its discretion by inadequately examining the first *Goldberger* factor of time and labor spent pursuing monetary recovery for the Rule 23(b)(3) class?

5.      Did the district court abuse its discretion by including in its lodestar cross-check Class Counsel's hours spent laboring under a conflict and performing services aimed at securing injunctive relief for a (b)(2) class that were of no benefit to the (b)(3) class?

6.      May one class be made to pay attorneys' fees for work performed for the benefit of a separate class with adverse interests?  Was it an abuse of discretion for the district court to order the (b)(3) damages class to pay attorneys'

fees based on time spent pursuing distinct benefits for the adverse (b)(2) class while operating under a deliberate and self-created conflict of interest?

7.     Can a (b)(3) damages class be charged for attorney time spent pursuing forward-looking legislative changes, regulatory amendments, and third-party prosecutions and litigation of no benefit to a damages class?

8.     Did the district court abuse its discretion by awarding Class Counsel attorneys' fees that represent a multiplier of more than ten times their non-conflicted lodestar?

9.     Did the district court abuse its discretion by awarding Class Counsel a fee that represents a positive multiplier for risk-free time?

10.    Is it permissible to base a service award on time spent pursuing relief of no value to the (b)(3) class being ordered to pay the award?

11.    Must a service award be reasonable in relation to the average class member's expected settlement recovery?

## STATEMENT OF THE CASE

The facts underlying this antitrust class action are as set forth in this Court's opinion in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 827 F.3d 223 (2d. Cir. 2016).

This action was filed in June 2005[1] on behalf of a "putative class of approximately 12 million merchants [alleging] that, among other things, defendants Visa U.S.A. Inc. ("Visa") and MasterCard International Incorporated ("MasterCard"), as well as issuing and acquiring banks (collectively the "defendants"), conspired to fix interchange fees in violation of Section 1 of the Sherman Act." *In re Payment Card*, 986 F.Supp.2d 207, 213 (E.D.N.Y., 2013). See also *In re Payment Card*, 827 F.3d 223, 227. The approximate number of class members is now 16.3 million. ECF 7821 at 8.

"Plaintiffs are merchants that accept or accepted Visa- and Mastercard-branded cards, and have alleged that Defendants harmed competition and charged the merchants supracompetitive fees by creating unlawful contracts and rules and by engaging in various antitrust conspiracies." ECF No. 7821, p. 1-2. The alleged

---

[1] "At the earliest stages of this litigation, multiple class actions, as well as individual lawsuits by large retailers, were filed against the Defendants. All actions were consolidated together into a multi-district litigation in 2005. … Since the initial consolidation a number of matters have been continuously added to the MDL, which now involves over seventy associated cases." ECF No. 7821, p. 1, fn. 1.

conspiracies, among other concerns, involved Defendants agreeing to a "combination of network rules" including "Honor-all-Cards rules"[2] and "anti-steering rules."[3] *In re Payment Card*, 986 F.Supp.2d 207, 214 (E.D.N.Y., 2013). Together these rules supported the charging of a "supracompetitive default interchange fee"[4] – which fee was ultimately borne by plaintiffs – on merchants' customer transactions utilizing Visa- and/or MasterCard-branded cards. Plaintiffs allege Defendants, through development of these rules and charging of the default interchange fee, sought to restrict market competition in violation of the Sherman Act and other antitrust laws.[5]

---

[2] The "Honor-all-Cards" rules require merchants who "accept *any* Visa- or MasterCard-branded credit cards to accept *all* cards of that brand, no matter what bank may have issued them and no matter the interchange fee." *In re Payment Card*, 986 F.Supp.2d 207, 214 (E.D.N.Y., 2013).

[3] "Anti-steering rules" "prohibit merchants from using price signals at the point of sale to steer customers to less costly forms of payment." *In re Payment Card*, 986 F.Supp.2d 207, 215 (E.D.N.Y., 2013).

[4] As described by the district court, "Class Plaintiffs allege that these rules insulate the Visa and MasterCard networks from competition with each other, from other brands and from other forms of payment, allowing Visa and MasterCard and the issuing banks to set supracompetitive default interchange fees." *In re Payment Card*, 986 F.Supp.2d 207, 220 (E.D.N.Y., 2013).

[5] Plaintiffs "complain that the combination of the Honor-all-Cards rules and the anti-steering rules … strips the issuing banks of any incentive to accept interchange fees lower than the default interchange fees. … Thus "default interchange," … becomes a fixed rate that applies to every credit card transaction [with very narrow exceptions for very large merchants who negotiate private

7

"The putative Rule 23(b)(3) class sought relief in the form of monetary damages, and brought the action along with a separate [Rule 23(b)(2)] class that sought equitable relief." ECF No. 7821, p. 1, fn. 1.

Procedural History: The *In re Payment Card* cases were consolidated in an MDL in 2005 in the E.D.N.Y. The first settlement, reached in 2012, was negotiated by Class Counsel on behalf of both a Rule 23(b)(3) class of merchants that accepted Visa and/or MasterCard from January 1, 2004 to November 28, 2012 and a Rule 23(b)(2) class comprised of merchants that accepted (or would accept) Visa and/or MasterCard from November 28, 2012 onwards; members of the Rule 23(b)(3) class were collectively eligible to receive up to $7.25 billion in monetary compensation, while the Rule 23(b)(2) class was to receive injunctive relief in the form of changes to Defendants' network rules. *In re Payment Card, supra,* 827 F.3d at 229.

In 2016, this Court vacated the district court's certification of the conflicted settlement class, reversed approval of the 2012 settlement, and remanded for further proceedings not inconsistent with its opinion. *Id.* at 240. In overturning the district court's approval of the 2012 settlement, this Court reminded that "Rule 23(a)(4)… requires that "the representative parties … fairly and adequately protect

---

interchange fees with issuing banks]." *In re Payment Card*, 986 F.Supp.2d 207, 214-215 (E.D.N.Y., 2013).

the interests of the class," [and] "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.,* at 231(citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n. 20 (1997)). This Court further found "the unitary representation of these plaintiffs was inadequate. Class representatives had interests antagonistic to those of some of the class members they were representing. The fault lines were glaring as to matters of fundamental importance." *In re Payment Card*, 827 F.3d at 234.

On remand, the district court permitted the same attorneys who had operated under the described conflict to continue to represent the Rule 23(b)(3) damages class as "Damages Class Counsel."[6] ECF 6754, p. 1. At the same time, the district court appointed separate counsel as "interim co-lead counsel for a putative class of plaintiffs seeking class certification pursuant to Rule 23(b)(2). ("Injunctive Relief Class Counsel")." ECF 6754, p. 1. The district court found the appointment of two separate sets of counsel "necessary as a result of the decision vacating an earlier class certification and settlement on the basis of a conflict of interest the court found to inhere in the appointment of counsel to represent all class plaintiffs." ECF 6754, p. 1.

---

[6] "Damages Class Counsel" and "Class Counsel" refer to the same group of attorneys.

9

On April 10, 2017, Injunctive Relief Class Counsel filed an Equitable Relief Class Action Complaint styled *Barry's Cut Rate Stores, Inc., et al., v. Visa, Inc., et al.*, seeking injunctive relief on behalf of the Rule 23(b)(2) class.  ECF 6910.

On November 6, 2017, Damages Class Counsel filed the currently controlling "Third Consolidated Amended Class Action Complaint" on behalf of the Rule 23(b)(3) class.  ECF 7123.  The settlement of claims set forth in that complaint are at issue in the instant appeal.

Following remand, the parties elected not to rescind the 2012 settlement, and Defendants left the net $5.7 billion fund created by the 2012 settlement in escrow. As a consequence, after the 2016 remand Class Counsel was litigating this case without significant risk owing to the escrowed $5.7 billion earmarked to fund an eventual Rule 23(b)(3)-only settlement.[7]

In September 2018, the parties reached a new monetary settlement on behalf of the Rule 23(b)(3) class ("2018 settlement").  ECF 7257-2.  The 2018 settlement largely incorporates terms of the 2012 settlement.  ECF 1656-1.  The 2018 settlement comprises settlement monies escrowed pursuant to the 2012 settlement,

---

[7] Per the 2018 settlement, Defendants were to add $900 million to the $5.7 billion in earlier escrowed settlement principal, bringing the settlement total to $6.6 billion, which after a $700 million opt-out takedown should have provided a net settlement fund of $5.9 billion.  It is not clear why the current net settlement fund is only $5.6 billion.  ECF 7822, p. 4-5.

plus an additional $900,000,000.  ECF 7257-2, p. 24.  The 2018 settlement could have been worth as much as $6.26 billion, but, after "opt-out reduction and expense takedowns," the settlement totaled only $5.6 billion – some $100 million less than the 2012 settlement's final total – despite spreading the net recovery across seven additional years of Defendants' antitrust violations.  ECF 7257-2, p. 21 of 284.  Memorandum and Order, ECF 7363, p. 12 of 88.

In exchange for the $5.6 billion, class members "release 'claims arising out of or relating to conduct or acts that were alleged or raised or that could have been alleged or raised relating to the subject matter of this litigation' that have accrued through the date of the Court's preliminary approval of the settlement, i.e., January 24, 2019*, and that 'accrue no later than five years after the Settlement Final Date'* [described as "the business day after the affirmation by any appeals court of this Court's final approval of the proposed settlement."]."  ECF 7363, p. 13 and fn. 15 (emphasis added).   See also ECF 7257-2, p. 34 of 284, ¶ 31(a).

Unlike the 2012 settlement, which provided injunctive relief against future violations, the 2018 settlement contains no injunctive terms – *i.e*., it does not in any way inhibit the Defendants from persisting in their patterns of antitrust misbehavior – and bars claims for ongoing violations for at least six years (the "Extended Release Period").

The value of each class member's claim is "based on the actual or estimated interchange fees attributable to the merchant's Mastercard- and Visa- payment card transactions from January 1, 2004, to January 24, 2019" (the "Claims Period"). ECF 7257-2, p. 221 of 284. The release period, however, extends to all claims for the period January 1, 2004, through a date five years following the uncertain Settlement Final Date (the "Release Period"). ECF 7257-2, p. 222. In other words, class members will recover based on damages suffered during a well-defined and limited period, but are forced to waive recovery of currently incalculable unaccrued future damages for a substantially longer period of at least six years, which results in the disproportionate distribution of settlement proceeds among class members.

Attorneys' Fees: From 2005 through 2013, Class Counsel racked up 500,000 hours of attorney and paralegal time while representing both the (b)(3) damages class *and* the (b)(2) injunctive relief class. When presenting their lodestar in connection with the 2012 settlement, Class Counsel did not differentiate between (b)(3) and (b)(2) hours – which by Class Counsel's own description included, among other endeavors, time spent:

- "developing a legislative strategy";

- "drafting and strategizing regarding legislative proposals that ultimately come to be called the Durbin Amendment";

12

- "travelling to Washington, D.C. … to meet with merchants and their counsel, and occasionally with senators and their staff, to assist with the efforts to get the Senate to adopt the Durbin Amendment … and literally dozens of telephone conference calls to discuss these efforts";

- "monitoring the [House] conference committee" regarding the passage of the Durbin Amendment;

- "development of a strategy to defeat the Tester amendment [including traveling] to Washington several times to meet with my clients and with the lobbying firm that [Class Counsel] had retained to assist us with the goal of assisting the merchants in persuading a sufficient number of senators to vote no on the Tester amendment" which effort was a complete failure;

- assisting in "development of rules by the Federal Reserve Board," preparing materials for submission to the FRB, and meeting and corresponding with the "staff at the Federal Reserve Board responsible for development of the [rules implementing Dodd-Frank/Durbin Amendment]";

- providing assistance to "lawyers for the FRB in formulating their response" to third party litigation efforts in an unrelated case;

- assisting in a "Department of Justice investigation";

13

- providing support of a Department of Justice antitrust investigation for "a sixteen-month period";

- by an attorney whose "principal" assignment for many months "was to respond to requests from lawyers at the Department of Justice or the states"; and

- preparing "merchants for their interview with the DOJ and the states and participated in the telephonic interviews."

ECF 2113-6, p. 36 – 46 of 138.

*All* of Class Counsel's hours spent between 2004 and 2013 on behalf of the separate (b)(2) class were resubmitted in 2019 as part of the lodestar supporting Class Counsel's inflated common fund fee request. The district court allowed all of these (b)(2) injunctive relief class hours, without discount, to be included in Class Counsel's lodestar, and ordered the (b)(3) damages class to pay attorney's fees generated for the sole benefit of the (b)(2) class. ECF 7471-1, p. 8, 10-14. ECF 7822, p. 4-5, 20.

Class Counsel now represent *only* the (b)(3) damages class, and time devoted to matters other than pursuit of damages – for instance time spent on injunctive relief or legislative changes, or in support of government prosecutions or third party litigation – is not properly included in Class Counsel's lodestar. Class Counsel made no effort to distinguish their Rule 23(b)(3)-specific lodestar from

14

their far more voluminous (b)(2) lodestar, claiming they could not possibly untangle (b)(2) work from (b)(3)-specific work.  The district court accepted this argument, and permitted Class Counsel to charge *all* of their pre-remand time – (b)(3) and (b)(2) alike – to the (b)(3) damages class, resulting in  an attorneys' fee overcharge of hundreds of millions of dollars.

Numerous class members objected to the settlement.  Appellants herein filed timely objections to both the settlement and the district court's fee awards, and appeared through counsel at the November 7, 2019 fairness hearing.  Appellants' objections specifically contested the future release provisions of the settlement, the inequitable distribution of settlement proceeds among class members, Class Counsel's fee request, and the request for service awards.  ECF 7617, p. 6 – 14, and 17 – 21.  ECF 7555, p. 2-9.

At the fairness hearing, objectors argued the extended release disproportionately impacted newer businesses.  As well, with reference to the attorneys' fee issue, counsel for Appellant Gnarlywood argued "the problem is that we don't have in [Class Counsel's] lodestar any discrimination between that which was spent [on (b)(2) and that which was spent [on] (b)(3)" and that "the (b)(3) class, [is] simply not obligated to compensate counsel" for hours expended on behalf of the (b)(2) class.  ECF 7822, p. 23 of 57, citing Hr.g Tr. 116:15-18, 117: 5-8.  Counsel for Appellant Unlimited Vacations argued Class Counsel was

15

seeking compensation "even for time spent [working] on things that aren't being settled here."  ECF 7822, p. 24 of 57, citing Hr.g Tr. 113: 7-8, and further objected to excessive service awards.

On various dates in December 2019 the district court overruled all class member objections, approved the settlement, awarded Class Counsel attorneys' fees of $523,269,585.27, and approved service awards of up to $200,000 for time and effort unrelated to this settlement.  ECF 7821, 7822 and 7823.

## SUMMARY OF ARGUMENT

### I.  THE SETTLEMENT.

The settlement is problematic because it releases unaccrued future antitrust claims without restraining Defendants' continuing antitrust misconduct, and because the scope of the release disproportionately impacts class members whose interests were not adequately represented by Class Plaintiffs.  The Federal Rules of Civil Procedure cannot be used to "abridge, enlarge or modify any substantive right."  28 U.S.C.A. § 2072.  Here, the Rule 23(b)(3) settlement prevents the effective vindication of future claims by proscribing action against Defendants for their future antitrust violations.  ECF 7257-2, p. 34.  The settlement's release provision imposes "a prospective waiver of a party's right to pursue statutory [antitrust] remedies," which is against public policy.  *American Exp. Co. v. Italian Colors Restaurant* 570 U.S. 228, 234 – 235 (2013).

The district court abused its discretion under Rule 23 by approving a settlement that abridges plaintiffs' collective and individual rights to bring claims against Defendants for future antitrust misconduct.  These claims, which did not exist at the time of the court's order and could not possibly have been sued upon in this case, may not be extinguished by order of the district court.  *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 328 (1955).  ("Judgment [precluding] recovery on claims arising prior to its entry … cannot be given the

17

effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.")

Rule 23(e)(2)(D) requires that a settlement proposal treat "class members equitably relative to each other." Importantly, the district court should consider "*whether the scope of the release may affect class members in different ways that bear on the apportionment of relief*." Fed. R. Civ. P. 23 Committee Notes on Rules – 2018 Amendment, Subdivision (e)(2), paragraphs (C) and (D).

The Claims Period is not coextensive with the much longer Release Period, and several years of unaccrued future claims are released without remedy. For many newer merchants, damage claims are limited to a much shorter period than the Extended Release Period, while older businesses will recover for 15 years of damages, suffering a substantially lesser proportionate impact from the Extended Release Period. In order to be fair, the Claims Period should be coextensive with the Release Period. It is not, and the resulting inequity in the apportionment of relief among class members is such that Rule 23(e)(2)(D) requires rejection of the settlement.

The inequitable allocation of settlement proceeds results from inadequate representation of the newer merchant class members. The interests of those with relatively greater uncompensated future claims released by the settlement are not aligned with the interests of Class Plaintiffs, all of which are old businesses that

18

have been accepting Defendants' cards for at least the past 15 years. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 113 (2d Cir. 2005). ("Where different claims within a class involve the identical factual predicate, adequate representation of a particular claim is determined by the alignment of interests of class members.")

The district court abused its discretion by disregarding Class Plaintiffs' inadequate representation of the interests of those class members required to give up future claims that may be much more substantial than their compensated claims. This is no small group. Each new business class member swept into this case by the post-remand expansion of the class – approximately 4.3 million merchants – will be disadvantaged by this settlement and was inadequately represented by the Class Plaintiffs.

## II.    ATTORNEYS' FEES.

The district court failed to adhere to the six-step process for calculating attorneys' fees established by this Court in *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir. 2000). The first step in every *Goldberger* fee analysis must be an adequate examination of the time and labor expended by counsel in pursuit of its clients' interests. Here, however, the district court abused its discretion by entirely disregarding its obligation to properly consider this primary *Goldberger* factor.

19

In its cursory review of Class Counsel's time and labor, the district court permitted inclusion of hundreds of thousands of hours of attorney time spent pursuing the interests of the adverse (b)(2) injunctive relief class, including a vast amount of time spent pursuing legislative changes, supporting government investigations and prosecutions, and participating in unrelated third-party litigation. ECF 7471-2, p. 6, ECF 7471-1, p. 16-18 and 13-14, and ECF 2113-6, p. 30-42.

Class Counsel made no effort to calculate or even estimate that portion of their lodestar devoted to pursuit of injunctive and legislative relief. Instead, Class Counsel chose to maximize their lodestar, enlarge their fee, and gouge their (b)(3) class clients. In a Circuit that aspires to the minimization of attorneys' fees, this conduct alone is grounds for denial of any fee.

The district court awarded Class Counsel a fee of $523.2 million, ($470 million more than Class Counsel's non-conflicted lodestar, and representing a lodestar multiplier of more than 10) for what was essentially risk-free time spent pursuing the 2018 settlement. Judge Gleeson previously characterized a request for a similar multiplier in a class action against Visa and Mastercard as "absurd." *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 522 (E.D.N.Y. 2003). In this case, it is not only absurd, it is unethical. The district court's acceptance of all Class Counsel's hours accrued since 2005 resulted in the (b)(3)

class being charged for work performed not for its benefit, but for the prospective benefit of the adverse (b)(2) class.

Second Circuit law is clear: a lawyer simultaneously representing two clients with adverse interests is entitled to no attorney's fees from either. *Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917 (2d Cir. 1950). This Court held in 2016 that Class Counsel had an irreconcilable conflict of their own making, and Class Counsel could not simultaneously represent both the (b)(3) and (b)(2) classes. Class Counsel's solution on remand was to abandon the (b)(2) class, and then to charge the (b)(3) class for pre-remand time spent litigating on behalf of the adverse (b)(2) class. Usually, charging one client for work performed on behalf of another client would earn an attorney a reprimand, if not a suspended license. Of course, ordinarily, the client would notice the overcharge and complain. In this case, however, Class Plaintiffs are receiving unearned payoffs of up to $200,000 for their own work performed on behalf of the (b)(2) class, and, not unremarkably, they have acceded to Class Counsel's fee.

The conflict here did not arise outside of Class Counsel's control; from the outset, Class Counsel defined and represented both the adverse Rule 23(b)(3) and Rule 23(b)(2) classes. Based on 2013 affidavits in support of their fee motion, Class Counsel spent the great majority of their pre-2016 time pursuing legal and regulatory changes, with only relatively modest time devoted to recovery of

damages. In 2013, Class Counsel felt no need to accurately apportion their time between the two adverse subclasses. After this Court reversed and remanded based on the conflict, Class Counsel remained determined to charge the (b)(3) damages class for the entire amount of their conflicted lodestar. This hubris begs this Court's application of its longstanding prudential rule barring recovery of attorney's fees for time billed during a conflict.

The district court also abused its discretion in assessing the *Goldberger* risk factor. The risk meter stopped running for (b)(3) Class Counsel following this Court's 2016 remand. Class Counsel claim they generated a post-remand lodestar of $52 million, yet all that time was essentially risk-free, because the 2012 settlement monies remained in escrow pending a new settlement agreement. The only legitimate purpose of running up an additional $52 million in lodestar would be to increase the amount of the settlement, but the final amount of the current settlement is $100 million *less* than the net amount of the 2012 settlement. Class Counsel seek to charge the (b)(3) class for $52 million of unproductive legal work performed at no risk, and then to multiply that amount by a factor of more than ten. Considering their conflict and the lack of significant risk, Class Counsel's fee should be limited to no more than the amount of their post-remand lodestar, without a multiplier.

III.     SERVICE AWARDS.

The district court abused its discretion in awarding excessive service awards to the (b)(3) Class Plaintiffs that: (1) are up to 100 times larger than their claims; (2) compensate for hours spent on unrelated and unproductive tasks; (3) compensate for hours that did not result in loss of wages/income; and (4) compensate for hours spent pursuing the interests of an adverse subclass.  Courts in this Circuit, including Judge Gleeson when denying these same excessive incentive award requests in 2014, require that incentive awards be reasonable relative to the amount of the class representative's claim.

In this Circuit and nationwide, courts have limited incentive awards to reflect a class representative's time taken away from remunerative work, in the form of lost wages or income.  Here, there was no proof offered that Class Plaintiff Schumann lost *any income* from his part-time business as a result of the hours he devoted to this case, yet he was awarded $200,000 at a rate of $217/hour.

The award of $200,000 to Class Plaintiff Goldstone for 4,680 hours updating his blog and tweeting about the credit card industry offends reason.  It is clear from Class Counsel's 2013 filings that most of Mr. Goldstone's work was aimed at achieving legislative and regulatory changes, not at maximizing the recovery of damages by the (b)(3) class.  Mr. Goldstone participated in a public relations campaign to get lawmakers' attention, but played no part in the recovery of

23

damages.  Thus, Mr. Goldstone should have been named as a (b)(2) class representative and should make his case for an incentive award if and when that case is settled.

There is no evidence that either Mr. Schumann or Mr. Goldstone contributed in any way to the recovery of (b)(3) damages, and there is no sound basis for charging the (b)(3) damages class for any of their time.  The excessive incentive awards are all the more untenable in light of the recipients' spectacular failure to perform their primary duty to supervise Class Counsel.  No Class Plaintiff has challenged Class Counsel's wrongful overcharging of the (b)(3) damages class.  Instead, Class Plaintiffs were compliant "figureheads,"[8] indifferent to the overreach on fees because Class Counsel cut them in.

Finally, no Class Plaintiff should receive any multiplier on the demonstrated loss of income or wages.

---

[8] *Goldberger* at 53.

## **ARGUMENT**

### I.   **CLASS MEMBERS HAVE BEEN DISARMED OF A REMEDY FOR FUTURE ANTITRUST VIOLATIONS.**

Review of a district court's approval of a class action settlement is for

abuse of discretion. *Lomeli v. Securities & Inv. Co. Bahrain*, 546 Fed.Appx. 37,

40 (2d. Cir. 2013). *Charron v. Wiener*, F3d 241, 247 (2d Cir. 2013). "A district

court abuses its discretion when its decision rests on an error of law or a clearly

erroneous factual finding, or when its decision cannot be located within the range

of permissible decisions." *Id.*

Review of "legal standards applied by the district court and the court's

other legal conclusions is *de novo*." *Myers v. Hertz Corp*., 624 F.3d 537, 547 (2d

Cir. 2010) (citing In re *Salomon Analyst Metromedia Litg.,* 544 F.3d 474, 480 (2d

Cir. 2008); *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 32 (2d Cir. 2006).

The public interest favors "vigilant enforcement of the antitrust laws

through the instrumentality of the private treble-damage action." *Lawlor v.

National Screen Service Corp.*, 349 U.S. 322, 329 (1955).

While Injunctive Relief Class Counsel continue to litigate on behalf of the

(b)(2) class, the settlement imposes no restraints on Defendants' continuing

antitrust misconduct. Yet the district court has authorized the release without

25

redress of the (b)(3) class's future antitrust claims that will continue to accrue throughout the Extended Release Period.

The Federal Rules of Civil Procedure cannot be used to "abridge, enlarge or modify any substantive right." 28 U.S.C.A. § 2072. Here, the settlement prevents the effective vindication of future claims by proscribing action against Defendants for their continuing antitrust misconduct. ECF 7257-2, p. 34. The settlement's release provision is against public policy because it effectively imposes "a prospective waiver of a party's right to pursue statutory [antitrust] remedies." *American Exp. Co. v. Italian Colors Restaurant* 570 U.S. 228, 234-235 (2013).

"Courts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or any other contract." *Id.*, at 244 (Kagan, J., dissenting), citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc*., 473 U.S. 614, 637, and n. 19 (1985).

The district court misinterpreted governing law, and abused its authority under Rule 23, in approving a settlement that waives class members' collective and individual rights to bring as yet unaccrued claims against Defendants for their ongoing antitrust misconduct. These claims did not exist at the time of the court's order and could not possibly have been sued upon in this case; and the district court has exceeded its authority by ordering their extinguishment. *Lawlor*

26

*v. National Screen Service Corp.*, 349 U.S. 322, 328 (1955). ("Judgment [precluding] recovery on claims arising prior to its entry [ ] cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."). *See also Information Superhighway, Inc. v. Talk America, Inc*. 274 F.Supp.2d 466, 471 (S.D.N.Y. 2003) ("Numerous courts have held general releases inapplicable to conduct subsequent to the execution of the release"), *citing Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1485 (2d Cir.1995) ("Although the releases shield the [defendants] from any liability for any conduct through their effective dates, they do not protect the [defendants] from liability arising from any subsequent conduct.").

This Court reviews this issue *de novo,* and owes no deference to the district court's shortcutting on this fundamental principle. Because Class Plaintiffs lack Article III standing to assert or to release future claims belonging to absent class members, the district court lacked jurisdiction to approve the settlement's release of future claims.

27

**II. THE SETTLEMENT DISADVANTAGES NEWER MERCHANTS RELATIVE TO OTHER CLASS MEMBERS AND IS NOT FAIR WITHIN THE MEANING OF RULE 23.**

Compounding the injury caused by the release of unaccrued claims, the extended release favors older merchants over newer merchants.  The settlement compensates only past money damages suffered during the Claims Period, but releases Defendants from liability for both the Claims Period and the expandable Extended Release Period.  Some class members have substantial past claims but no future claims, while others have only modest past claims but may have substantial future claims.  The net settlement fund is to be distributed to claimants pro rata according to their relative transaction volume during the Claims Period only.   This ordinarily acceptable pro rata distribution of funds is rendered unfair, however, by the disproportionate impact of the settlement's release provisions – which extend well beyond the Claims Period, and which fail to treat class members equitably relative to each other, as required by Rule 23(e)(2)(D).  Moreover, this inequitable treatment indicates Class Counsel and Class Plaintiffs failed to adequately represent the interests of all class members.

28

### A.     Rule 23(e)(2)(D): inequitable impact of release.

The release language purports to release Defendants for both past and future antitrust misconduct for an *undetermined* period – undetermined because the Extended Release Period end date is calculable only when the settlement becomes final, which may be some years in the future.   The settlement does not in any way inhibit Defendants from persisting in patterns of antitrust misbehavior, yet deprives class members of any remedy for these future antitrust violations that will continue to undermine competition and injure class members.

The burden of the extended release is inequitable when considered from the perspective of merchants who became class members toward the end of the Class Period, and who will recover pro rata on only a few years or months of transactions, but may have far greater transactional charges during the Extended Release Period, for which they will recover nothing.  The district court's Memorandum and Order acknowledged the inherent unfairness of this allocation: "a class member that became a merchant for only the last several months [of the claim period] would receive very small remuneration but have to release claims for a number of years." ECF 7821, page 58.

The Class Plaintiffs designed the settlement allocation to favor older merchant class members like themselves.  Each of the Class Plaintiffs incurred Interchange Fees from January 2004 through January 24, 2019 – a period of 15

29

years.  Therefore, if the future release expires by December 2025 (*i.e.* six years

from the district court's approval order), each Class Plaintiff will:  (1) receive a

settlement payment based on 15 years of paying Interchange Fees; and (2) release

21 years of claims.  In other words, each Class Plaintiff will be compensated based

on 71.4% of its damages during the Release Period.

By contrast, a merchant who began accepting Visa and Mastercard on

January 1, 2019 will receive a settlement payment based on one month of

transactions, but will release claims for a period of six years and one month.  ECF

7257-1, p. 11 of 51.  This hypothetical new merchant will recover compensation

based on less than two percent (i.e. 1.37%) of its damages suffered during the

Release Period.

Rule 23(e)(2)(D) requires a settlement proposal treat "class members

equitably relative to each other."  The drafting committee regarded as a matter of

particular concern "whether the apportionment of relief among class members

takes appropriate account of differences among their claims, and *whether the scope*

*of the release may affect class members in different ways that bear on the*

*apportionment of relief*."  Fed. R. Civ. P. 23 Committee Notes on Rules – 2018

Amendment, Subdivision (e)(2), paragraphs (C) and (D).  In this case, the Claims

Period is not co-extensive with the Release Period, and the distribution of the

settlement disfavors those with briefer participation in the Claims Period.  In other

words, the scope of the release affects class members in a way that bears on the apportionment of relief relative to actual damages.

The district court failed to address this argument, disregarding "the key point that an expanded release requires the allocation of at least some of the settlement consideration to the holders of the claims prejudiced by the expansion …" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 112 (2d Cir. 2005), citing *In re Auction Houses Antitrust Litigation,* 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) (2d Cir.2002).

### B. The opt-out right does not relieve the court of the burden to ensure the settlement is fair to all class members.

Rather than requiring a modification to address the lopsided distribution, the district court merely noted "For those merchants, they may have assessed that it is not worthwhile to join the class." ECF 7821, p. 58.

The right to opt out can be practically exercised only by those merchants whose claims can justify the substantial expense of pursuing separate litigation against the Defendants. Several large merchants *have* opted out of the settlement, taking with them large swaths of the gross settlement proceeds as opt-out take down reductions. It is the smaller merchant to whom "economic reality dictates that petitioner's suit proceed as a class action or not at all.*" Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974).

31

Appellants are practically compelled to participate in the settlement or walk away without compensation. This is not a question of how much money is being recovered by the settlement; it is a matter of how the proceeds of settlement should be equitably distributed to class members according to the impact of the Extended Release Period.

Having acknowledged the inequity of the distribution, the district court's reference to the right to opt out does not make the distribution of settlement proceeds any more equitable; rather, it is a clear indication of the settlement's lack of fairness and the district court's abuse of discretion in granting approval. The unfair settlement and its inequitable plan of distribution can be remedied in at least three ways: (1) eliminating the future release; (2) extending the Claims Period to make it co-extensive with the Release Period; or (3) delaying final approval pending resolution of the Rule 23(b)(2) claims in *Barry's Cut Rate Stores*, etc. The drafters of Rule 23(e)(2)(D) were fully aware of the right to opt out when they drafted the rule requiring equitable allocation. The opt-out right, a feature of every Rule 23(b)(3) class action, does not permit the district court to ignore this settlement's patent inequity.

**C.** **The Class Plaintiffs failed to adequately represent the class as required by Rule 23(a)(4).**

Class Plaintiffs' authority to settle claims is "limited by … "adequacy of representation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 107 (2d Cir. 2005). The adequacy of representation requirement is codified by Rule 23(a)(4) and 23(e)(2)(A).

To satisfy the Rule 23 adequacy requirement, the named plaintiffs must "possess the same interests and suffer the same injuries as the class members." *In re Literary Works in Elec. Databases Copyright Litig.* 654 F.3d 242, 249 (2d Cir. 2011), *quoting Amchem Prods., Inc. v. Windsor* 521 U.S. 591, 625-626 (1997). Here, the release of future antitrust claims arising out of unaccrued future injury without a corresponding remedy has resulted in the lack of uniformity and alignment of interest among class members.

Each Class Plaintiff is a business started before the filing of this lawsuit and each is a member of the subclass that will receive maximum available recovery relative to their released claims. As explained above, for newer merchants, the ratio of Claims Period damages to Extended Release Period damages will be much lower. Newer class members were not adequately represented by Class Plaintiffs whose interests are aligned with old merchant class members. Class Counsel should have recognized the need for a sub-class representing the interests of newer merchants, recruited one or more lead plaintiffs that came into existence after the

33

original 2012 settlement, and appointed those plaintiffs to represent the interests of

newer merchants.   The conflict between holders of present claims and holders of

future claims harkens back to the conflicts addressed by the Supreme Court in

*Amchem , supra* and *Ortiz v. Fibreboard Corp*., 527 U.S. 815 (1999).  In *Amchem*

the court found "the interests of those within the single class" were "not aligned":

holders of present claims were interested in "generous immediate payments,"

whereas holders of future claims sought to ensure "an ample, inflation-protected

fund for the future." *In re Literary Works* 654 F.3d at 250, *citing Amchem*, at 626.

The original Class Plaintiffs' representation of class members with an imbalance of

damages between the Class Period and the Extended Release Period is inadequate,

and violates Due Process.

### III. THE $523,269,585 ATTORNEYS' FEE AWARD IS GROSSLY EXCESSIVE.

#### A. The fee award forces the (b)(3) damages class to pay for legal services provided to a separate, adverse class that did not enhance the monetary recovery.

Attorneys' fee awards are commonly reviewed for abuse of discretion. *Goldberger v. Integrated Resouces, Inc.,* 209 F.3d 43, 47 (2d Cir. 2000). "[A]n abuse of discretion occurs when "the court's decision rests on an error of law (such as an application of the wrong legal principle)." *CARCO GROUP, Inc. v. Maconachy,* 718 F.3d 72, 79 (2d Cir. 2013) (citing *McDaniel v. County of Schenectady*, 595 F.3d 411, 416 (2d Cir. 2010)).

The district court's fee award must be reversed because of its defective *Goldberger* analysis and its inadequate lodestar cross-check.

Under *Goldberger,* "the attorneys whose efforts created the fund are entitled to a reasonable fee … to be taken from the fund." *Goldberger v. Integrated Resources, Inc.* 209 F.3d 43, 47 (2d Cir. 2000). That fee, however, may compensate Class Counsel *only* for work in "representing [that class's] interest." *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 125 (1885) (emphasis added). "Attorneys' fee awards from a common fund depend on whether the attorneys' 'specific services benefitted the fund – whether they tended to create, increase, protect or preserve the fund.'" *In re Prudential Sec. Inc. Ltd.*

35

*Partnerships Litig.* 911 F.Supp. 135, 141 (S.D.N.Y. 1996), *quoting Lindy Bros. Builders, Inc. v. American Radiator, Etc.*, 540 F.2d 102, 112 (3rd Cir.1976).

It is undisputed that from 2005 through 2016, Class Counsel performed services for two adverse subclasses without distinguishing time spent on behalf of the (b)(3) subclass from time spent working for the (b)(2) subclass or on other unrelated concerns. Many courts have denied attorneys' fees for efforts aimed at pursuing collateral actions that don't confer a benefit on the class. *See, e.g., Churchill Village, L.L.C.*, 361 F.3d 566, 577 (9th Cir. 2004) (refusing to award fees to attorneys who pursued related but ultimately unsuccessful litigation in Florida; *Winninger v. Sl Management L.P.*, 301 F.3d 1115. 1126 (9th Cir. 2002) (affirming district court's decision to refuse to award fees for the unsuccessful efforts of counsel).

The $161.7 million lodestar Class Counsel claimed in 2013 included enormous amounts of time spent in pursuit of injunctive relief, extra-judicial legislative changes, and support of third-party investigations and litigations, not Rule 23(b)(3) damages. ECF 7471-2, p. 6, ECF 7471-1, p. 16-18, and 13-14 of 46, and ECF 2113-6, p. 30-42. The 2012 settlement agreement contains 27 pages of negotiated rule changes and restrictions on Defendants' future conduct achieved on behalf of the (b)(2) class. ECF 1656-1, p. 39 – 66. These constitute injunctive relief obtained for the (b)(2) class which did nothing to increase the (b)(3) common

36

fund.   ECF 2113-6, p. 36 of 138, para. 107.  The (b)(2) rule modifications
negotiated as part of the 2012 settlement are entirely absent from the current
settlement; Class Counsel nevertheless seeks compensation for their earlier efforts
aimed at securing this relief.

The 2012 settlement agreement defined "Attorneys' Fee Awards" to mean
"all attorneys' fees that are awarded by the [district court] to Class Counsel or
other counsel in the Class Actions for work performed for the benefit of members
of the Rule 23(b)(3) Settlement Class _**or**_ the Rule 23(b)(2) Settlement Class."  ECF
1656-1, p. 10 of 379, para. 1(b) (emphasis added).   The use of the disjunctive "or"
clearly indicates that in 2013 Class Counsel understood the distinction between
legal work provided to benefit the (b)(3) damages class and that provided to benefit
the (b)(2) class.

The 2018 settlement agreement neatly glosses over the distinction among
classes by ducking the issue and broadly defining "Attorneys' Fee Awards" as "all
attorneys' fees that are *awarded by the Court* to Rule 23(b)(3) Class Counsel or
other Rule 23(b)(3) counsel in the Class Actions *for work performed in connection
with MDL 1720*."  ECF 7257-2, p. 10 of 284, para. 3(d) (emphasis added).  The
2018 agreement vaguely references all work in connection with MDL 1720,
without regard to whether that work benefitted the (b)(3) damages class being
asked to pay for it, or the separate interests of the (b)(2) class that continues to seek

37

distinct and separate relief. *See In re Payment Card*, 827 F. 3d 223, 236 (2016).

("Structural defects in this class action created a fundamental conflict between the

(b)(3) and (b)(2) classes … the only unified interests served by herding these

competing claims into one class are the interests served by settlement: (i) the

interest of class counsel in fees … .")

The important distinction between the two classes and the work provided in

support of their separate interests – identified by this Court in *In re Payment Card*,

*supra* – was knowingly obscured by Class Counsel and disregarded by the district

court in its calculation of Class Counsel's (b)(3) common fund fee.   As a result,

the district court awarded excessive and demonstrably unreasonable fees to Class

Counsel, forcing the (b)(3) damages class to pay for time spent advocating on

behalf of an adverse class client.

## B.    The district court failed to properly perform the required *Goldberger* analysis.

The roadmap for determining what constitutes a reasonable common fund

fee was drawn by this Court in *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50

(2d Cir. 2000).   *Goldberger* confirmed a common fund award could be calculated

by using either a lodestar method or a percentage of fund method.   Whichever path

a district court chooses, however, *Goldberger* reminds that district courts must

"continue to be guided by the traditional criteria in determining a reasonable

common fund fee, including: "(1) the time and labor expended by counsel; (2) the

magnitude and complexities of the litigation; (3) the risk of the litigation …; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."" *Goldberger* at 50, citing *In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 724 F.Supp. 160, 163 (S.D.N.Y. 1989) (summarizing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ("*Grinnell I*") and *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977) ("*Grinnell II*")).

In *Goldberger*, this Court reiterated that the "starting point of every fee award, once it is recognized the court's role in equity is to provide just compensation for the attorney, *must be a calculation of the attorney's services in terms of the time he has expended on the case*. Anchoring the analysis to *this concept is the only way of approaching the problem that can claim objectivity*, a claim which is obviously vital to the prestige of the bar and the courts." *Grinnell I.* at 470 (emphasis added). See *Goldberger* at 50.

Only after a district court has considered the time and labor expended by counsel can it proceed to analyze less objective *Goldberger* factors to determine whether an enhancement or multiplier is in order. *Goldberger* at 54 ("We have historically labeled the risk of success as "perhaps the foremost" factor to be considered in determining whether to award an enhancement." Citing *In re "Agent*

*Orange" Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987), quoting *Grinnell I*, 495 F.2d at 471.)

In making its fee award, the district court abused its discretion by allowing inclusion of time spent on behalf of the Rule 23(b)(2) class, thereby failing to meaningfully consider the first *Goldberger* factor of time and labor spent by Class Counsel in representing the (b)(3) damages class.

In the memorandum in support of their fee request, Class Counsel include all their pre-2013 time – totaling approximately 500,000 hours[9] – along with an additional 130,000 hours spent post-remand, for a total of 630,000 hours of combined legal effort spent in the MDL.  ECF 7471-1, p. 8 of 46.

Plaintiffs' fee memorandum describes pre-remand services to include "petition[ing] all three branches of the Federal Government and Monitor[ing] Foreign Governments on Behalf of the Class," "draft[ing] an *amicus* brief" in third party litigation, filing "an additional *amicus* brief in that same third party matter, and providing "substantial assistance" to the DOJ. ECF 7471-1, p. 16-18, and 13-14.  None of this activity successfully contributed to the recovery of monetary

---

[9] In making its application for the Phase One attorneys' fees, Class Counsel described to the Court that Class Counsel and Class Supporting Counsel had expended work that supported a "total lodestar" of $161,681,596.07.  Declaration of Thomas J. Undlin in Support of Class Plaintiffs' Joint Motion for Award of Attorneys' Fees, Expenses and Class Plaintiffs' Awards, ECF 2113-2, p. 9 of 40, ¶ 12.

damages for the (b)(3) damages class.[10]  *Cf. Hensley v. Eckerhart*, 461 U.S. 424,

436 (1983) (if plaintiff has achieved only partial or limited success, including all

hours spent on litigation as a whole in lodestar is improper.  "[W]ork on an

unsuccessful claim cannot be deemed to have been "expended in pursuit of the

ultimate result achieved." *Id*., at 435, *citing Davis v. County of Los Angeles*, 8

E.P.D. ¶ 9444, at 5049 (CD Cal.1974).

Class Counsel's more recent description of Rule 23(b)(2) efforts is dwarfed,

however, by the recitation of services provided to the (b)(2) class in the 2013

Declaration of K. Craig Wildfang, of Co-Lead Class Counsel firm Robins, Kaplan,

Miller & Ciresi LLP, in support of Class Counsel's 2013 fee request.  ECF 2113-6.

There, Mr. Wildfang described the class action's "***primary goals were to reform

the market*** by eliminating the horizontal agreements among the banks to fix the

levels of interchange fees and enforce the rules that we were challenging."  ECF

2113-6, p. 9, para. 24 (emphasis added).  He further admitted that **"*recovery of

money damages had always been only a secondary goal of the litigation*."**  ECF

2113-6, p. 64, para. 186 (emphasis added).  Mr. Wildfang even acknowledges

---

[10] If and when the *Barry's Cut Rate Stores* action settles, Class Counsel may seek
compensation of their (b)(2) lodestar through that action.  Of course, attorneys'
fees in an injunctive relief class action are limited to class counsel's lodestar with
no multiplier.  *See Perdue v. Kenny A.*, 559 U.S. 542 (2010).  Plainly it serves
Class Counsel's economic interest to include as much of their (b)(2) lodestar as
possible in the b(3) fee calculation in order to obtain a multiplier on that time.

some of the work done for the (b)(3) damages class redounded to the benefit of the (b)(2) class – not the other way around.  ECF 2113-6, p. 47, para. 133.  ("Finally, the inter-network conspiracy claim and the claims relating to the no-surcharge rule – for which plaintiffs previously sought damages and injunctive relief – were converted to claims for injunctive-relief only.")  In addition to general descriptions and references throughout his declaration, Mr. Wildfang spent a full 13 pages explaining the extensive efforts he and his team spent in support of interests of the (b)(2) class between 2005 and 2013.[11]  For his own services – devoted specifically to the achievement of Rule 23(b)(2) injunctive relief or legislative changes – Mr. Wildfang alone rang up $8,225,856.25,[12] or more than five percent of Class Counsel's 2013 lodestar.[13]  Using the district court's 2.31 multiplier, the (b)(3) damages class has been ordered to pay $19 million for Mr. Wildfang's services to another client.

At the 2019 Fairness Hearing, Mr. Wildfang claimed "it's impossible to segregate time that benefitted an injunctive relief class from the damages class.

---

[11]  ECF 2113-6, p. 30-42.

[12]  See RKMC Billing Summary, ECF 2113-2, p. 37-38.

[13]  In connection with the 2012 settlement Class Counsel was awarded a calculated a lodestar of $160,000,000 against some 500,000 hours of legal work.  ECF 6169, p. 2.

The same effort went in to proving liability and damages that went into pursuing injunctive relief." Fairness Hearing Tr., p. 135. The district court failed to even ask whether *any* efforts were made to distinguish between services provided to the separate clients,and ignored that "the fee applicant bears the burden of establishing entitlement to an award and documenting the *appropriate hours expended*… ." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (emphasis added). *See also, Winninger v. SI Management L.P.* 301 F.3d 1115, 1125 (9th Cir. 2002) ("party petitioning for attorneys' fees necessarily bears the burden of persuasion on the elements of that claim.") Of course, when an attorney creates a situation in which it is impossible to accurately bill separate clients, such as happened here with conflicted simultaneous representation, the remedy is to preclude the recovery of any attorney's fees from either client. *See sub*-Section III.c, *infra*.

A further example is drawn from the substantial efforts of Class Counsel's "ASR Group"[14] of attorneys that, according to the declaration of attorney Thomas J. Undlin of lead counsel firm Robbins Kaplan LLP, was dedicated to "litigating a challenge to the [defendants'] networks' "anti-steering" rules." ECF 7471-2, p. 6. The ASR Group was not involved in pursuing money damages for the (b)(3)

---

[14] The ASR firms included Friedman Law Group and "Reinhardt Wendorf & Blanchfield, Chestnut & Cambronne, P.A., Starr Gern Davison & Rubin P.C., Chitwood Harley & Harnes LLP, Murray Frank & Sailer, Markun Zusman & Compton, LLP and Bolognese & Associates." ECF 7471-2, p. 7, fn. 4.

damages class, yet was promised it would "receive a share of attorneys' fees awarded, if any, consistent with the share of their efforts as reflected in reported and approved lodestar." *Ib.* at 6. The combined Phase One lodestar for the ASR Group was $17,839,757.14. ECF 2113-2, p. 17-18. Applying the multiplier of 2.31, the ASR Group will receive fees of $41,209,839 for its work in pursuit of Rule 23(b)(2) relief, which is to be wrongfully charged to the (b)(3) damages class.

Between the ASR Group's charges and Mr. Wildfang's charges alone, the Rule 23(b)(3) damages class has been charged over $60,000,000 for work not performed in its service. Coming up with these numbers does not require a detailed lodestar audit – one merely has to look at the 2013 declarations to understand the fees were generated in direct service to the (b)(2) injunctive relief class. Instead, disregarding this Court's opinion in *In re Payment Card*, 827 F. 3d 223, and without any effort toward distinguishing between legal services provided to the separate classes, the district court accepted Class Counsel's entire pre-remand lodestar without reduction.

In its fee award the district court rejected "the notion that "there was a lot of time that was spent here that did not help the [(b)(3)] class."" "[T]he injunctive relief achieved under the 2013 Settlement Agreement remains in place, even though it can be altered." ECF 7822, p. 24 of 57. Irrespective of earlier failed efforts toward achieving injunctive relief, Class Counsel cannot be credited with

44

the value of any relief obtained on behalf of the (b)(2) class, or for their time spent obtaining that relief.

The district court's superficial "time and labor" analysis makes no specific finding regarding Class Counsel's claimed lodestar of $214,801,410 based on 658,900 billed hours.[15] ECF 7822, p. 20 of 57. The district court granted an adjusted lodestar of $213,348,555,[16] its only adjustment being a disallowance of $1,452,855 of Freidman Law Group's ("FLG") lodestar for the period December 2012 through January 2019 – correctly disallowing FLG's time spent pursuing Rule 23(b)(2) and legislative objectives.[17] ECF 7822, p. 52 – 53. The district court failed to take the same razor to any other firm's lodestar.

---

[15] These numbers are the sum of "over 630,000 hours of attorney and paralegal time through January 31, 2019, which Class Counsel calculated to amount to a lodestar of $204 million," plus 28,900 hours, "amounting to a lodestar of $11,047,661" attributable to the Friedman Law Group LLP ("FLG").

[16] It should also be noted: the district court found "after conducting a lodestar cross check, that a slight reduction is warranted due to certain hourly rates." No such lodestar reduction is evidenced anywhere in the fee award order. ECF 7822, p. 55 of 57.

[17] The district court found "Because the majority of FLG's [post-remand] hours *were spent working on anti-surcharge legislation efforts* and because it appears that FLG has and/or will receive compensation for these efforts … the [district court] is unable to discern what percentage, if any of FLG's [post-remand] lodestar, if any, should be considered for the purposes of deciding the fee application." ECF 7822, p. 52 – 53 (emphasis added).

45

That portion of Class Counsel's $161,681,596.07 pre-remand lodestar attributable to Rule 23(b)(2) concerns should not have been included in the district court's analysis of the first *Goldberger* factor – i.e. time and labor expended by counsel in creating, enhancing, preserving, or protecting the (b)(3) damages class settlement. *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005). The district court's failure to distinguish between Class Counsel's hours spent pursuing a (b)(3) damages class cash settlement and Class Counsel's hours spent pursuing (b)(2) injunctive relief and related legislative changes infects every other aspect of the district court's *Goldberger* analysis.

The district court's decisions enjoy broad discretion when "supported by adequate findings and [] consistent with [the 2d Circuit's] preference for moderation …" *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 57 (2d Cir. 2000). In the instant case, however, the district court made no adequate finding regarding the time and labor spent by Class Counsel in representing the Rule 23(b)(3) class. None. Therefore, the district court's fee award must be reversed, and remanded for a proper calculation of Class Counsel's non-conflicted lodestar of benefit to the Rule 23(b)(3) damages class and contributing to the creation of the common fund.

46

C.    **Class Counsel's deliberate conflict of interest and subsequent overcharge of their clients requires they receive no fee for pre-remand conflicted services.**

In *Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917 (2nd Cir. 1950), this Court held that an attorney who simultaneously represents two opposed interests may not receive fees from either client. *Id.* at 920-921.

> Certainly by the beginning of the Seventeenth Century it had become a common-place that an attorney must not represent opposed interests; and the usual consequence has been that he is debarred from receiving any fee from either, no matter how successful his labors. Nor will the court hear him urge, or let him prove, that in fact the conflict of his loyalties has had no influence upon his conduct; ***the prohibition is absolute and the consequence is a forfeiture of all pay.***

*Id.* (emphasis added).

Judge Learned Hand's opinion in *Silbiger* has never been disturbed and continues to control in this Circuit. The opinion continues to carry weight in other circuits as well, and was cited by the Ninth Circuit in its decision disallowing all fees to a class counsel that had operated with a conflict created by an incentive fee agreement. *See Rodriguez v. Disner*, 688 F.3d 645, 654 (9th Cir. 2012). "A court has broad equitable power to deny attorneys' fees … when an attorney represents clients with conflicting interests. *See [Silbiger].* … [A] reasonable fee for an attorney who represents clients with conflicting interests is "zero," at least "when the violation is one that pervades the whole relationship." *Id.* at 653-654. "We apply these equitable principles even more assiduously in common fund class

47

action cases, such as this one, because the district court has a special duty to protect the interests of the class." *Id*. at 655.

Most relevant to this case, the Ninth Circuit held the rule barring fees must be applied "where the conflict was not one that developed beyond the control or perception of class counsel." *Id*. The Ninth Circuit proceeded to deny all attorneys' fees to class counsel for the entire period of the case before the conflict was exposed.

> The representation of clients with conflicting interests and without informed consent is a particularly egregious ethical violation that may be a proper basis for complete denial of fees... A district court has a special obligation to consider these equitable principles at the fee-setting stage in common fund class action cases, given the district court's fiduciary role to protect absent class members.

*Id*. at 655-656.

Such an ethical violation is precisely what happened here. In the 2006 First Consolidated Amended Complaint, Class Counsel defined the class to include both class members seeking (b)(3) damages relief and class members seeking (b)(2) injunctive relief, without designating separate representatives and counsel. ECF 317 at p. 32. The conflict among the classes, and Class Counsel's conflict, was created by Class Counsel from the inception of the case. This was hardly a case where the conflict was a hidden surprise to class counsel, like Gary Friedman's back channel communications with Keila Ravelo. ECF 7470-1 at p. 6.

48

Class Counsel have clearly not been chastened by this Court's 2016 opinion and are still seeking to maximize their fees at the expense of their inadequately represented clients.[18] The district court has ignored Class Counsel's repeated ethical lapses, abused its discretion, and breached its fiduciary duty by ordering payment of fees to Class Counsel for time spent while representing separate clients with conflicting interests.

Because Class Counsel is not due any fees for time spent while operating under the clear professional conflict, the entire fee award must be justifiable in view of Class Counsel's post-remand $52 million lodestar. If the fee award is allowed to stand, it would mean the lodestar multiplier is not 2.45, but greater than 10 – a number Judge Gleeson has called "absurd." *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 522 (E.D.N.Y. 2003).

---

[18] Class Counsel's combination of the (b)(2) and (b)(3) classes in the initial Complaint was part of an effort to maximize their attorneys' fees and derive maximum value from their (b)(2) lodestar. Because multipliers are forbidden in fee-shifting cases, like the (b)(2) class action proceeding below, *see Perdue v. Kenny A.*, 559 U.S. 542 (2010), by blurring the line between work done on behalf of the adverse classes, Class Counsel sought to impermissibly leverage their (b)(2) lodestar. After remand, Class Counsel continued to not only improperly seek payment of their (b)(2) lodestar by the (b)(3) class, they also sought and received an impermissible multiplier on their (b)(2) lodestar.

**D.      Class Counsel's claimed post-remand $52,000,000 lodestar is grossly overstated, carried no risk, and cost the class money.**

Class Counsel claims to have accrued a lodestar of over $52 million between remand of this case on June 30, 2016 and the settlement of this case in January 2019, a period of thirty months.  Despite Defendants' willingness to pay a net amount of $5.7 billion to the Rule 23(b)(3) class as part of the 2012 settlement (which money was escrowed and remained on the table after the 2016 remand), Class Counsel spent $52 million over the next thirty months *reducing* the net settlement figure to $5.6 billion, while the (b)(3) class grew by millions of new class members, and the Claims Period was extended by an additional seven years' worth of transactions.  This must be the least productive $52 million of attorney time ever spent.  Class Counsel took a sure $5.7 billion and proceeded to spend $52 million getting that figure down to $5.6 billion.  For this, they would like a reward of 1,000% of their $52 million.

The (b)(3) damages class is undeniably a victim of Class Counsel's conflicted simultaneous representation of the (b)(3) and (b)(2) classes.  It is victimized by a reduced net recovery,[19] by the fee charged to it but attributable to

---

[19] In the absence of the conflict, the class would have secured $5.7 billion at least seven years ago.  The present value of $5.7 billion dollars recovered in 2013, bearing interest at a rate of just one percent, is $6,172,283,222, which represents a time-value loss to the class of $472,283,222 suffered since May 2013 due to conflict issues.

the (b)(2) class, by the delay-created lower percent-of-damage recovery, and by the Extended Release Period – each a result of Class Counsel's conflicted work in this case.

The rule barring recovery of fees generated during conflicted representation is designed to ensure, to the extent possible, that any damages caused to the client by the conflict fall upon the attorney rather than the blameless client. *See Silberger, supra.* Class Counsel have, however, sought not only to impose the loss of more than $100 million caused by their faithless representation on the (b)(3) class, they have run up their lodestar tab by $52 million and seek to charge the damages class ten times that amount as fees.

The (b)(3) damages class has been forced to wait an additional five years for their relief, and a reduced recovery is now spread across a much larger class, thus reducing pro rata recoveries. To further penalize the blameless (b)(3) class by extracting from their common fund an excessive attorneys' fee of 1,000% of Class Counsel's non-conflicted, risk-free lodestar would be an especially perverse result. The district court's order in this regard is an abuse of discretion warranting reversal by this Court.

**IV.    THE CLASS PLAINTIFF SERVICE AWARDS ARE FLAGRANTLY EXCESSIVE AND COMPENSATE ACTIVITIES UNRELATED TO THE (b)(3) DAMAGES CLASS.**

A district court's grant of incentive awards is reviewed for abuse of discretion.  *Lobur v. Parker*, 378 Fed. Appx. 63, 65 (2d Cir. 2010).

Appellants hereby adopt and incorporate that portion of the Brief of Appellant Kevan McLaughlin relating to the impermissibility of incentive or service awards of any amount.  (Docket No. 20-342.)   Such awards have never been authorized by the Supreme Court.

The instant case perfectly illustrates the susceptibility to abuse of service awards, and the wisdom of a sensible rule banning outsized and excessive awards. Incentive awards in this Circuit are typically in the $5,000 to $12,000 range, and should bear a reasonable relationship to the amount of the representative class member's expected recovery from the settlement, as well as the average class member's expected recovery.  *See In re Libor-Based Fin. Instruments Antitrust Litig.*, 2018 U.S. Dist. LEXIS 137433 at *65 (S.D.N.Y. Aug. 14, 2018) (average and mean incentive awards range from $5000 to $12,000); *In re AOL Time Warner ERISA Litig.*, 2007 U.S. Dist. LEXIS 79545 at **11-13 (denying request for $20,000 incentive awards when average class member's recovery is far less, and awarding only $1000).

52

Here, the average recovery per class member is calculated to be approximately $350, with some Class Plaintiffs expecting only slightly more. Inexplicably, Judge Brodie did not mention this consideration, despite this being the main reason cited by Judge Gleeson for not approving the requested awards in January 2014.  991 F. Supp. 2d 437, 448-449.  In his decision, Judge Gleeson stated he had, in another case, denied settlement approval because the requested incentive awards were *four to thirteen times* anticipated settlement payments.  *See Gulino v. Symbol Techs., Inc.*, 2007 U.S. Dist. LEXIS 76915 (E.D.N.Y. October 17, 2007) (emphasis added).  Here, some of the service awards are more than *100 times* as large as the representative plaintiff's expected settlement recovery, and 570 times as large as the average claim recovery!

In connection with the 2012 settlement, Judge Gleeson ordered Class Counsel to provide documentation "setting forth the value of each Class Plaintiff's claim and each one's proposed incentive award."   991 F. Supp. 2d at 449.  Class Counsel complied with this directive in their 2019 Memorandum of Law in Support of Motion for Class Representative Service Awards.  Document 7472-1, p. 22.  The requested awards include award-to-claim ratios ranging from less than 0.1:1 up to 122:1 – a ratio unheard of in this Circuit.

Limiting incentive awards to amounts relatively close to a class representative's settlement claim makes sense for several reasons.  An incentive

award five hundred times greater than the average class member's recovery severs the connection between the class representative and the class members he is charged to represent, and renders the class representative indifferent to the amount of the settlement recovery and, as in this case, the amount of his attorneys' fee request. Large awards invite illegitimate motives; a class representative may view the litigation as an opportunity to earn a substantial incentive award, rather than a quest to recover small damages for class members.

Judge Brodie failed to justify the incentive awards as a multiple of each Class Plaintiff's claim or as a multiple of the average expected recovery. Judge Gleeson was correct; there should be an upper limit on the amount by which an incentive award may exceed a plaintiff's expected recovery from the lawsuit. Here certain Class Plaintiffs efficiently participated in the litigation and were reasonably compensated for their effort. For instance, CHS was able to adequately pursue its $7.7 million claim for just $39,250 worth of employee time. This reflects an economically sensible dedication of time to the class action effort. As well, it was rational and efficient for Payless to have devoted $70,000 of employee time in pursuit of its $1.4 million claim.

Class representatives should typically be limited to incentive awards in the range of $5,000 to $12,000. Class Plaintiffs, however, are requesting incentive awards as if this antitrust case were a securities case. While incentive awards are

54

specifically authorized by the PSLRA, courts in this Circuit have begun to question

the propriety of routine incentive awards in class action cases:

> "As a colleague of mine recently articulated, it is totally unclear "why
> a party who chooses to bring a lawsuit should be compensated for
> time expended in appearing at a deposition taken in order to insure
> that [he or she] is actually capable of fulfilling his statutory
> obligations, or responding to document requests, or performing what
> are essentially duplicative reviews of pleadings and motions that his
> lawyers are perfectly capable of reviewing.""

*In re IndyMac Mortgage-Backed Sec. Litig.*, 2015 U.S. Dist. LEXIS 37052

at *25 (S.D.N.Y. March 24, 2015) (*quoting City of Providence v.

Aeropostale*, *Inc.*, 2014 U.S. Dist LEXIS 64517 at *19 (S.D.N.Y. May 9,

2014)).

This Court has never had occasion to review a grant of incentive awards in a

class action settlement. One reason may be that district courts in this Circuit have

generally been sensible and conservative in their approach to such awards, unlike

in this case. Courts ordinarily tether their awards to evidence of specific lost

wages or income, as well as claim amount and/or average recovery, and limit

awards to a modest level such that absent class members have rarely been

prompted to challenge them. *See AOL Time Warner ERISA, supra.* If incentive

awards had remained in the $1000 to $10,000 range, it is unlikely that any party

would have had an incentive to challenge them. Unfortunately, incentive awards

of the magnitude awarded in this case are the increasingly frequent exception that

has swallowed the rule, and turned class litigation into a jackpot lottery for figurehead plaintiffs.

Perhaps the most thorough discussion of incentive awards was authored by Judge Scheindlin in *In re IPO Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009). In that decision, Judge Scheindlin described several principles that guided her in setting awards for named plaintiffs, including the bedrock principle that the litigation must have caused the plaintiff to lose wages or income.

> The PSLRA makes clear that only lost wages may be awarded....The requests of those representatives who were employed during the litigation but who attest only to the hours spent on this litigation and their hourly rate are also denied. These representatives make no mention of having lost wages as a direct result of the work performed on these cases and thus are not entitled to awards for lost wages.

*Id*. at 500.

District courts in this Circuit have generally adhered to this common-sense calculus. As Judge Scheindlin pointed out in *IPO*, an unemployed class representative would never be eligible for an incentive award, because they "cannot show that they incurred any lost wages." *Id*.

In this case, Judge Brodie awarded $200,000 to Michael Schumann, who claims to work only part-time for his business. Mr. Schumann claimed in his Declaration that he works no more than 720 hours per year for his business Traditions, or roughly 15 hours per week. Mr. Schumann's part-time business

afforded him ample time, free of any economic burden, to perform the tasks asked of him by class counsel and required of him by the defendants.

Mr. Schumann devoted approximately 700 hours to this case over a period of nine years, or roughly 78 hours per year, a limited commitment of time that did not interfere with Mr. Schumann's part-time business operations. Mr. Schumann does not claim this case interfered with his business or cost him a nickel in lost income or wages. Under the PSLRA's approach, there is no basis for granting Mr. Schumann any service award in this case; under any reasonable approach the district court abused its discretion in awarding him $200,000.

### A. Most of the time devoted by Class Plaintiffs related exclusively to injunctive relief, not damages.

Class Counsel are surprisingly forthcoming about how little the class representatives had to do with the ultimate monetary recovery and how most of their activities were focused on obtaining legislative and rules changes – not one hour of which contributed to the (b)(3) class' monetary recovery in any way.

Even in their most recent Memorandum in Support of Motion for Class Representative Service Awards, Class Counsel speak without any hint of irony about things that relate *solely* to the (b)(2) class, if they relate to the litigation at all.

> In Congress, for example, merchants had been unsuccessful for many years in securing interchange-fee regulation. This changed with the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, which empowered the Federal Reserve

57

> Board to cap debit-card interchange fees and eliminated some of the
> Defendants' anti-steering rules.  This legislation obtained part of the
> reform that Class Representatives were seeking.  The merchants'
> change of fortune in the legislative branch was no accident.  It
> resulted from a conscious effort by Class Counsel, working together
> with many of the Class Representatives and others, to convince
> Congress to pass the Durbin Amendment.  Several of the Class
> Representatives met with elected officials and staffers and created
> informative and sympathetic "faces" for the merchant community
> seeking reform… And Class Representative Leon's was also an active
> named class plaintiff in the challenge to California's no-surcharging
> litigation.

Document 7472-1 at p. 10.  While some of this work may be grounds for a service

award if and when the 23(b)(2) class action pending in the district court reaches a

settlement, *none of it* has anything to do with the recovery of damages in *this* class

action.  As with attorneys' fees, the (b)(3) class should not be charged excessive

service awards for Class Plaintiffs' work on behalf of another class – and certainly

not for their many hours spent lobbying, blogging, tweeting and seeking changes in

the law.

Class Counsel seem to have merely recycled their 2015 briefing on class

representative awards without reflecting on the significant change imposed by this

Court's 2016 decision.  "Representatives of Traditions and Photos provided

interviews to the Department of Justice that contributed to an important component

of the reforms that merchants obtained during this litigation."  *Id*. at p. 18.  "Nor do

service awards set a bad precedent in this case, given the exceptional activities that

the Class Representatives performed, such as advocating in the media and lobbying Congress and antitrust enforcers on behalf of the Class for more than 13 years." *Id*. at p. 20.

In their 2015 briefing, Class Counsel were even more explicit about the basis of the request for service awards, making it clear the services of certain Class Representatives' were focused on injunctive relief and regulatory changes.

> The fact that injunctive relief was such an important component of the overall settlement package is itself a "special circumstance," in that the Class Representatives provided practical, real-world insight into how proposed reforms would work in practice. ***The importance of injunctive relief*** distinguishes this case from the "typical" cartel or securities class action, in which the illegal conduct has ceased and the parties ***are merely agreeing on appropriate compensation.***

Document 6366-1 at p. 19 (emphasis added).

The claims of the (b)(3) damages class have nothing to do with legislative reforms, Congressional hearings, or government investigations. Class Counsel's 2015 briefing is a concession that Class Plaintiffs' services were heavily dedicated to obtaining injunctive relief and had little or nothing to do with the recovery of damages in the settlement on appeal.

The interests of the (b)(2) injunctive relief class are still being litigated in the district court. There is no authority and no acceptable reason for Class Plaintiffs to be paid out of the (b)(3) class common fund for time spent advancing the interests

59

of another class or in pursuit of legislative – not judicial – action; Judge Brodie

abused her discretion in ordering such payment by the (b)(3) class.

> **B.     The district court abused its discretion by failing to limit the service awards by the amount of time devoted to the case by CHS and Payless.**

Judge Scheindlin in *IPO* established as one of her guiding principles that the

number of hours spent by each class representative was limited by the median

number of hours expended by all of the representatives.  *In re IPO*, 671 F. Supp.

2d at 501.  This rule ensures the court does not reward inefficiency, but holds class

representatives to a discernable standard, anticipating each class representative

should have spent roughly the same amount of time performing similar tasks.

Here, rather than the median, the benchmark should be set by the number of

hours devoted to the litigation by CHS and Payless, the Class Plaintiffs with the

largest claims by a factor of a  at least thirty.  ECF 7472-1, p. 22.  These two Class

Plaintiffs did more discovery-related work than any other Class Plaintiff, and every

employee hour devoted to this litigation was an hour of work lost to their business.

It is reasonable to expect CHS and Payless were judicious in allocating resources

and conservative in allotting employee time to the case.  They did not send their

employees to Washington DC to lobby or monitor meaningless deliberations, or

otherwise try to run up the hours in an effort to increase their incentive awards.

For this reason, the hours spent in service to the (b)(3) damages class claims by

CHS and Payless employees should be used as a benchmark for time spent by other Class Plaintiffs.

The district court did not comment on the disparity between the number of hours spent by the two largest Class Plaintiffs and hours claimed by vastly smaller Class Plaintiff merchants, most notably Traditions and Photos Etc. The 5,139 hours claimed by Photos Etc. would have raised red flags had the court only compared it to the far fewer number of hours spent by CHS and Payless employees. This would also have prompted a review of Class Plaintiff Goldstone's declaration in which he claimed 4,680 hours for non-compensable "media advocacy" activities, but described no more than 429 hours of time spent on litigation matters. ECF 6367-4.

## C. The district court abused its discretion in awarding multipliers on the reasonable value of time.

Appellants do not oppose an award of the reasonable value of time spent by each class representative on Rule 23(b)(3) specific matters, limited only by the rule that incentive awards not exceed ten times the class representative's estimated claim. Therefore, Appellants do not oppose an award of $70,151 to Payless, $39,250 to CHS, $46,682 to Parkway, $39,123 to Leon's Transmission, and $17,160 to Mitch Goldstone (429 hours multiplied by $40 /hour). Discount Optics and Capital Audio should receive a service award of no more than ten times their estimated claims.

61

Appellants do, however, oppose the application of a multiplier to any of the service awards. The district court provided no explanation for its decision to award the class representatives more than the value of their lost wages, in stark contrast with *In re IPO, supra*. Lost wages may not be arbitrarily increased by unsupported and wildly varying amounts. For example, while Payless claims $70,000 in lost wages and CHS claims $39,000, each was granted a service award of $100,000, which had the effect of giving CHS a multiplier of 2.5, while Payless received only a 1.4 multiplier. What was the reason for this? Was CHS's performance of its Class Plaintiff duties somehow more commendable or meritorious? The district court does not say.

Lodestar multipliers have been banned by the Supreme Court in fee shifting cases. *Perdue v. Kenny A.*, 559 U.S. 542 (2010). If a lawyer's time may no longer be enhanced by the application of a multiplier in a fee-shifting case, why should a lead plaintiff's reasonable time be subject to one? The application of a multiplier introduces an element of caprice into service awards.

The district court abused its discretion in awarding all of the class representatives more than the reasonable value of the time they spent on (b)(3) litigation tasks.

62

## **CONCLUSION**

For the foregoing reasons, this Court should: (1) reverse the district court's approval of the settlement; (2) reverse the district court's award of attorneys' fees and remand with instructions to disregard Class Counsel's conflicted lodestar and lodestar incurred on behalf of the (b)(2) class; and (3) reverse the district court's award of Class Plaintiffs' service fees, and remand with instructions to limit service awards to loss of earnings for documented time spent pursuing damages for the Rule 23(b)(3) class, without any multiplier.

Respectfully submitted,

/s/ John J. Pentz
John J. Pentz, Esq.
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

Attorney for Appellants
Unlimited Vacations and
Cruises Inc., and USA Pets LLC

/s/ Kendrick Jan
Kendrick Jan
Kendrick Jan, APC
402 West Broadway, Suite 1520
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com
Attorney for appellants
Gnarlywood LLC and
Quincy Woodrights, LLC

## CERTIFICATE OF COMPLIANCE WITH FRAP 32
## AND LOCAL RULE 28.1.1

1.      This document complies with the type-volume limitation of Local

Rule 28.1.1 because excluding the parts of the document exempted by Fed R. App.

P. 32(f) this document contains 13,771 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word 2013 in 14-point Times New Roman.


Dated: June 30, 2020

/s/ John J. Pentz
Attorney for Appellants
Unlimited Vacations and
Cruises Inc., and USA Pets LLC


/s/ Kendrick Jan
Attorney for Appellants
Gnarlywood LLC and
Quincy Woodrights, LLC

64

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2020, I filed the foregoing JOINT BRIEF

OF APPELLANTS GNARLYWOOD LLC, AND QUINCY WOODRIGHTS,

LLC, (20-341 CON), AND UNLIMITED VACATIONS, CRUISES, INC., AND

USA PETS LLC (20-343 CON) via the ECF filing system for the United States

Court of Appeals for the Second Circuit, and that as a result each counsel of record

received an electronic copy of this Brief on June 30, 2020.


/s/ John J. Pentz