# No.20-339-cv(L)

20-304(CON), 20-340(CON), 20-341(CON), 20-342(CON), 20-343(CON),20 -344(CON)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

In Re: Payment Card Interchange Fee and
Merchant Discount Antitrust Litigation

Appeal from the United States District Court
for the Eastern District of New York
1:05-md-1720-MKB-JO (Hon. Margo K. Brodie)

## APPELLANT KEVAN MCLAUGHLIN'S OPENING BRIEF

C. Benjamin Nutley
1055 E. Colorado Blvd., Fifth Floor, Pasadena, CA 91106
Telephone: 626-204-4060; email: nutley@zenlaw.com

John W. Davis
3030 N. Rocky Point Dr. W., Suite 150
Tampa, FL 33607
Telephone: 813-533-1972; email john@johnwdavis.com

*Counsel for Objector-Appellant Kevan McLaughlin*

# FRAP 26.1 DISCLOSURE STATEMENT

Appellant Kevan McLaughlin has no parent corporation and issues no stock.

# TABLE OF CONTENTS

FRAP 26.1 DISCLOSURE STATEMENT ...................................................ii

TABLE OF AUTHORITIES ...............................................................vi

I.   JURISDICTION ......................................................................1

   A. The District Court's Subject-Matter Jurisdiction ..........................1

   B. Appellate Jurisdiction ........................................................1

   C. Filing Dates Showing Timeliness .............................................1

   D. Finality ............................................................................2

II.  ISSUES PRESENTED ................................................................3

III. STATEMENT OF THE CASE ........................................................4

   A. Local Rule 28.1 Statement ....................................................4

   B. Statement of Facts and Procedural History .................................5

      1. Settlement and Preliminary Approval.....................................6

      2. McLaughlin's Objection to the Settlement Release, Attorneys'
         Fees, and Incentive Awards .............................................7

      3. Final Approval Hearing...................................................9

4. Approval of the Settlement and Attorneys' Fees Request and Subsequent Appeal ..................................................................10

C. Standard of Review .......................................................................11

IV. SUMMARY OF ARGUMENT ...........................................................12

A. McLaughlin's Challenge to the Settlement's Release of Claims...12

B. McLaughlin's Challenge to the Award of Attorneys' Fees ............14

C. McLaughlin's Challenge to the Grant of Incentive Awards..........16

V.  ARGUMENT......................................................................................17

A. The district court erred in approving the release..........................17

B. Supreme Court and Second Circuit precedent do not support a fee award of 523,269,585.27, representing a multiplier of 2.45 on hourly billings, in this mega-fund settlement ...............................23

1. The fee award cannot be supported by reference to customary percentages or lodestar multipliers in this Circuit...................29

2. The district court misapplied *Fresno County's* guidance on contingent risk in assessing the lodestar multiplier ...............35

3. The divergence in common-fund and fee-shifting calculations is unwarranted, resulting in widely differential fee awards for identical work and risk ............................................................... 39

C. The district court erred by granting incentive bonuses prohibited by binding Supreme Court precedent ............................................. 45

1. Though lower courts have lately forgotten, the Supreme Court's fundamental common fund decisions prohibit the grant of incentive awards ......................................................................... 46

2. Incentive awards impair the adequacy of representation ........ 55

VI. CONCLUSION ................................................................................. 58

CERTIFICATE OF COMPLIANCE WITH RULE 32(g) ........................ 59

CERTIFICATE OF SERVICE .................................................................. 60

# TABLE OF AUTHORITIES

**CASES**

*Agostini v. Felton*
　　521 U.S. 203 (1997) ....................................................... 50

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*
　　421 U.S. 240 (1975) ................................................... 39, 47

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*
　　522 F.3d 182 (2d Cir. 2008) ........................................... 27

*Assif v. Titleserv, Inc.*
　　2015 WL 13753144 (E.D.N.Y. Aug. 14, 2015) ............................. 34

*Autorama Corp. v. Stewart*
　　802 F.2d 1284 (10th Cir. 1986) ......................................... 3

*Berry v. Schulman*
　　807 F.3d 600 (4th Cir. 2015) .......................................... 51

*Boeing Co. v. Van Gemert*
　　444 U.S. 472 (1980) .............................................. 24, 46, 54

*Bosse v. Oklahoma*
　　137 S.Ct. 1 (2016) .................................................... 54

*Caliguri v. Symantec Corp.*
　　855 F.3d 860 (8th Cir. 2017) .......................................... 51

*Carlson v. Xerox Corp.*
　　596 F.Supp.2d 400 (D. Conn.) .......................................... 33

*Central Railroad & Banking Co. v. Pettus*
　　113 U.S. 116 (1885) .............................................. passim

*China Agritech Inc. v. Resh*
    __U.S.__, 138 S.Ct. 1800 (2019) ......................................................50

*City of Burlington v. Dague*
    505 U.S. 557 (1992) ........................................................................26

*City of Detroit v. Grinnell*
    495 F.2d 448 (2d Cir. 1974)............................................................25

*Cook v. Niedert*
    142 F.3d 1004 (7th Cir 1998) .....................................................50, 51

*Crutcher v. Logan*
    102 F.2d 612 (5th Cir. 1939) ..........................................................48

*Deboard v. Sunshine Mining and Refining Co.*
    208 F.3d 1228 (10th Cir. 2000) ........................................................2

*Dial Corp. v. News Corp.*
    317 F.R.D. 426 (S.D.N.Y. 2016) .....................................................33

*Dornberger v. Metro. Life Ins. Co.*
    203 F.R.D. 118 (S.D.N.Y. 2001) .....................................................45

*Flanagan, Lieberman, Hoffman & Swaim v. Ohio Public*
    *Empls. Ret. Sys.*
    814 F.3d 652 (2d Cir. 2016)............................................................11

*Flores v. Mamma Lombardi's of Holbrook, Inc.*
    104 F. Supp. 3d 290 (E.D.N.Y. 2015) .............................................34

*Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Family Tr.,*
    925 F.3d 63 (2d Cir. 2019)..................................................... passim

*Gamble v. United States,* __U.S.__
    139 S. Ct. 1960 (2019) ....................................................................54

*Goldberger v. Integrated Res., Inc.*
  209 F.3d 43 (2d Cir. 2000)....................................................... passim

*Gortat v. Capala Brothers, Inc.*
  949 F.Supp.2d 374 (E.D.N.Y. 2013) ................................................ 49

*Granada Investments, Inc. v. DWG Corp.*
  962 F.2d 1203 (6th Cir. 1992) ................................................ 48, 51

*Grant v. Martinez*
  973 F. 2d 96 (2d Cir. 1992)........................................................ 27

*Hadix v. Johnson*
  322 F.3d 895 (6th Cir. 2003) ...................................................... 57

*Hall v. ProSource Techs., LLC*
  2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) ................................... 34

*Henderson v. Fort Worth Ind. Sch. Dist.*
  584 F.2d 115 (5th Cir. 1978) ...................................................... 53

*In re Am. Exp. Fin. Advisors Sec. Litig.*
  672 F.3d 113 (2d Cir. 2011)........................................................ 11

*In re American Preferred Prescription, Inc.*
  255 F.3d 87 (2d Cir. 2001)........................................................... 2

*In re AOL Time Warner ERISA Litig.*
  2007 WL 3145111 (S.D.N.Y. Oct. 26, 2007)................................... 45

*In re BioScrip, Inc. Sec. Litig.*
  273 F. Supp. 3d 474 (S.D.N.Y. 2017) ........................................... 36

*In re Bolar Pharm. Co. Sec. Litig.*
  966 F.2d 731 (2d Cir. 1992)........................................................ 26

*In re Currency Conversion Fee Antitrust Litig.*
263 F.R.D. 110 (S.D.N.Y. 2009) ..................................................32

*In re Currency Conversion Fee Antitrust Litig.*
2012 WL 3878825 (S.D.N.Y. Aug. 22, 2012)............................33

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*
2001 WL 709262 (S.D.N.Y. June 22, 2001) ...............................32

*In re Dry Max Pampers Litig*
724 F.3d 713 (6th Cir. 2013) ............................................. 52, 56, 57

*In re Home Depot Inc.*
931 F.3d 1065 (11th Cir. 2019) .............................................. 42, 43

*In re Initial Pub. Offering Sec. Litig.*
671 F. Supp. 2d 467 (S.D.N.Y. 2009) .............................................44

*In re Lorazepam & Clorazepate Antitrust Litig.*
205 F.R.D. 369 (D.D.C. 2002)........................................................51

*In re Mego Financial Corp. Securities Litigation*
213 F.3d 454 (9th Cir. 2000) ........................................................51

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*
2007 WL 4526593 (S.D.N.Y. Dec.20, 2007) ................................33

*In re Payment Card Interchange Fee & Merch. Disc.*
*Antitrust Litig.,*
986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*"Interchange Fees I"*)...........5

*In re Payment Card Interchange Fee & Merch. Disc.*
*Antitrust Litig.*
827 F.3d 223 (2d Cir. 2016) (“*Interchange Fees II*”) ........................6

*In re Tremont Sec. Law, State Law & Ins. Litig.*
699 F. App'x 8 (2d Cir. 2017) .......................................................35

*In re Twinlab Corp. Sec. Litig.*
  187 F.Supp.2d 80 (E.D.N.Y.2002) ................................................. 33

*In re Westinghouse Sec. Litig.*
  219 F.Supp.2d 657 (W.D. Pa. 2002) ........................................ 48, 51

*Keepseagle v. Perdue*
  856 F.3d 1039 (D.C. Cir. 2017)....................................................... 51

*Koon v. United States*
  518 U.S. 81 (1996) ........................................................................ 12

*Matsushita Elec. Indus. Co. v. Epstein*
  516 U.S. 367 (1996) ................................................... 13, 17, 18, 19

*McDaniel v. County of Schenectady*
  595 F.3d 411 (2d Cir. 2010).................................................. 11, 27

*McGill v. Secretary of Health & Human Services*
  712 F. 2d 28 (2d Cir. 1983).............................................................. 2

*Melito v. Experian Mktg. Sols., Inc.*
  923 F.3d 85 (2d Cir. 2019)................................................. 20, 52, 53

*Meredith Corp. v. Sesac*
  87 F. Supp. 3d 650 (S.D.N.Y. 2015) .............................................. 37

*Mickens v. Taylor*
  535 U.S. 162 (2002) ...................................................................... 50

*Milea v. Metro-North R. Co.*
  658 F.3d 154 (2d Cir. 2011)........................................................... 11

*Mills v. Electric Auto-Lite Co.*
  396 U.S. 375 (1970) ...................................................................... 55

*Missouri v. Jenkins by Agyei*
  491 U.S. 274 (1989) ...................................................................... 27

*Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth*
    473 U.S. 614 (1985) ........................................................ 19

*Montejo v. Louisiana*
    556 U. S. 778 (2009) ...................................................... 54

*Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (2019),
    *reh'g en banc granted, opinion vacated*
    939 F.3d 1278 (11th Cir. 2019) ............................... 52, 53

*Newmont Min. Corp.*
    352 F.App'x 232 (10th Cir. 2009) .................................. 51

*Nottingham Partners v. Dana*
    564 A.2d 1089 (1989) ...................................................... 18

*Perdue v. Kenny A. ex rel. Winn*
    559 U.S. 542 (2010) ............................... 26, 40, 41, 43

*Plummer v. Chemical Bank*
    91 F.R.D. 434 (S.D.N.Y. 1981) .................................... 56

*Priceline.com, Inc. v. Silberman*
    405 F.App'x 532 (2d Cir. 2010) .................................... 32

*Radcliffe v. Experian Information Solutions. Inc.*
    715 F.3d 1157 (9th Cir. 2013) .................................... 56

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*
    490 U.S. 477 (1989) ........................................................ 54

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*
    58 F. Supp. 3d 424 (S.D.N.Y. 2014) ............... 31, 33, 35, 37

*Seigal v. Merrick*
    619 F.2d 160 (2d Cir. 1980) .......................................... 2

*Shalala v. Illinois Council on Long Term Care*
    529 U.S. 1 (2000) ....................................................... 50

*Shane Group, Inc. v. Blue Cross Blue Shield*
    825 F.3d 299 (6th Cir. 2016) ..................................... 51

*Sprague v. Ticonic Bank*
    307 U.S. 161 (1939) ................................................ 2, 24

*Sullivan v. DB Investments, Inc.*
    667 F.3d 273 (3d Cir. 2010) ...................................... 51

*Swanson v. American Consumer Indus.*
    517 F.2d 555 (7th Cir. 1975) ....................................... 3

*Tiro v. Pub. House Investments, LLC*
    2013 WL 4830949 (S.D.N.Y. Sept. 10, 2013) ................ 32

*Trustees v. Greenough*
    105 U.S. 527 (1882) ......................................... Passim

*U.S. Airways, Inc. v. McCutchen*
    569 U.S. 88 (2013) ................................................... 47

*United States v. Bonnet-Grullon*
    212 F.3d 692 (2d Cir. 2000) ...................................... 12

*United States v. Equitable Trust Co.*
    283 U.S. 738 (1931) ................................................. 25

*United States v. Hatter*
    532 U.S. 557 (2001) ................................................. 54

*United States v. Yalincak*
    853 F.3d 629 (2d Cir. 2017) ........................................ 2

*Van Gemert v. Boeing*
    516 F.Supp. 412 (S.D.N.Y. 1981) .............................. 25

*Vassalle v. Midland Funding LLC*
708 F.3d 747 (6th Cir. 2013) ........................................................57

*Wal-Mart Stores v. Visa*
396 F.3d 96 (2d. Cir. 2005) ..........................................................30

*Weseley v. Spear, Leeds & Kellogg*
711 F. Supp. 713 (E.D.N.Y. 1989) ................................................32

*Zucker v. Westinghouse Electric*
374 F.3d 221 (3d Cir. 2004)......................................................48, 51

## STATUTES

15 U.S.C. § 1 ..................................................................................3

15 U.S.C. § 2 ..................................................................................3

15 U.S.C. § 15(a) .......................................................................1, 40

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

28 U.S.C. § 2072 ..........................................................................55

## RULES

Fed. R. Civ. P. 23............................................................17, 55, 56

Fed. R. Civ. P. 23(b)(2) ..............................................................6, 40

Fed. R. Civ. P. 23(b)(3) ........................................................2, 4, 6, 40

Fed. R. Civ. P. 23(h)(2) ..................................................................8

11th Cir. R. 35-10 ........................................................................53

# OTHER AUTHORITIES

Bryan A Garner, et al., The Law of Judicial Precedent
  (Thomson West, 2016) ................................................................. 54

John P. Dawson, *Lawyers and Involuntary Clients: Attorney
  Fees from Funds*
  87 Harv. L. Rev. 1597 (1974) ................................................... 47-49

*McLaughlin on Class Actions* §6:28 (15th ed., 2018) ............................. 49

Michael D. Axline, *Decreasing Incentives to Enforce
  Environmental Laws: City of Burlington v. Dague*
  43 Wash. U. J. Urb. & Contemp. L. 257 (1993) ............................ 44

*Newberg on Class Actions* §§17:1 (5th ed. 2019) .............................. 49, 55

Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to
  Class Action Plaintiffs: An Empirical Study*
  53 U.C.L.A. L. Rev. 1303 (2006) .............................................. 49-50

# I. JURISDICTION

## A. The District Court's Subject-Matter Jurisdiction

Plaintiffs asserted and settled claims arising under the federal antitrust laws. JA3308/DE7257-2:1.[1]

The district court thus possessed subject-matter jurisdiction over this case under 28 U.S.C. §1331, conferring jurisdiction over cases arising under the laws of the United States, and under 15 U.S.C. §15(a), conferring jurisdiction over federal antitrust suits.

## B. Appellate Jurisdiction

This Court has jurisdiction under 28 U.S.C. §1291 to review the district court's final judgment, which disposed of all claims before the court, and was entered on December 20, 2019. JA7459-7472/DE7832.

## C. Filing Dates Showing Timeliness

The district court entered final judgment on December 20, 2019. DE7832. Appellant timely filed his notice of appeal from the judgment and related orders on January 8, 2020. JA8584/DE7845.

---

[1] Record citations in this brief are to the Joint Appendix ("JA") and/or to the district court's numbered Docket Entries ("DE"). Numbers following "JA" refer to page numbers in the referenced appendix. For "DE" cites the referenced pages or paragraphs within a document ordinarily will follow a colon. Pinpoint citations are to the ECF-assigned page numbers unless otherwise noted.

## D. Finality

The orders appealed from were entered in conjunction with the district court's Judgment which finally disposed of all Rule 23(b)(3) claims as to all named parties. JA7459-7472/DE7832.

Orders determining substantive issues such as attorney's fees generally are appealable. *See United States v. Yalincak,* 853 F.3d 629, 636 (2d Cir. 2017) ("post-judgment orders in 'ordinary civil litigation' are 'generally appealable'"); *In re American Preferred Prescription, Inc.,* 255 F.3d 87, 93 (2d Cir. 2001) ("In this Circuit, 'substantive' post-judgment orders issued in 'cases involving a protracted remedial phase' have readily been deemed appealable.").

An order awarding attorney's fees and incentive awards from a common-fund is sufficiently independent and final to be appealed under the rule of *Sprague v. Ticonic Nat. Bank,* 307 U.S. 161, 169 (1939), and *Trustees v. Greenough,* 105 U.S. 527, 531 (1882), that an order allowing costs and fees "'as between solicitor and client'" is a final appealable order because "'the inquiry was a collateral one, having a distinct and independent character.'" *Sprague,* 307 U.S. at 169 (quoting *Greenough,* 105 U.S. at 531); *Seigal v. Merrick,* 619 F.2d 160, 164 n.7 (2d Cir. 1980); *see also McGill v. Secretary of Health & Human Services,* 712 F. 2d 28, 29-30 (2d Cir. 1983); *Deboard v. Sunshine Mining and Refining Co.,* 208 F.3d 1228, 1237 (10th Cir. 2000) ("motions for attorney fees are separate from and collateral to any decision on the merits"); *Autorama*

*Corp. v. Stewart,* 802 F.2d 1284, 1286 (10th Cir. 1986); *Swanson v. American Consumer Indus.,* 517 F.2d 555, 560 (7th Cir. 1975).

## II.    ISSUES PRESENTED

1.  Whether a settlement and release of claims in a class action under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 may prospectively waive claims for future violations that accrue during a five year period after settlement and, if so, whether it is error to approve a release that is extended by the pendency of appeals from the judgment?

Standard of review: De novo as to legally permissible scope of release of liability for future acts under the antitrust laws, and as to whether the duration of such a release may be extended during the pendency of appeals.

2.  Whether the district court erred in awarding attorneys' fees of $523,269,585.27 equating to 9.31% to be taken from the settlement "mega-fund" and representing a 2.45 times multiplier on the lodestar, when, inter alia, (1) recent Supreme Court and Second Circuit authority suggest that common fund awards should be more closely tethered to the lodestar, which is presumptively a reasonable fee, and (2) when the

scale and duration of the future claims released is uncertain, hampering analysis of the detriment imposed on the class relative to the benefits received in the settlement?

Standard of review: De novo as to the legal standards applicable to common fund fee awards, abuse of discretion as to the calculation of the amount of the award under the proper standard.

3.  Whether the district court erred in awarding $900,000 from the class fund to the named plaintiffs, in the absence of statutory authorization and in light of the Supreme Court's decisions in *Trustees v. Greenough*, 105 U.S. 527 (1882) and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), which forbid such awards?

Standard of review: De novo as to the applicable law.

## III.  STATEMENT OF THE CASE

### A.    Local Rule 28.1 Statement

This appeal arises following the settlement of a federal antitrust class action, asserting claims on behalf of:

> all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that the Rule 23(b)(3) Settlement Class

shall not include (a) the Dismissed Plaintiffs, (b) the United States government, (c) the named Defendants in this Action or their directors, officers, or members of their families, or (d) financial institutions that have issued Visa-Branded Cards or Mastercard-Branded Cards or acquired Visa-Branded Card transactions or Mastercard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date. (the "class").[2]

Appellant is a class member because he accepted Visa and Mastercard branded cards in the United States during the class period.[3]

The district court, the Honorable Margo K. Brodie, United States District Court Judge presiding, approved the parties' settlement (JA7324-7397/DE7821) and granted plaintiffs' motions for attorneys' fees (JA7398-7454/DE7822) and "service awards" (JA7455-7458/DE7823) on December 16, 2019.   Appellant filed his timely notice of appeal from that Order and Judgment on January 8, 2020. JA8584/DE7845.

## B.    Statement of Facts and Procedural History

The relevant facts and procedural history prior to the settlement at issue here are set forth in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213 (E.D.N.Y. 2013)

---

[2] *See* Superseding and Amended Definitive Class Settlement Agreement of the Rule 23(b)(3) Class Plaintiffs and the Defendants. DE7257-2:21-22

[3] *See* Declaration of Kevan McLaughlin.  DE2474-1

("*Interchange Fees I*"), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) ("*Interchange Fees II*")

Prior to *Interchange Fees II*, Appellant McLaughlin objected to the original settlement on May 25, 2013. DE2474. The original settlement was reversed and remanded, on grounds of conflict in representation, necessitating on remand separate representation for a Rule 23(b)(3) "damages" class and a Rule 23(b)(2) "injunctive" class.

## 1. Settlement and Preliminary Approval

The lead plaintiffs and defendants entered into a new settlement agreement in September, 2018. JA3304-3587/DE7257-2. This Agreement resulted in a class fund valued at approximately $6.24 billion. JA3523/DE7257-2:220.

The Settlement Agreement provided that Lead Counsel could apply for an award of attorney's fees, and for reimbursement of costs and expenses from the cash available to compensate class members (the "Total Cash Consideration"). JA3355-3356/DE7257-2:52-53.

On January 24, 2019, the District Court preliminarily approved the Agreement, authorized notice to be disseminated to potential Class Members, and scheduled the Settlement Hearing to consider whether to grant final approval to the settlement and plaintiffs' counsel's request for fees. DE7361 (Order Preliminarily Approving Settlement).

Lead Counsel thereafter applied for a fee amounting to 9.56% of the Settlement Fund, i.e. $602.28 million, plus interest earned at the

same rate as the Settlement Fund, and also applied for reimbursement of $ $38,263,023.81 in litigation expenses and costs. DE7471-1 (Memorandum). Lead Counsel urged the District Court to apply a percent-of-fund method to calculate the attorney's fees, acknowledging that the requested 9.56% award would amount to a 2.96 multiplier of Lead Counsel's lodestar – roughly 300% more than the lawyers' billable hourly rates. DE7471-1:8.

### 2. McLaughlin's Objection to the Settlement Release, Attorneys' Fees, and Incentive Awards

Appellant Kevan McLaughlin objected to the Superseding Settlement. JA6687-6703/DE7571. He argued primarily that the release of claims in the case remained too broad, pointing out that it appeared to release claims that had not yet accrued and which would be based upon prospective violations of the antitrust laws outside the class period and outside the ambit of the "identical factual predicate" of the lawsuit's claims. Moreover, the release contained an unprecedented provision by which its five-year duration would be extended for the duration of any appeals taken by class members. McLaughlin pointed out that the indeterminate release period hampered analysis of the settlement, because the district court could not discharge its duty to compare the rights given up by the class members against the financial relief offered by the settlement.

McLaughlin also opposed lead plaintiff's motion for "class representative service awards," pointing out that such payments were not permitted under Supreme Court precedent. JA6700-6703/DE7571:14-17.

Additionally, McLaughlin objected to class counsel's request for attorneys' fees,[4] arguing that counsel's unenhanced lodestar was a presumptively reasonable fee and that class counsel had not demonstrated that they should receive a substantial multiplier on top of their lodestar based on risk or other factors. *Id.* The objection suggested that Supreme Court authority regarding the calculation of lodestar fees in fee-shifting cases should inform fee calculation when there is a common fund. DE7571:7-14. The objection contended that the result in the case, although sufficient to support settlement, was not so extraordinary as to justify the fee requested, and that the district court should (l) recognize that limitations on reasonable attorneys' fee awards under fee-shifting statutes may inform common fund awards, (2) presume a fee based on counsel's lodestar is reasonable and adequate in the absence of extraordinary circumstances; and (3) refuse to award a percentage fee that greatly exceeds that amount. *Id.*

---

[4] Federal Rule of Civil Procedure 23(h)(2) provides that when class counsel file a motion for attorney's fees, a "class member, or a party from whom payment is sought, may object to the motion."

The objection pointed out that most of the factors were already adequately compensated by class counsel's high hourly rates, which in this case ranged up to $1,250 before any multiplier, and $3,062.50 per hour after application of the 2.45 multiplier utilized by the district court.  *See* DE7471-4:11; DE7471-2:89; DE7471-3:16; DE7822:56.  The objection reminded that *Goldberger* was skeptical of compensating for risk over and above lodestar, and that *Goldberger* itself affirmed an unenhanced lodestar fee award based on findings that "[the] use of high hourly billing rates compensated counsel for the quality of their efforts, and what risk there was in the case." DE7571:14, quoting *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 54 (2d Cir. 2000).

Finally, the objection pointed out that, as a matter of public policy, there should not be a large disparity between fees awarded in common fund cases and fees awarded under fee-shifting theories.  The possibility of a larger fee award for the same essential effort creates a strong and unjustified incentive for lawyers to pursue exclusively cases that are likely to generate a common fund, and a consequent misallocation of resources away from cases Congress intended to incentivize. DE7571:13-14.

### 3.    Final Approval Hearing

On December 7, 2019, the district court held a hearing to consider whether to grant final approval to the Superseding Settlement, as well as the motions for attorneys' fees and incentive awards.  JA7048-7200

(Transcript of Dec. 7, 2019 hearing).  McLaughlin's counsel appeared and offered argument at the hearing.  *See id*. at 12-14, 37-43, 119-123.

### 4.    Approval of the Settlement and Attorneys' Fees Request and Subsequent Appeal

The district court held the net settlement fund, after adjustment for opting-out class members, was $5,620,511,120.  JA7329/DE7821:6, n.8 citing DE7752, finding that based on transaction volume, those that have opted out of the Superseding Settlement Agreement "represent over 28%, which is a significant percentage of the class." DE7821:34 (citing DE7791, Nov. 2019 letter from parties).  Based on this calculation and other factors, the district court granted final approval of the Agreement.  JA7324-7397/DE7821. The district court awarded 9.31% of the settlement fund, i.e. $523,269,585.27, in attorneys' fees – resulting in a multiplier of 2.45. DE7822:56.   The district court awarded class counsel expenses in the amount of $39,155,068.01.  *Id.* at 57.  Additionally, the district court approved additional compensation to lead plaintiffs consisting of $900,000 in "service awards" and $734,643.01 in out-of-pocket expenses. DE7823:4.

On January 8, 2020, Appellant timely filed a notice of appeal from the district court's order granting final approval, order awarding attorney's fees, order granting "service awards", and judgment.  DE7845

## C. Standard of Review

The issues raised by Appellant primarily concern questions of law, including the determination of what legal standards properly govern releases in antitrust class action settlements and the award of attorneys' fees and incentive awards in common fund cases. As such, the issues central to this appeal should be subject to this Court's non-deferential *de novo* review.

The permissible legal scope of a settlement release is reviewed de novo, with the district court's factual conclusions reviewed for plain error. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011).

This Court ordinarily reviews an award of attorney's fees for abuse of discretion. *See Millea v. Metro-North R. Co.,* 658 F.3d 154, 166 (2d Cir. 2011); *McDaniel v. County of Schenectady,* 595 F.3d 411, 416 (2d Cir. 2010). "However, this discretion is not unfettered, and when a prevailing party is entitled to attorney's fees, the district court must abide by the procedural requirements for calculating those fees articulated by this Court and the Supreme Court." *Millea,* 658 F.3d at 166. "The Second Circuit reviews a district court's decision to grant or deny an award of attorney's fees for abuse of discretion, reviewing de novo any rulings of law." *Flanagan, Lieberman, Hoffman & Swaim v. Ohio Public Empls. Ret. Sys.,* 814 F.3d 652, 656 (2d Cir. 2016).

Thus, when an issue under review concerns the proper legal standards that should control the district court's exercise of discretion, "[t]he court of appeals need not defer to the district court's resolution of the point." *Koon v. United States,* 518 U.S. 81, 100 (1996); *see United States v. Bonnet-Grullon,* 212 F.3d 692, 700 (2d Cir. 2000).

Likewise, regarding the grant of incentive awards from the class fund, McLaughlin poses only the legal issue of whether such awards are prohibited by Supreme Court precedent, and thus does not reach whether the district court abused its discretion in the calculation of the awards.

## IV.  SUMMARY OF ARGUMENT

### A.  McLaughlin's Challenge to the Settlement's Release of Claims

The renewed settlement effort in this case suffers from a singular infirmity in the scope of its release of claims, which not only releases liability for past conduct, but purports to release claims accruing after the settlement and thus would immunize defendants from continuing their present conduct into the future, and permit them to impose the same or similar conditions upon class members.  McLaughlin argues that a class action release cannot lawfully be construed to release claims based on future conduct that have yet to accrue.

Some courts have adopted an unwarranted interpretation of the Supreme Court's definition of an "identical factual predicate" to affirm releases that purport to immunize defendants from future conduct and release claims that have yet to accrue. *See* discussion *infra* at 17-20, discussing *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996). Appellant also argues that the district court gave short shrift to courts warning that settlement agreements and releases should not permit or excuse later acts, particularly under the antitrust laws. *See* discussion *infra* at 20-22.

In addition, the five-year prospective release effectively extends the class period, such that it reduces the effective recovery for class members, in a case in which the recovery was already very small in the district court's own estimation. Worse still, the five-year period only commences at the resolution of all appeals, which penalizes class members for exercising the right to appeal by further lowering the value of their claims for an indeterminate period. *See* discussion *infra* at 21-22.

Appellant therefore asserts that the district court misinterpreted the scope of the "identical factual predicate" doctrine, and therefore erred in approving the settlement over objections to the release.

### B. McLaughlin's Challenge to the Award of Attorneys' Fees

McLaughlin asserts the district court erred when it awarded as attorneys' fees a percentage of 9.31% of a fund of $5.62 billion, which in this case resulted in a multiplier of 2.45 to Lead Counsel's lodestar, and a fee of $523,269,585.27. DE7822:56-58.

The Supreme Court has recognized percentage fee awards in common-fund cases, but has not given guidance on their calculation. What guidance there is suggests the percentage fee awarded here is high. Meanwhile, the Supreme Court's discussions of lodestar calculation in fee-shifting cases have notably limited the recovery of amounts in excess of the lodestar, which is presumed to be a reasonable fee. This Court's opinions have generally hewed to that interpretation, both in the context of statutory fee-shifting awards, and in common fund awards. *See* discussion *infra* at 23-29.

This circuit has not historically been given to fees set by casual reference to benchmark percentages, and has been relatively modest in applying multipliers to lodestar fees. Appellant asserts that multipliers well in excess of 1-2 are not at all common or customary in this Circuit, contrary to the district court's assessment, much less the 2.45 multiplier granted in this mega-fund case. *See* discussion *infra* at 29-35.

In this case, the district court misinterpreted the law in cross-checking the percentage award against the lodestar, finding the multiplier to be within an acceptable range under the circumstances. Doing so, the district court erroneously included in the multiplier risk elements inconsistent with Supreme Court and recent Second Circuit authority, which include only contingent risk—and not other elements of litigation risk—as risk to be enhanced by a multiplier. *See Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 71 (2nd Cir. 2019). Had the district court applied the standard correctly, the multiplier would have stood as a red flag indicating likely overcompensation to class counsel by way of the percentage. *See* discussion *infra* at 35-39.

Appellant also warns that there should not be a large divergence in common-fund and fee-shifting awards. The potential for cases to involve alternative common-funds and fee-shifting theories can result in widely differential fee awards for identical work and risk. Not only is that inequitable, it creates inappropriate incentives unduly affecting tactics in individual cases, as well as skewing the allocation of enforcement resources among types of cases. *See* discussion *infra* at 39-45.

### C. McLaughlin's Challenge to the Grant of Incentive Awards

The Supreme Court's decisions establishing the common-fund doctrine—under which lead plaintiffs and class counsel claim their incentive awards and attorneys' fees—are *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*,113 U.S.116 (1885). Both decisions clearly hold that a representative plaintiff (and its counsel) may recover reasonable litigation expenses including attorney's fees from a common-fund recovery, but that the representative plaintiff *shall not* be reimbursed for personal service rendered on behalf of the class. The Court held that any payment compensating a representative plaintiff for "personal services" in prosecuting the litigation is both "decidedly objectionable" and "illegally made." *Greenough,* 105 U.S. at 537-38. A named plaintiff's "claim to be compensated, out of the fund ... for his personal services" the Court flatly "rejected as unsupported by reason or authority." *Pettus,* 113 U.S. at 122. Thus, a representative plaintiff who procures a common fund benefitting others is entitled to have attorneys' fees and litigation expenses assessed against the fund, but **cannot** recover compensation for his own service as class representative. *Greenough*, 105 U.S. at 537-38; *Pettus,* 113 U.S. at 122.

Unquestionably, district courts have made a recent practice of granting such awards, and a few Circuit courts have upheld them.

They have done so without authorization or authority, and in contravention of the Supreme Court prohibition. That prohibition is hardly capricious, because current incentive award practice creates conflicts of interest and undermines the purposes of Rule 23.

Appellant therefore respectfully requests that this Court reverse the approval of the settlement, attorneys' fees, and incentive awards, and that the Court make such additional clarification of the law that will assist the district court on remand.

## V.   ARGUMENT

### A.   The district court erred in approving the release

McLaughlin argues that the release of claims remains too broad because it goes beyond precluding claims based on the "identical factual predicate" test set forth in Supreme Court authority. The district court made an extensive analysis of the extant caselaw, concluding that released future conduct was still within the "identical factual predicate" permitted to be released under Supreme Court precedent.

Appellant asserts that the phrase "identical factual predicate" has been interpreted too broadly. The Supreme Court's sole discussion of "identical factual predicate" comes in *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996). The Court held there that a federal court must give full faith and credit to a Delaware state court settlement releasing federal claims that could not have been brought there. In that

case, the "identical factual predicate" refers to the identical original conduct giving rise to different causes of action in different fora. There is no indication that the Court intended to expand the doctrine to extend a settlement release of antitrust claims that "could not have been brought" because they had not yet accrued. In *Matsushita*, "identical factual predicate" does not mean "later conduct that is the same as earlier conduct, or part of the same ongoing conspiracy." In fact, Justice Ginsburg, writing in concurrence, pointed out that the test is actually narrower than the "same transaction" Matsushita had argued for. *Matsushita*, 516 U.S. at 395 n.4 ("In its endeavor to forecast Delaware preclusion law, the Court appears to have blended the 'identical factual predicate' test applied by the Delaware Supreme Court in *Nottingham Partners v. Dana,* 564 A.2d 1089, 1106–1107 (1989), with the broader 'same transaction' test advanced by Matsushita.").

Later acts that give rise to new violations are certainly not the "same transaction" and it is not clear how they could meet the narrower "identical factual predicate" test as it was articulated by the Supreme Court. Moreover, in this case, the settlement permits defendants to alter their practices and still be within the release. This case challenges the rules that defendants impose on their merchant customers and, as the district court explained, "references to these rules 'mean those rules as they are or were in place on or before the Settlement Preliminary Approval Date and rules in place thereafter

that are *substantially similar*."' JA7374/DE7821:51 (citing Superseding Settlement at 31(c)) (emphasis by district court). *See also id.* at 50 ("The Release Provision broadly releases claims arising out of certain rules challenged in the litigation and other rules that are substantially similar."). Putting aside the viability of future acts being within an "identical factual predicate" in the first place, the notion that defendants might later alter the rules seems a concession that wholly precludes a finding that the conduct is within an "identical" factual predicate.

The Supreme Court's explication of the identical factual predicate test in *Matsushita* cannot be stretched to cover this situation. That is particularly true given the numerous cases McLaughlin and other objectors cited, which speak of strong public policy against immunizing future antitrust violations and putting a court's imprimatur on an assertedly unlawful course of conduct. JA6690-6691/DE7571:4-5 & n.2. The district court was unimpressed by those authorities, however. JA7377-7379/DE7821:54-56. The court distinguished *Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985), as dicta warning only against contractual clauses in an arbitration agreement operating to work "a prospective waiver of a party's right to pursue statutory remedies for antitrust violations," finding that "[f]or many reasons," that scenario is different from the "jointly negotiated release" in this case. DE7821:56. But the public

policy imperative expressed in the Supreme Court's statement—against the prospective waiver of antitrust violations—is directly on point, and the district court did not explain why an agreement to arbitrate antitrust claims requires more scrutiny than an agreement to release them altogether, particularly in a settlement that permits some of the challenged conduct to continue for an indeterminate period.

The Supreme Court has not since clarified the "identical factual predicate" test, but its arcane origin and granular factual underpinnings do not support all the purposes to which it has since been put. Some courts have apparently embraced the idea that any later-accrued claim based on the same type of conduct must necessarily be within the "identical factual predicate" of the released claim. For example, the district court relied on a case involving unconsented text messages, *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019). But the *Melito* opinion simply restates the assertion that claims can be released "as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct" then immediately concludes without elaboration that the appellant there did "not realistically argue that text messages sent after the class period, as opposed to those sent during, are somehow different." The opinion does not actually analyze whether the future acts or unaccrued causes of action actually met the identical factual predicate test. It merely assumes that they must.

By contrast, other courts have been careful to distinguish future conduct, which cannot be immunized, from the continuing effects of released conduct, which can. *See* JA6690-6691/DE7571:4-5 (McLaughlin Objection).

The district court expressed sympathy for class members' concerns about the release of future claims, "especially five years after the finalization of all appeals, which may be many years into the future." JA7375/DE7821:52. Still, the district court took the glass-half-full view, reasoning that the five-year limitation—and the fact that the release might be extended for additional time pending appeals—was unobjectionable because the release of future claims based on the "identical factual predicate" could permissibly continue into perpetuity. JA7375/DE7821:52 & n.20. Seen this way, the five-year period is a benefit to class members because it actually limits the prospective release.

That view assumes that unaccrued claims based on future acts can be released in perpetuity, which McLaughlin disputes. But even taking that proposition as true, the provision has the effect of concomitantly extending the class period, so that the fixed value of the settlement is reduced to the extent the objectionable acts continue. *See* JA7383/DE7821:60 (acknowledging that the small percentage recovery estimated in the original settlement is "now likely even less due to a longer class period and a larger class membership."). And, if the five-

year limitation is a benefit, there remains no explanation for why it should be reduced (i.e., the release extended) merely because class members seek to challenge the settlement. As McLaughlin explained in his Objection:

> There is nothing about the pendency of an appeal that justifies extending the release period to commence only after the appeal is resolved. If the approved settlement were struck down, the mooted release would fall with it regardless of when the period commenced. Conversely, an affirmance would leave the relative positions of the parties unchanged and so, too, any release they agreed upon.

JA6691/DE7571:5 (McLaughlin Objection).

There is no rational reason to impose a greater detriment upon the class merely because some class members exercise the right to appeal, and neither the parties nor the district court could explain the justification for penalizing, and thus discouraging, challenges to the settlement. Appellant submits that a release of claims that extends into the future to immunize later indeterminate conduct, for an indeterminate period, is without legal authority and contrary to public policy. The district court therefore erred in approving it.

**B.** **Supreme Court and Second Circuit precedent do not support a fee award of 523,269,585.27, representing a multiplier of 2.45 on hourly billings, in this mega-fund settlement**

The district court correctly recognized its duty "to act as a fiduciary who must serve as a guardian of the rights of absent class members." DE7822:19 (citation omitted).  To fulfill that duty, this Court permits district courts substantial latitude in choosing the method of determining fees in common-fund cases, permitting either the use of the percent-of-fund method, or the lodestar methodology by which the court multiplies the hours expended by a reasonable hourly rate.  *E.g.*, *Goldberger*, 209 F.3d at 47 (use of either lodestar or percentage method is "reasonable."); *Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 71 (2d Cir. 2019) (this flexibility means that "class counsel cannot enter into a premature settlement confident that it will receive a percentage-of-the-fund fee that exceeds its lodestar fee.").

Whatever method is used, "district courts should continue to be guided by the traditional criteria in determining a reasonable common-fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'" *Id.* at 50.  *See also id.* at 53 ("[A] fee award should be assessed based on

scrutiny of the unique circumstances of each case….").  District courts using the percentage method, moreover, should cross-check the percentage fee against the lodestar—the presumptively reasonable fee—to ensure there is no windfall.  *Fresno County*, 925 F.3d at 72.

The propriety of specific percentage awards can be difficult to assess, the threshold problem being that the Supreme Court has not given much guidance on percentage fees in common fund cases.  The Supreme Court's original common-fund decision, *Trustees v. Greenough,* 105 U.S. 527 (1882), reimbursed a class representative for itemized attorneys' fees that he had actually incurred and paid over years of litigation—essentially a lodestar award.[5]  The fee award approved in *Sprague v. Ticonic Bank,* 307 U.S. 161 (1939), similarly involved itemized disbursements rather than a percentage of the fund.[6] Complying with the Supreme Court's mandate in *Boeing v. Van Gemert,* 444 U.S. 472, 478 (1980) that common-fund fees must be assessed against the entire fund, the district court on remand awarded fees

---

[5] *See Greenough,* 105 U.S. at 529-31; Transcript of Record, *Trustees v. Greenough,* No. 601, at 711-24 (original), 228-32 (print)(itemizing expenses, lawyer by lawyer)(1881).

[6] *See Sprague v. Ticonic Nat'l Bank,* 28 F.Supp. 229, 231 (D.Me. 1939), *aff'd in relevant part and rev'd in part on other grounds,* 110 F.2d 174, 178 (1st Cir. 1940)("The decree of the District Court is affirmed insofar as it allows the original petition for reimbursement in the amount of $1,214.51.").

based on counsel's lodestar. *See Van Gemert v. Boeing,* 516 F.Supp. 412, 414, 417-20 (S.D.N.Y. 1981). "'The starting point of every fee award,'" the district court explained on remand, "'must be a calculation of the attorney[s'] services in terms of the time [they have] expended on the case.'" *Id.* at 414 (quoting *City of Detroit v. Grinnell,* 495 F.2d 448, 470 (2d Cir. 1974)).

The Supreme Court has since acknowledged percentage-based fees in common-fund cases, but it has not given a blueprint for calculating them. Nor has it ever explicitly endorsed a percentage resulting in a fee as high as that awarded here. The Court has allowed percentage fee awards in common-fund cases, if they are "made with moderation and a jealous regard to the rights of those who are interested in the fund," *Trustees v. Greenough*, 105 U.S. 527, 536-37 (1882), and do not exceed the "reasonable compensation for their professional services," *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 127-28 (1885) (cutting common-fund fee award in half, to 5% of the fund), with "special care ... taken to confine the fees to what was reasonable." *United States v. Equitable Trust Co.,* 283 U.S. 738, 746 (1931) (cutting equitable-fund fee award that the Second Circuit had approved in half, to roughly 8% of the fund in question).

The Supreme Court has not recently revisited the issue of percentage fee calculation under the common fund doctrine. It has, however, explained in discussions of lodestar fee awards that the

lodestar affords presumptively fair and adequate compensation for attorneys taking a matter on a contingent basis. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546 (2010); *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). In fact, the Supreme Court's precedents defining a "reasonable" fee in the context of contingent fee class actions uniformly hold that class counsel's flat lodestar is presumptively adequate compensation and thus a "reasonable" attorney's fee. *Perdue* holds (1) that in contingent fee class action litigation, "a 'reasonable fee' is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious … case," (2) that "the lodestar method yields a fee that is presumptively sufficient to achieve this objective," and (3) that enhancement of the lodestar is appropriate only in "'rare' and 'exceptional' circumstances." *Perdue*, 559 U.S. at 552. (emphasis added). Moreover, "there is a strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Perdue*, 559 U.S. at 546.

For the most part, this Court is in accord regarding lodestar fees. *See In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d 731, 731 (2d Cir. 1992) ("in the context of attorneys' fee awards, we have demanded 'specific reasons' when a district court departs from the lodestar figure, which is

'strongly presumed to be reasonable'") (citations omitted); *Grant v. Martinez*, 973 F. 2d 96, 101 (2d Cir. 1992)(same); *compare Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 192 (2d Cir. 2008) (honoring "the Supreme Court's emphasis on the need to use the approximate market rate for an attorney's services in calculating the presumptively reasonable fee.") citing *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989).

Furthermore, this Court has consistently rejected the argument that "the lodestar method applied in the common fund context is distinct from that employed in the statutory fee-shifting context." *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 421 (2d Cir. 2010):

> this Court's case law does not suggest that there are two different lodestar methods, *see, e.g.*, *In re "Agent Orange" Product Litig.*, 818 F.2d 226, 232 (2d Cir.1987) ("[W]e have adopted a lodestar formula for calculating fees in equitable fund and statutory fee contexts."). To the contrary, in discussing the lodestar method, our common fund and statutory fee shifting cases have employed the same definition and referenced the same foundational cases.

*Id*. at 422 (footnote omitted).[7]

---

[7] Appellant notes that this Court has considered a similar argument in an unrelated appeal, *In re: BHP Billiton Limited Sec's. Litig.*, No. 19-1378 (decided March 12, 2020) (not precedential - *see* Second Circuit Local Rule 32.1.1(a)).

That prior guidance, taken at face value, would suggest percentage fees lower than that found in district courts today. The Court's comments on lodestar, moreover, suggest that lodestar cross-checks should serve to reduce percentage fees to be more closely in line with lodestar. It likewise stands to reason that if a common fund fee can be calculated as a lodestar fee, or as a percentage-of-fund with a lodestar cross-check, common fund awards would hew very closely to lodestar awards made in the other contexts, such as cases involving fee-shifting statutes.

However, as the district court observed, this Court has recently held that when a litigation generates a common fund for the payment of fees, there is more leeway for a lodestar enhancement than when a fee is awarded under fee-shifting principles. DE7822:19, discussing *Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63 (2nd Cir. 2019). In *Fresno County*, this Court acknowledged that Supreme Court precedent mandated a relatively strict lodestar approach when fees are awarded pursuant to a fee-shifting statute, but held that courts could nevertheless award a common-fund percentage fee exceeding base lodestar, even if the fund is generated in litigation under an applicable fee-shifting statute. *Id*. at 68 ("[A]n attorney seeking a fee after establishing statutory liability will presumptively receive a fee equal to the unenhanced lodestar, and an attorney seeking a fee after establishing a common fund will receive a fee calculated

using either the lodestar method or a percentage-of-the-fund method, which can yield a fee that is less than, equal to, or greater than the lodestar fee.").

### 1. The fee award cannot be supported by reference to customary percentages or lodestar multipliers in this Circuit

Using primarily the percentage method, the district court approved attorneys' fees of $ $523,269,585.27, equating to 9.31% to be taken from the $5.62 billion settlement and representing an approximate 2.45 times multiplier on class counsel's adjusted lodestar of $213,348,555. JA7452-7453/DE7822:55-56. This Court has warned against fee-setting by reference to customary fees. In *Goldberger*, this Court acknowledged other circuits' practice of fixing a 25% percentage "benchmark," and that district courts had subsequently "eased into a practice of 'systematically' awarding fees in the 25% range….". *Goldberger*, 209 F.3d at 51. This Court considered and rejected the practice. *Id*. at 51-52. This Court found itself "disturbed by the essential notion of a benchmark" because it presents an "all too tempting substitute for the searching assessment that should properly be performed in each case." *Id*.[8] Consistent with that bespoke approach

---

[8] This Court further observed that, if there were any empirical benchmark for fees from a fund between $50 million and $75 million, it would fall not around 25%, but somewhere between 11% and 20%. *Id*. at 52.

to fee setting, the *Goldberger* factors do not direct district courts to consider fee awards made in other cases.

Nevertheless, and although overtly skeptical of the accuracy of the approach, the district court found itself comparing the proposed percentage to fee awards in similar "mega-fund" antitrust cases (DE7822:44-45) and ultimately satisfied itself that the percentage award "aligns with those percentages granted in other similar types of actions as within the range of similar awards." *Id.* at 46. To evaluate the reasonableness of the requested percentage further, the district court engaged in a lodestar cross-check, concluding that the multiplier "fell well within a range of multipliers that have been deemed acceptable." *Id.* at 49-50.

*Fresno County* confirmed that district courts setting percentage fees should cross-check them against the lodestar for reasonableness. *Fresno County*, 925 F.3d at 72. Conducting a lodestar cross-check, the district court here allowed that "courts differ in opinion as to what constitutes an acceptable lodestar multiplier" but found class counsel's multiplier to fall "well within a range of multipliers that have been deemed acceptable, especially in complex actions." JA7447/DE7822:50 (quoting *Wal-Mart Stores v. Visa*, 396 F.3d 96, 123 (2d. Cir. 2005) ("multipliers of between 3 and 4.5 have become common")).

The reported lodestar in this case is based on premium attorney rates ranging up to $1250 per hour which, with the awarded multiplier,

equates to effective compensation of $3062.50 per hour. DE7471-4:11 (Declaration of Alexandra S. Bernay, hourly rate of Patrick J. Coughlin). Three other Robbins Geller attorneys billed time at rates exceeding $1000 per hour. DE7471-4:11 (Time Report at Historical Rates – December 1, 2012 through January 31, 2019). *See also* DE7471-3:16 (rates for Berger & Montague attorneys ranging up to $985 per hour); DE7471-2:89 (several Robins Kaplan attorneys billing in excess of $900 in later years of litigation). Taken as an average, the awarded fee represents approximately $2035 [$523,269,585.27 divided by 630,000 hours of attorney and paralegal time multiplied by 2.45] per hour across all timekeepers. DE7471-1:8.

The percentage award the district court calculated, when compared to the number of hours and hourly rates of class counsel, should have given the district court greater pause to consider whether such high multiple returns for every billed hour are truly appropriate. *E.g.*, *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 437 (S.D.N.Y. 2014) (2.8 multiplier would "result in an effective hourly rate of over $1,200 for every attorney and paralegal who worked on this case—a rate commanded by very few attorneys in this city, and deserved by even fewer.").

First, percentage fee awards, particularly in mega-fund cases, that represent a multiplier of 2.45 on class counsel's lodestar are not, and should not be, in any sense customary under the law of this Circuit.

Instead, the district court should have viewed a multiplier of 2.45 as a red flag indicating that the percentage award might be excessive. *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 CV 4318 HB, 2001 WL 709262, at *6 (S.D.N.Y. June 22, 2001) (finding "red flags" were raised by a percentage fee request resulting in a multiplier above 2, and awarding a 15% fee representing no multiplier); *cf. Tiro v. Pub. House Investments, LLC*, No. 11 CIV. 7679 CM, 2013 WL 4830949, at *15 (S.D.N.Y. Sept. 10, 2013) ("[I]f the lodestar is significantly out of line with the percentage of recovery, it raises a red flag. Where, as here, lodestar is virtually identical to the percentage of recovery, no red flag waves.").

Other district courts have forcefully disagreed with the proposition that the multiplier awarded in this case is routine or unremarkable: "Nearly all the cases cited to support the claim that a multiplier of 2.7 is 'average' are from other circuits." *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 718–19 720 (E.D.N.Y. 1989) (collecting cases showing multipliers ranged between 1.3 to 2.3 even in difficult, novel, complex litigations handled by the most competent counsel). These courts tend to make fee awards embodying lodestar multipliers in the range of 1-2, even in common-fund cases. *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009), aff'd *sub nom. Priceline.com, Inc. v. Silberman*, 405 F.App'x 532 (2d Cir. 2010) ("[A]s a rule, 'post-*Goldberger* courts ... have generally

refused multipliers as high as 2.03.') (quoting *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 4526593, at *21 (S.D.N.Y. Dec.20, 2007)) (quoting *In re Twinlab Corp. Sec. Litig.*, 187 F.Supp.2d 80, 87 (E.D.N.Y.2002)); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437–38 (S.D.N.Y. 2016) (collecting recent cases finding multipliers of 1.33 to 1.9 appropriate in megafund class actions); *In re Currency Conversion Fee Antitrust Litig.*, No. 04 CIV. 5723 WHP, 2012 WL 3878825, at *2 (S.D.N.Y. Aug. 22, 2012) (multiplier of 1.35); *Carlson v. Xerox Corp.*, 596 F.Supp.2d 400, 413 (D. Conn.), aff'd, 355 F.App'x 523 (2d Cir. 2009) (16% award of $750 million fund was 1.25 multiplier on lodestar).

A number of district courts have, in fact, found the extant authority on lodestar cross-checks to be of little value:

> The lodestar is worthless as a "cross check" on the percentage recovery method when there is so little agreement as to what constitutes a reasonable multiplier. Guidance from the Court of Appeals would be welcome, but of course there is rarely an appeal from a decision such as this.

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 438 (S.D.N.Y. 2014). Thus wrote one district court judge frustrated with the diverse authority regarding when and how much a lodestar may be multiplied before the fee becomes a probable windfall. *Fujiwara* attributed this divergence in authority to a proliferation of published

proposed orders prepared by plaintiffs' counsel themselves, concluding that the practice had resulted in "the class action bar…creating its own caselaw on the fees it is entitled to" and concluding "No wonder that 'caselaw' is so generous to plaintiffs' attorneys." *Id.* at 436. Other district courts immediately agreed. *Flores v. Mamma Lombardi's of Holbrook, Inc.*, 104 F. Supp. 3d 290, 307 (E.D.N.Y. 2015) rejected the assertion that "[c]ourts regularly award lodestar multipliers from two to six times the lodestar," holding it to be "undercut by applicable Second Circuit and U.S. Supreme Court precedent" which counsel that the base lodestar already "includes most, if not all, of the relevant factors constituting a reasonable attorney's fee." *Id.* at 315 (quoting *Millea,* 658 F.3d at 167).[9] In all, the growing disparity in practices and authority

---

[9] After *Fujiwara* and other courts cast doubt on support for "typical" percentage awards, "rather than relying on the percentage-of-fund method, courts routinely evaluated the lodestar and determined whether a multiplier was appropriate in light of the *Goldberger* factors." *Hall v. ProSource Techs., LLC*, No. 14-CV-2502 (SIL), 2016 WL 1555128, at *11 (E.D.N.Y. Apr. 11, 2016); *see also Long* 2016 WL 4764939, at *7 (observing same conduct as in *Fujiwara* and concluding "I continue to be wary of much of the case law awarding a one-third percentage-of-the-fund in FLSA cases, and I decline to apply the percentage method."); *Assif v. Titleserv, Inc.*, No. CV113203PKCAKT, 2015 WL 13753144, at *16–17 (E.D.N.Y. Aug. 14, 2015) (citing *Fujiwara* and rejecting one-third fee request that would result in a 6.6 multiplier and instead awarding a 1.5 multiplier primarily to account for future time expenditures in collecting and distributing the judgment.).

led the *Fujiwara* court to declare that "There is little consensus in this district on the appropriate range for lodestar multipliers." *Fujiwara*, 58 F. Supp. 3d at 438

In light of that authority, the district court's observation that "courts differ in opinion as to what constitutes an acceptable lodestar multiplier" is understatement. JA7447/DE7822:50. However, as discussed *infra*, the opinion in *Fresno County* provides recent, binding guidance explaining the composition of risk multipliers in common fund cases. The district court, unfortunately, misinterpreted that authority.

### 2. The district court misapplied *Fresno County's* guidance on contingent risk in assessing the lodestar multiplier

Despite the large resulting fee award, the district court found support for the multiplier by reference to the litigation risk of the case, asserting that "this case involved significant litigation risk and is a far cry from a 'standard' common fund case." JA7448/DE7822:51 (distinguishing *In re Tremont Sec. Law, State Law & Ins. Litig.*, 699 F. App'x 8, 18 (2d Cir. 2017).

The district court explained that Second Circuit authority permitted the multiplier to be based on "three categories of risk" including "(1) risks inherent in the litigation itself (i.e. hurdles to successfully establishing liability); (2) risks that the defendant may be unable to pay any ultimate award (i.e. risks of recovery); and (3)

contingency fee risks (i.e. the specific risk that [l]ead [c]ounsel will not be compensated at all for its work)." DE7822:29-30 (quoting *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 498–99 (S.D.N.Y. 2017)).

However, the district court's understanding of risk compensation was based on cases that predate *Fresno County*. *See id.* at 30. The discussion of multipliers in *Fresno County* makes clear that it is contingency risk, and not any other *Goldberger* risk factors, such as the difficulty of the case or a defendant's potential insolvency, that is being compensated by a lodestar multiplier in common-fund cases. *Fresno County* explains that multipliers are intended to compensate the **contingency** risk inherent in taking the case on contingency, including foregoing payment in other matters:

> The plaintiff class is therefore appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases. That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is limited by the risk she has assumed that the class's cause will be unsuccessful.

*Fresno County*, 925 F.3d at 70. Although *Fresno County* concludes that counsel can invoke common-fund doctrines to supplant otherwise-applicable statutory fee provisions, it does not represent an expansion of the components that make up a lodestar multiplier, or counsel higher lodestar multipliers than had previously been awarded. The fee award

there, for example, amounted to only a 1.39 multiplier of the lodestar. *Id*. at 66.

Notably, *Fresno County* does **not** consider the prospective difficulty or undesirability of the case as part of contingent risk analysis. Instead, the contingent risks that *Fresno County* contemplates compensating with a multiplier are limited to either: (1) the possibility that the lawyer would have had other paying work during the pendency of the case or, (2) the risk of loss over the lawyer's entire portfolio of cases. *Id*. at 70. *See also Meredith Corp. v. Sesac*, 87 F. Supp. 3d 650, 669 (S.D.N.Y. 2015) (lodestar multipliers are "commonly justified on the ground that counsel risked money and time, and may have foregone other engagements and clients, to pursue an uncertain representation of the class.").

The district court plainly considered in the multiplier non-contingent risks outside of those permitted in *Fresno County*, and so its error is manifest. Applying *Fresno County's* explanation of risk to this case, a multiplier of 2.45 would mean that Plaintiffs' counsel stood to make almost two and a half times as much money for the same time expended on other, foregone engagements. Yet there is nothing in the district court's analysis, nor in the record, to support that conclusion. Alternatively, the doubling of a lodestar suggests that class counsel end half of their cases with no recovery. *Fujiwara*, 58 F. Supp. 3d at 439 (awarding 1.75 multiplier on claimed hourly rates, commenting that

"The plaintiffs' bar is presumably selective enough with the cases they take on to win a recovery in at least half of them.").  Increasing the multiplier to 2.45 suggests that they routinely end nearly 60% of their cases with no fee recovery.  Again, that proposition has no support in the record, common experience, or this Court's prior guidance.  *See., e.g.*, *Goldberger*, 209 F.3d at 54 (finding high hourly rates compensated for quality of counsel's efforts, "and what risk there was in the case.").

This Court in Fresno County did not endorse multipliers in excess of two, and instead counseled that multipliers in common fund cases should not deviate much from lodestar.  *Fresno County*, 925 F.3d at 72 (reminding that district courts should use the lodestar as a "baseline" against which to crosscheck percentage fees, and that "Fee requests that deviate wildly from the unenhanced lodestar fee are unlikely to pass this crosscheck, and district courts are at liberty to reduce the requested fee within their discretion.").  *Id. See also id.* at 70, n.3 ("We note that it will not always be the case that an attorney representing a class assumes compensable contingency risk.").

If it is true that awards representing 2.45 multipliers are indeed routine in a case of this size, then it is reasonable to conclude that class counsel are routinely being overcompensated for risk in common-fund cases, both practically and in contravention of Supreme Court and Second Circuit authority.  Nevertheless, the district court interpreted *Fresno County* as giving leave to grant percentage awards resulting in

multipliers in excess of three in complex cases, and justifying a multiplier of 2.45 in this case. JA7447/DE7822:50. Appellant submits that was a misinterpretation of that case, and resulted in a fee that ultimately did, in fact, "deviate wildly" from the lodestar. *Fresno County*, 925 F.3d at 72. Accordingly, the fee award should be reversed and remanded so that the district court may calculate a fee that does not provide such a large windfall.

> ### 3. The divergence in common-fund and fee-shifting calculations is unwarranted, resulting in widely differential fee awards for identical work and risk

As discussed *supra*, there is considerable disagreement among courts as to the determination of percentage fees and the role of lodestar multiplier in setting them. This Court should not give a too-expansive interpretation of the observation, expressed in *Fresno County*, that fees in common fund cases may result in effective lodestar multipliers that greatly exceed one in common-fund cases, while cases subject to fee-shifting are presumptively limited to unadorned lodestar fees.

The distinction between "common fund cases" and "fee shifting cases" is neither immutable nor exclusive. They are not types of cases but exceptions to the standard "American rule" that litigants bear their own costs and attorneys' fees. *See, e.g.*, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 & 257-58 (1975). In actuality, a

case might involve elements of both common fund and fee-shifting. It could be filed under a statute that provides for fee-shifting for a prevailing party, involve a contract that provides for fee shifting, and also result in a cash common fund for the benefit of a class of people.

This case illustrates that well, given its late bifurcation into separate Rule 23(b)(3) "damages" and Rule 23(b)(2) "injunction" classes. The case was filed under the Sherman Act, which contains a fee shifting provision providing that persons "injured in [their] business or property by reason of anything forbidden in the antitrust laws…shall recover threefold the damages…sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. §15(a). Were class counsel to seek a fee under that provision, they would be limited under *Perdue* to a lodestar award strongly presumed to be the reasonable fee. However, the Superseding Settlement produced a cash common fund, allowing class counsel to claim a more enhanced fee under the common fund doctrine.

Accordingly, in this "damages" class, the lawyers who obtained a common fund amounting to a small fraction of the damages from the alleged practice were awarded a fee that is several times their lodestar. The district court openly critiqued the recovery as "quite small when compared to Plaintiffs' own damages estimate and the large number of class members" DE7822:37-38, concluding the low recovery "weighs slightly against granting the full amount of Class Counsel's requested

fee." *Id.* at 39.  Still, as the district court noted, common funds representing a minuscule fraction of potential damages are routinely approved as reasonable and adequate.  JA7384-7385/DE7821:61-62 (collecting cases).

Meanwhile, if the lawyers pursuing injunctive relief in the 23(b)(2) class are successful, there will not be a common fund: they will be limited to a statutory lodestar fee recovery, with a multiplier severely constrained by *Perdue*.  That is so even though an injunction preventing the conduct altogether might be much more valuable in its very first months than the entire settlement in this case.  *E.g.*, JA7385/DE7821:62 (acknowledging argument that earlier injunctive relief was estimated by Plaintiffs' expert as "at least $26 billion.").

Despite this divergence, as the district court also noted, the work done to establish liability in the case is substantially the same, whether for injunctive relief or damages. Specifically, the district court refused to reduce the lodestar calculation to account for class counsel's work on Rule 23(b)(2) injunctive matters prior to the bifurcation of the classes, in part because "the majority of Class Counsel's work leading up to the 2013 Settlement Agreement would have been aimed generally at proving antitrust violation, regardless of the particular remedy sought or class represented." DE7822:24.

Given the identical work and risk undertaken, it is difficult to explain a large variance in the resulting compensation.  *Fresno County*

explains the dichotomy by asserting that it is equitable for the class to subsidize counsel's contingent risk by paying a premium on attorneys' fees when there is a class fund, but that it is not equitable to force a losing defendant to subsidize the lawyer's risk by paying a premium when fees are awarded pursuant to a fee-shifting statute. *Fresno County*, 925 F.3d at 70. Yet that distinction hardly seems to justify a variance in fees measured in multiples. On the contrary, there is a countervailing argument that courts should be less solicitous of defendants subject to statutory fee shifting than to class members equitably sharing the fee to recover a common fund representing something they lost. After all, courts stand in a fiduciary capacity as regards class members; they are in no such position with a defendant.

At the same time, a wide divergence in the fees resulting from the two doctrines creates warped incentives in proportion to the degree of divergence. A recent case from the Eleventh Circuit not only corroborates the frequently minimal distinction between fee-shifting and common-fund cases, it illuminates the degree to which they are within the control of the settling parties. *In re Home Depot Inc.*, 931 F.3d 1065, 1079 (11th Cir. 2019), involved a class settlement creating a common fund, but the terms of the settlement provided that defendants would pay attorneys' fees, to be determined separately by the district court. Class counsel argued on appeal the case should be treated as a common fund for fee calculation purposes, but the Eleventh Circuit

disagreed, finding the fee arrangement in the settlement was a contractual fee-shifting provision, such that the fee was properly determined under fee-shifting principles despite the common fund recovery. *In re Home Depot Inc.*, 931 at 1079 ("[W]e are convinced that this is a fee-shifting case."). Having so decided, the Court analyzed the fee award as a lodestar award limited by the *Perdue* case. *Id.* at 1082 (citing and discussing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550, (2010)).

In *Home Depot*, a slightly different settlement agreement would have led to a common-fund fee. And to the extent common-fund fees are not considered "restricted" by reasonableness standards set forth in *Perdue*, that could lead to a considerably higher fee award in the same case. Again, as in this case, that result obtains even though all of the elements of the case are the same: the risk of nonpayment, the work performed, the expertise and performance of counsel, the result obtained in settlement, and the novelty and difficulty of the case.

If time spent obtaining common fund relief is overtly likely to be compensated at a higher rate, even in two otherwise identical cases, plaintiffs' counsel can be expected to make strategic decisions in individual cases with an eye towards avoiding fee-shifting. They face a strong incentive to settle for a common fund rather than proceed to trial in a case likely to result in fee-shifting. Courts in this circuit have been sensitive to those incentives. *In re Initial Pub. Offering Sec. Litig.*, 671

F. Supp. 2d 467, 512 (S.D.N.Y. 2009) (footnotes omitted)(noting conflict of interest between class members, who have little risk in proceeding to trial, and their counsel, who "have a strong incentive to settle, even if the recovery obtained is a fraction of the expected damages.").

The potential for a wide divergence in fee calculation causes problems that go beyond gaming the system in individual cases. The greater the divergence between common-fund and fee-shifting awards, the greater chance of influencing lawyers' choice of cases toward those that are more likely to produce a common fund, though the effort and risk may well be the same. One undesirable result will be the overenforcement of cases potentially involving common funds at the expense of cases involving primarily injunctive or other nonfinancial relief, regardless of their relative social or economic importance, and even though Congress has indicated an intent to promote their enforcement through fee-shifting provisions. DE126-1:13-14; *see also* Michael D. Axline, *Decreasing Incentives to Enforce Environmental Laws: City of Burlington v. Dague*, 43 Wash. U. J. Urb. & Contemp. L. 257 (1993) (discussing effect of limiting risk multipliers in fee-shifting cases).

*Fresno County* seems to anticipate—and attempts to forestall—the problem by limiting the enhancement to "contingent risk" rather than other forms of risk, and taking pains to remind that although common-

fund fees may sometimes practically exceed those available under a strict fee-shifting analysis, they should not exceed it by very much.

### C. The district court erred by granting incentive bonuses prohibited by binding Supreme Court precedent

In approving the grant of $900,000.00 in bonus "incentive payments" to the named plaintiffs in the case, the district court asserted these awards are given "to compensate the named plaintiff for any personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." (JA7455/DE7823:1) (quoting *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001)). The district court explained that courts evaluating incentive bonuses "often look to the sums awarded in similar cases, and compare the named plaintiff's requested award to each class member's estimated *pro rata* share of the monetary judgment or settlement." *Id.* (quoting *In re AOL Time Warner ERISA Litig.*, No. 02-CV-8853, 2007 WL 3145111, at *2 (S.D.N.Y. Oct. 26, 2007)).

Applying that standard, the district court approved the bonuses by concluding that the named representatives "had spent an enormous amount of time and resources in serving" and that the litigation was both complex and "spanned well over a decade." DE7823:2. The district court added that "[c]ertain Class Representatives expended additional

effort that far exceeded what an average class representative might do to advocate on behalf of the class."  DE7823:2.

Despite these conclusions, to grant the incentive awards was error as a matter of law.  As McLaughlin's Objection pointed out, the Supreme Court's seminal common-fund decisions expressly prohibit these awards and, in the absence of specific statutory authorization, lower courts that approve them have erred. JA6700-6703/DE7571:14-17. There is no inherent or statutory authority to make such awards in this case; to the contrary, controlling authority prohibits them. Therefore, the district court erred as a matter of law in approving them.

> **1.  Though lower courts have lately forgotten, the Supreme Court's fundamental common fund decisions prohibit the grant of incentive awards**

The fundamental cases recognizing courts' inherent authority to distribute litigation expenses from a common fund expressly proscribe other compensation to the named plaintiff.  "Since the decisions in *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), the Supreme Court of the United States has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980); *see generally* John P. Dawson, *Lawyers and Involuntary Clients:*

*Attorney Fees from Funds,* 87 Harv. L. Rev. 1597, 1601-02 (1974). The Court has applied the rule "in a wide range of circumstances as part of our inherent authority."[10]

But in authorizing the payment of common fund attorneys' fees, *Greenough* and *Pettus* specifically prohibited awards to representatives in excess of their share of the common fund. *Greenough* condemned as "decidedly objectionable" an incentive award to compensate the named plaintiff, Francis Vose, for services rendered to the class. *Greenough,* 105 U.S. at 537. "The reasons which apply to his expenditures incurred in carrying on the suit, and reclaiming the property subject to the trust, do not apply to his personal services and private expenses." *Id*. at 537. *Greenough* holds that "[s]uch an allowance has neither reason nor authority for its support," and thus is "illegally made." *Greenough,* 105 U.S. at 557-38.

The Court reiterated the rule in *Pettus*: "'It would present,' said Mr. Justice Bradley, speaking for the court, 'too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interests of creditors, and that, perhaps, only to a small amount, if they could calculate upon the allowance of a

---

[10] *U.S. Airways, Inc. v. McCutchen,* 569 U.S. 88, 104 (2013); *see also Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257-58 (1975).

salary for their time and having all their private expenses paid.'" *Pettus,* 113 U.S. at 122 (quoting *Greenough*).[11]

For a century, lower courts applying the common fund doctrine followed these holdings, distinguishing between the litigation expenses (including reasonable attorney's fees) that class representatives may recover, and allowances for "personal services" in acting as representative plaintiffs—compensation *Greenough* and *Pettus* expressly forbade.[12]  *See* Dawson, *Lawyers and Involuntary Clients,* 87

---

[11] *See also* Dawson, *Lawyers and Involuntary Clients*, 87 Harv. L. Rev. at 1602:

> The Court in *Greenough* ... drew a sharp distinction ....
> While [Francis] Vose, the active litigant, was held to be
> entitled to a "charge" for the reasonable value of
> his lawyers' services, which the lower court would fix with
> a wide discretion, it had no discretion to award an
> allowance to Vose himself for his own time and
> expenses.

[12] *See, e.g., Zucker v. Westinghouse Electric,* 374 F.3d 221, 226 (3d Cir. 2004) (reiterating the rule of *Greenough* that "denied Vose's request for fees for 'personal services' because such compensation might reward and encourage potentially useless litigation by others seeking lucrative 'salaries'"), *aff'g  In re Westinghouse Sec. Litig.,* 219 F.Supp.2d 657, 660-61 (W.D. Pa. 2002) (similarly following *Greenough*); *Granada Investments, Inc. v. DWG Corp.,* 962 F.2d 1203, 1207-08 (6th Cir. 1992) (applying *Greenough's* distinction between litigation expenses on the one hand, and "personal services and private expenses," on the other); *Crutcher v. Logan,* 102 F.2d 612, 613 (5th Cir. 1939) (under *Greenough* and *Pettus* claimants interested in the fund itself can receive "no

Harv. L. Rev. at 1602 (finding in 1974 no cases reimbursing representatives "for their own time, travel, or personal expenses, however necessary their efforts may have been to litigation….").

However, between 1980 and 1990 lower courts began to ignore the rule, and the practice of paying representative plaintiffs subsequently became widespread. "Beginning around 1990…awards for representative plaintiffs began to find readier acceptance," and soon orders "approving incentive awards proliferated," so that "[b]y the turn of the century, some considered these awards to be 'routine.' Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L. Rev. 1303, 1310-11 & n.21 (2006); 2 *McLaughlin on Class Actions* §6:28 & nn.29-30 (15th ed., 2018) (reporting "near-universal recognition that it is appropriate for the court to approve an incentive award payable from the class recovery, usually within the range of $1,000-$20,000.").

They have done so with no basis at all in law.  Even putting aside *Greenough's* express prohibition, there is no affirmative authority empowering courts to make these awards from common funds. "The judiciary has created these awards out of whole cloth." 5 *Newberg on Class Actions* §§17:1 (5th ed. 2019); *see id.* at §§17:2, 17:4. Theodore

---

compensation for personal services"); *see also Gortat v. Capala Brothers, Inc.*, 949 F.Supp.2d 374, 379 (E.D.N.Y. 2013) (following *Greenough*).

Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study,* 53 U.C.L.A. L. Rev. 1303, 1312-13 (2006) (noting the "lack of specific authorization for incentive awards in the relevant statutes or court rules.").

   *Greenough* and *Pettus* remain binding law.  The Supreme Court has never overruled its early prohibition on incentive awards.  Its only re-visitation comprises a recent footnote of dictum, referring to the practice, apparently without realizing it violates prior precedent. *China Agritech Inc. v. Resh,* __U.S.__, 138 S.Ct. 1800, 1811 n.7 (2019) (stating that named plaintiffs should be motivated to file class actions because "[t]he class representative might receive a share of class recovery above and beyond her individual claim." citing *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998).[13]

   Nevertheless, several circuit courts have since endorsed this departure from prior practice.  Most have done so without reference to any Supreme Court or statutory authority, instead relying upon the

---

[13] The Court's note makes no reference to *Greenough* or *Pettus*, or to the common fund doctrine, and so cannot be construed to have overruled them. *Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."); *Agostini v. Felton,* 521 U.S. 203, 237 (1997)(discouraging courts from concluding that "our more recent cases have, by implication, overruled an earlier precedent."); *see also Mickens v. Taylor,* 535 U.S. 162, 172 (2002).

perceived utility or prevalence of the practice among lower courts.[14]
The Third and Sixth Circuits have, in approving incentive awards,
overruled *sub silentio* their own prior cases recognizing *Greenough's*
prohibition.[15]   This Court has faced the argument on one prior occasion,

---

[14] *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998) ("[A]n incentive
award is appropriate if it is necessary to induce an individual to
participate in the suit."); *Caliguri v. Symantec Corp.,* 855 F.3d 860, 868
(8th Cir. 2017) (approving incentive awards because "courts in this
circuit regularly grant service awards of $10,000 or greater"); *In re
Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 463 (9th Cir.
2000) (holding without elaboration that "the district court did not abuse
its discretion ... in awarding an incentive award to the Class
Representatives."); *Berry v. Schulman,* 807 F.3d 600, 613-14 (4th Cir.
2015); *Newmont Min. Corp.,* 352 F.App'x 232, 235 (10th Cir. 2009)
("'Incentive awards [to class representatives] are justified when
necessary to induce individuals to become named representatives...'")
*Keepseagle v. Perdue,* 856 F.3d 1039, 1056 (D.C. Cir. 2017) (approving
incentive awards "to compensate the class representative").

[15] Compare *Zucker v. Westinghouse Elec.*, 374 F.3d 221, 226 (3d Cir.
2004), *aff'g In re Westinghouse Sec. Litig.,* 219 F.Supp.2d 657, 660-61
(W.D. Pa. 2002) (following *Greenough*) with *Sullivan v. DB Investments,
Inc.,* 667 F.3d 273, 333 n.65 (3d Cir. 2010) (*en banc*) (affirming incentive
awards explaining in a footnote that "'[i]ncentive awards are not
uncommon in class action litigation….") (quoting *In re Lorazepam &
Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 400 (D.D.C. 2002));
compare also *Granada Investments, Inc. v. DWG Corp.,* 962 F.2d 1203,
1207-08 (6th Cir. 1992) (noting that *Greenough* had specifically
disallowed any allowance for the named plaintiff's "personal services
and private expenses.") with *Shane Group, Inc. v. Blue Cross Blue
Shield*, 825 F.3d 299, 310-11 (6th Cir. 2016) (declaring that "[o]ur court
has never approved the practice of incentive payments to class
representatives, though in fairness we have not disapproved the

but did not reach the legal merits, and instead upheld the incentive awards by concluding without further explanation that the case before it was factually distinct: "[n]either [*Pettus*] nor [*Greenough*] provide factual settings akin to those here." *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019).

Rejecting McLaughlin's reliance on *Greenough*, the district court here relied obliquely on the district court's opinion below in *Melito*, and also upon a now-vacated Eleventh Circuit opinion upholding incentive awards, *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1196 (11th Cir. 2019), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019). The district court said that the Supreme Court cases McLaughlin cited "have been distinguished by a court in this Circuit, which rejected a similar argument, and that the specific argument he puts forth has been rejected by another Circuit." DE7823:3 (citing *Melito v. Am. Eagle Outfitters, Inc.*, No. 14-CV-2440, 2017 WL 3995619, at *16 n.21 (S.D.N.Y. Sept. 8, 2017); *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1196 (11th Cir. 2019)).

However, nothing about the *Melito* or *Muransky* cases takes this case out of the rule in *Greenough*. The district court's opinion in *Melito*, referenced by Judge Brodie in this case, disposes of *Greenough* and

_____

practice either." (quoting *In re Dry Max Pampers Litig,* 724 F.3d 713, 722 (6th Cir. 2013)).

*Pettus* in a footnote, saying "both of these case[s] are extremely old and pre-date Rule 23 by decades….[C]ourts routinely award named plaintiffs payment for 'special circumstances' arising out of their participation in the class litigation." *Melito v. Am. Eagle Outfitters, Inc.,* No. 14-CV-2440 (VEC), 2017 WL 3995619, at *16 n.21 (S.D.N.Y. Sept. 11, 2017). Likewise, the Eleventh Circuit's decision upholding incentive awards distinguishes the cases as having been decided prior to Rule 23, and that many lower courts had since awarded them. *Muransky*, 922 F.3d at 1196.

As discussed, *supra*, on appeal from the *Melito* decision, this Court did not adopt the district court's legal rationale or engage the legal issues, instead holding without elaboration that *Greenough* and *Pettus* were factually inapposite. *Melito*, 923 F.3d at 96. For its part, *Muransky* has since been vacated pending en banc rehearing, and is therefore no longer citable as precedent. *United States v. McIver,* 688 F.2d 726, 729 n.5 (11th Cir. 1982).[16]

Nevertheless, this Court should not follow the reasoning of the original *Muransky* panel, or the district court in *Melito*. Circuit courts

---

[16] *See also Henderson v. Fort Worth Ind. Sch. Dist.,* 584 F.2d 115, 116 (5th Cir. 1978)(en banc grant "effectively vacates the panel opinion as a citable precedent."); 11th Cir. R. 35-10 ("Unless otherwise expressly provided, the effect of granting a rehearing en banc is to vacate the panel opinion and the corresponding judgment.").

are not empowered to overrule the Supreme Court, even if they all concur.  The Supreme Court's decisions are binding authority until either overruled by the Court itself, or modified by Congress. Where, as here, a decision of the Supreme Court "has direct application," it properly controls. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484 (1989).  Even if the high-court precedent "appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.*; *accord, e.g., Bosse v. Oklahoma,* 137 S.Ct. 1, 2 (2016); *United States v. Hatter,* 532 U.S. 557, 567 (2001); *see generally* Bryan A Garner, et al., The Law of Judicial Precedent 28-33 (Thomson West, 2016).

Lower courts are not at liberty to determine that Supreme Court authority is no longer valid because they believe it to be "old" or outdated.  Longstanding decisions become more authoritative, not less: "the strength of the case for adhering to such decisions grows in proportion to their 'antiquity.'" *Gamble v. United States*, __U.S.__, 139 S. Ct. 1960, 1969 (2019) (citing *Montejo v. Louisiana*, 556 U. S. 778, 792 (2009))

No Supreme Court precedent has undermined *Greenough* and *Pettus*.  Those cases remain good law in this and every other circuit, controlling attorneys' fee awards in class actions.  *See, e.g., Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (following *Greenough* and *Pettus*);

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257-58 (1975) (*Greenough* "has been consistently followed"); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 392 n.17 (1970) (following *Greenough* and *Pettus*). Their holdings on common fund incentive awards are equally binding, and lower court cases, however numerous, cannot expand courts' inherent authority beyond that allowed by the Supreme Court.

The intervening promulgation of Rule 23 does not affect the viability of the Supreme Court's common fund cases. First, nothing in Rule 23 undermines—let alone overrules—the rule in *Greenough* and *Pettus*. Nowhere does Rule 23 authorize or permit special payments compensating named plaintiffs for service as class representatives or to give them additional incentives to litigate. *See* 5 *Newberg on Class Actions* §17:1. Second, Rule 23 could not do so. The Rules Enabling Act states that the federal rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. §2072. A federal rule of procedure cannot overrule the Supreme Court to expand courts' inherent authority to establish a right to incentive awards in common fund cases. Congress, of course, could provide for incentive awards, or their equivalent, by statute. But there is no claim to statutory entitlement in this case.

### 2. Incentive awards impair the adequacy of representation

Courts err when they grant incentive awards from common funds in the absence of statutory authorization, and the problem goes beyond

a mere bookkeeping error.  Special benefits for class representatives impinge their fiduciary duties by presenting them an incentive to pursue their own interests rather than those of the class, and thus violate basic Rule 23 principles.  That is the very rationale upon which *Greenough* and *Pettus* set forth a durable rule that federal courts are not equitably empowered to make incentive awards to plaintiffs in common fund cases.  Courts ignoring that rule have required an amalgamation of presumptions and tests intended to ameliorate the conflict problems that *Greenough* and *Pettus* preclude altogether simply by prohibiting incentive awards.

As McLaughlin pointed out, the named plaintiffs settled this case anticipating that class counsel would ask the Court to award them, collectively, incentive bonuses of $900,000.00.  DE7472-1:22. That represents a powerful financial incentive to accept the settlement without due regard for its value to absent class members.  The existence of such special favor raises the specter of inadequate representation. *See Plummer v. Chemical Bank,* 91 F.R.D. 434, 442 (S.D.N.Y. 1981) ("[w]hile there may be circumstances in which additional benefits to the named plaintiffs may be justified, such disparities must be regarded as prima facie evidence that the settlement is unfair to the class"), *aff'd* 668 F.2d 654, 660 (2d Cir. 1982); *accord, e.g., Radcliffe v. Experian Information Solutions. Inc.,* 715 F.3d 1157, 1163-64 (9th Cir. 2013); *In re Dry Max Pamers Litig.,* 724 F.3d 713, 722 (6th Cir. 2013) ("[W]e have

expressed a 'sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain.'")(quoting *Hadix v. Johnson,* 322 F.3d 895, 897 (6th Cir. 2003)).

Courts are also frequently confronted with a disparity between the representatives' incentive awards and the recovery by absent class members, indicating inadequacy of representation. In *Vassalle v. Midland Funding LLC,* 708 F.3d 747, 755-56 (6th Cir. 2013), the Sixth Circuit held that "the disparity in the relief afforded under the settlement to the named plaintiffs, on the one hand, and the unnamed class members, on the other hand, made the settlement unfair," and that the district court thus "abused its discretion in finding that the settlement was fair, reasonable, and adequate." *Vassalle,* 708 F.3d at 755. *See also In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) (following *Vassalle* and reversing settlement approval because, where incentive awards exceeded plaintiffs' damages, "the class representatives have no reason to care whether the mechanisms available to unnamed class members can provide adequate relief.")

The incentive awards granted in this case were made in contravention of binding Supreme Court precedent prohibiting them. The order granting them must therefore be reversed.

## VI.  CONCLUSION

For all the foregoing reasons, Appellant therefore respectfully requests that this Court reverse and remand.

Dated: January 4, 2021   Respectfully submitted,

          <u>s/ C. Benjamin Nutley</u>
          C. Benjamin Nutley, Attorney at Law
          1055 E. Colorado Blvd., Fifth Floor
          Pasadena, CA  91106
          Telephone:  626-204-4060
          Email:  nutley@zenlaw.com

          <u>s/ John W. Davis</u>
          John W. Davis
          Law Office of John W. Davis
          3030 N. Rocky Point Dr. W., Ste. 150
          Tampa, FL  33607
          Telephone:  813-533-1972
          Email:  john@johnwdavis.com

          Attorneys for Objector-Appellant
          Kevan McLaughlin

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

I hereby certify pursuant to Fed. R. App. P. 32(g) that the attached brief is proportionally spaced, has a typeface (Century Schoolbook) of 14 points, and contains 12,978 words (excluding items specified by Fed. R. App. P. 32(f)), as counted by the Microsoft Word processing system used to produce this brief.

Dated:  January 4, 2021

s/  John W. Davis

Law Office of John W. Davis
3030 N. Rocky Point Dr. W., Ste. 150
Tampa, FL  33607
Telephone:  813-533-1972
Email:  john@johnwdavis.com

# CERTIFICATE OF SERVICE

I certify under penalty of perjury, that on January 4, 2021, I electronically filed the document entitled Appellant Kevan McLaughlin's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF System. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 4, 2021

s/ John W. Davis

Law Office of John W. Davis
3030 N. Rocky Point Dr. W., Ste. 150
Tampa, FL 33607
Telephone: 813-533-1972
Email: john@johnwdavis.com