# 20-339-cv(L), 20-304-cv(CON), 20-340-cv(CON), 20-341-cv(CON), 20-342-cv(CON), 20-343-cv(CON), 20-344-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

IN RE: PAYMENT CARD INTERCHANGE FEE AND MERCHANT
DISCOUNT ANTITRUST LITIGATION.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## FINAL FORM REPLY BRIEF FOR OBJECTORS-APPELLANTS FIKES WHOLESALE, INC., MIDWEST PETROLEUM COMPANY, SLIDELL OIL COMPANY, LLC, THE SOCIETY OF INDEPENDENT GASOLINE MARKETERS OF AMERICA ("SIGMA"), THE NATIONAL ASSOCIATION OF SHELL MARKETERS, INC. ("NASM"), AND THE PETROLEUM MARKETERS ASSOCIATION OF AMERICA ("PMAA") ("BRANDED OPERATORS' BRIEF") (20-344-cv CON)

STEVE W. BERMAN
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
(206) 623-7292

NATHANIEL A. TARNOR
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, New York 10017
(212) 752-5455

*Attorneys for Objectors-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................2

I.  The Terms "All" and "Accepted" Cannot be Modified Through Appellate Proceedings ...................................................................2

    A.  The language of the release and class definition control ...................2

    B.  The terms "accepted" and "all" cannot be interpreted through the lens of federal antitrust law ...........................................................6

    C.  The term "accepted" is not an industry-specific term......................12

II. The Class-Wide Release Cannot be Modified on a Retroactive and Individualized Basis......................................................................13

III. The Class Is Not Ascertainable .................................................15

IV. Settlement Certification Was Improvidently Granted Because Multiple Mini-Trials Will Be Required to Determine Class Membership ..................................................................................17

V.  Class Counsel's Response Only Confirms the Inadequacy of Their Representation ..............................................................................19

VI. The District Court Abused its Discretion in Delegating to a Special Master Core Issues Such as Standing and Class Membership ...................22

VII. The Settling Parties Fail to Address the Inadequacy of Certain Class Members' Notice and Opt-Out Rights...............................................25

CONCLUSION ..................................................................................28

CERTIFICATE OF COMPLIANCE..................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## FEDERAL CASES

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2015 WL 5093503 (E.D.N.Y. July 10, 2015) ....................................................3

*In re Am. Cont'l Corp. v. Keating*,
49 F.3d 541 (9th Cir. 1995) ............................................................................7

*Burlington N. RR. Co. v.Dep't of Revenue, State of Wa.*,
934 F.2d 1064 (9th Cir. 1991) ...................................................................23

*California v. Infineon Techs. AG*,
2008 WL 4155665 (N.D. Cal. Sept. 5, 2008) ...........................................20

*In re Elec. Carbon Prods. Antitrust Litig.*,
622 F. Supp. 2d 144 (D.N.J. 2007) ............................................................3

*Hege v. Aegon USA, LLC*,
780 F. Supp. 2d 416 (D.S.C. 2011) ..........................................................26

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ...................................................................................21

*La Buy v. Howes Leather Co.*,
352 U.S. 249 (1957) ...................................................................................24

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
424 F.3d 195 (2d Cir. 2005) ........................................................................8

*Meijer, Inc. v. 3M*,
2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) .............................................3

*In re Motorola Secs. Litig.*,
644 F.3d 511 (7th Cir. 2011) .......................................................................7

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ...................................................................................27

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) .................................................................22

*In re Petrobras Secs.*,
862 F.3d 250 (2d Cir. 2017) ........................................15, 17, 18, 19

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012) .................................................9

*In re Qualcomm Antitrust Litig.*,
328 F.R.D. 280 (N.D. Cal. 2018).........................................................9

*Rothstein v. AIG*,
837 F.3d 195 (2d Cir. 2016) ...........................................................2, 7

*Stauble v. Warrob, Inc.*,
977 F.2d 690 (1st Cir. 1992)..............................................................23

*In re Visa Check/ Mastermoney Antitrust Litig.*,
2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ...................................10

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012).........................................................20

## STATE CASES

*Clayworth v. Pfizer, Inc.*,
233 P.3d 1066 (Cal. 2010) ...................................................................9

## FEDERAL STATUTES

Sherman Act Section 1...............................................................................9

## STATE STATUTES

Cal. Bus. & Prof. Code § 16720 ...............................................................9

Cal. Bus. & Prof. Code § 16750(a)....................................................9, 20

Cal. Bus. & Prof. Code § 17200 ...............................................................9

California Cartwright Act ......................................................8, 9, 10, 20

California Unfair Competition Law ...................................................................9, 10

### FEDERAL RULES

Federal Rule of Civil Procedure 23 ..............................................................*passim*

Federal Rule of Civil Procedure 53 .................................................................22, 23

### SECONDARY AUTHORITIES

7AA Fed. Prac. & Proc. Civ. § 1787 (3d ed.)...........................................................26

Newberg on Class Actions § 12:17 (5th ed.) ...........................................................5

Newberg on Class Actions § 13:58 (5th ed.)...........................................................27

Cal. Bus. & Prof. Code § 16750(a) .................................................................9, 20

# <u>INTRODUCTION</u>

Appellants Fikes Wholesale, Inc., et al. (the "Branded Operators" and the "Associations") hereby reply to the appellees' briefs. As detailed below, appellees' arguments only accentuate the fundamental intra-class conflicts at issue. The essential terms of the class settlement agreement cause significant conflicts between franchisors and franchisees regarding their respective rights under the settlement.  Class Counsel and the Defendants cannot amend their flawed settlement through the appellate process or provide the necessary precision at this time to ensure the class is ascertainable. Class Counsel baked these flaws into their settlement by failing to define the class in a sufficient manner and by settling and releasing claims that undermine the supposed scope of their agreement. At this point, neither the Court nor Class Counsel can rectify these flaws through a special master, especially because class settlement determinations will require multiple mini-trials to decide complex legal and factual disputes between class members. Class Counsel's willingness to abandon large portions of the class to this process or to remain "agnostic" only demonstrates the inadequacy of their representation. These problems, coupled with the lack of sufficient notice to some class members, necessitate that this Court, once again, take action to protect the interests of the class.

## ARGUMENT

## I. The Terms "All" and "Accepted" Cannot be Modified Through Appellate Proceedings

The settling parties' argument is based on a strawman. They argue that there is no intra-class conflict because they did not intend for the term "accepted" to apply to more than one payor in the chain, and therefore either franchisor or franchisee (but not both) is a class member. But that argument is rooted not in how the settling parties ***actually*** defined the settlement class or litigated this case; rather, it is based on how they ***now wish*** they had defined the class. Under the plain language of the actual settlement papers, both franchisors ***and*** franchisees are class members – regardless of which one ultimately receives compensation – because the term "accepted" is not limited to only one payor in the chain. In fact, the class definition, release, and final judgment plainly apply to ***all*** persons, businesses, and other entities that accepted payment cards during the relevant period; not just those that will be compensated through the class settlement, and not just those highest up in the chain. The language of the class definition and release control and cannot be altered by after-the-fact characterizations.

### A. The language of the release and class definition control

As a question of law, this Court should review the district court's interpretation of the Settlement Agreement *de novo*. *Rothstein v. AIG*, 837 F.3d 195, 205 (2d Cir. 2016).

The settlement agreement, class definition, release, and final judgment each define the settling class and releasing parties as all persons, businesses, and other entities that accepted Visa and Mastercard payment cards during the relevant timeframe. Settlement Agreement, ¶ 4 (DE 7257-2/JA-A-3305[1]). There is no limitation on the word "accepted." In fact, just the opposite: the settlement covers *all* persons, businesses, and other entities that accepted the relevant payment cards. The settlement does not, as most antitrust direct purchaser class settlements do, limit the class definition to anyone that *directly*[2] paid the alleged overcharge, and it does not otherwise define the term "accepted" or distinguish between franchisors and franchisees. It must be read according to its plain language.

According to that plain language, a gas station owner that accepted payment cards for payment by consumers at her gas station during the relevant time period

---

[1] "DE" refers to the ECF No. in the docket of *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., No. 05-MD-01720 (MKB) (JO) (E.D.N.Y.), unless otherwise noted.

[2] *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig*., No. 06-MD-1775 JG VVP, 2015 WL 5093503, at *1 (E.D.N.Y. July 10, 2015) (defining the class as "[a]ll persons . . . who purchased airfreight shipping services for shipments to or from the United States *directly* from any of the Defendants"); *Meijer, Inc. v. 3M*, No. 04-cv-5871, 2006 WL 2382718, at *3 (E.D. Pa. Aug. 14, 2006) ("all persons and entities that purchased invisible or transparent tape *directly* from 3M Company"); *In re Elec. Carbon Prods. Antitrust Litig*., 622 F. Supp. 2d 144, 149 (D.N.J. 2007) ("All persons . . . who purchased Electrical Carbon Products . . . *directly* from Defendants"). Here, as elsewhere in the brief, all emphasis added and internal citation omitted, unless otherwise noted.

-3-

is a class member. So is the McDonald's franchisee owner and the local Aamco transmission shop owner that accepted payment cards by consumers for their products and services. It is clear from the plain language of the settlement, as written, that franchisees **and** franchisors are class members – they each accepted payment cards during the relevant period – and they each will have their claims released by virtue of the final judgment regardless of whether they ultimately receive compensation out of the settlement fund.

Defendants contend that the term "accepted" is not ambiguous and should not be modified beyond its plain language definition. Defs. Br. at 49 (citing with approval the district court's conclusion that the term "accepted" is "objective enough by its plain English usage"). That can only mean that multiple claimants along the chain – franchisors and franchisees – indeed fall within the class definition.[3]

Defendants also now argue that "a franchisee that is deemed not to be the appropriate claimant . . . is not a class member and thus not bound by the release" (Defs. Br. at 42), but how is that so when the plain language of the settlement documents says otherwise? There is no procedure in the final judgment that would

---

[3] The Defendants may approve of the term "accepted" for this very reason. Its double meaning provides a broad release from merchants all along the payment chain, even if some of those releasing merchants may never receive compensation through the settlement.

retroactively void the release or class membership status of franchisees that are determined not to have viable compensation rights under the settlement. Nor is there any such procedure for franchisees that do not submit a claim through the settlement.[4] Indeed, a franchisee that does not submit a claim in the settlement will never have its compensation rights adjudicated by a special master, so there will never be any sort of retroactive determination "unwinding" that franchisee's release. Just because the Defendants say in appellate briefs that a class member will not be bound by the judgment and release does not make it so. Rather, if the settlement is not overturned, the final judgment will bind virtually every franchisee to the release forevermore because, by the plain language of that release, they are class members.

The settling parties argue that the class definition should not be read according to the meaning ascribed by appellants, including the associations who speak on behalf of tens of thousands of fuel and convenience store retailers nationwide.[5] The settling parties twist themselves in knots arguing that the

---

[4] Claim submission rates in claims-made settlements are typically very low. *See* Newberg on Class Actions § 12:17 (5th ed.) ("most class members will never step forward and file claims for relief in most class actions").

[5] *See* Statement of Objection Regarding the Proposed Class Settlement by the National Association of Shell Marketers, the Petroleum Marketers Association of America, and the Society of Independent Gasoline Marketers of America at 3. (DE 7301/JA-4409).

otherwise plain class definition should be qualified by three unwritten factors: (i) the nuances of federal antitrust jurisprudence (Class Br. at 41); (ii) the negotiated "compromise" made by the defendants to allow "less than direct" (but not indirect) payors into the class definition (Defs. Br. at 32); and (iii) the litigation and industry history of the term "accepted" (Class Br. at 43). In order to adopt the settling parties' interpretation, the word "all" would also need to be ignored.

But if the settling parties truly intended for the class definition to be construed according to those multiple qualifiers, and contrary to its plain English meaning, they should have drafted it that way. Inserting those qualifiers into the class definition now, through these appellate proceedings, is not the proper way to solve this intra-class conflict.

## B. The terms "accepted" and "all" cannot be interpreted through the lens of federal antitrust law

Recognizing that the plain language of the class definition captures payors at multiple levels of the payment chain, the settling parties now argue that the class definition should be modified in light of federal antitrust law. Defs. Br. at 33; Class Br. at 41. In addition to being procedurally improper, modifying the plain language of the settlement now based on federal antitrust law is wrong for at least four distinct reasons:

*First*, as discussed above, the terms "accepted" and "all" cannot be modified on appeal, and certainly not by terms that would change the apparent meaning that

-6-

class members have ascribed to the settlement. *See* Declaration of Tate A. Seideman ("Seideman Decl.") ¶ 4, (General Counsel of Objector Fikes Wholesale) annexed to Fikes Wholesale Objection as Ex. 1 (DE 7559-1/JA-6592) (operator believes that his retail operations are class members because they "accepted" the relevant payment cards by allowing customers to pay for products and services with those cards).

The cases cited in the settling parties' briefs do not say otherwise. Class Br. at 41; Defs. Br. at 30. Those cases, such as *In re Motorola Secs. Litig.*, 644 F.3d 511 (7th Cir. 2011), *Rothstein*, 837 F.3d at 195, and *In re Am. Cont'l Corp. v. Keating*, 49 F.3d 541 (9th Cir. 1995) sought to interpret terms in settlement agreements that had specialized meanings under the federal securities laws, such as "affiliate" and "purchased." It made sense in those cases to look to substantive law because the terms are used uniquely under the federal securities laws. Here, in contrast, there are no relevant regulatory schemes defining the plain language terms "accepted" and "all." They have no specialized definition under the federal antitrust laws. They are plain English words.

But the settling parties' argument is even more attenuated than that. They implore the Court not just to use federal antitrust law to modify plain English words, but more broadly to use the entire architecture of federal antitrust jurisprudence to add terms that are not included in the settlement, and ignore terms

that are.  Indeed, in order for the settling parties' argument to stand, the Court would need to modify the class definition by: (a) grafting the term "direct" or "more direct" into the settlement; (b) changing the plain meaning of the term "accepted;" and (c) completely ignoring the term "all." Federal substantive antitrust law cannot be used to add terms that do not exist in the settlement, or ignore the actual, plain meaning of the terms that do exist in the agreement. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (a contract interpretation "'that has the effect of rendering at least one clause superfluous or meaningless [] is not preferred and will be avoided if possible'").

**Second**, the class complaint and release are not limited to federal law.  The settling parties argue that the settlement cannot release both direct and indirect purchaser claims because the complaint sought relief only under federal law. (Defs. Br. at 31).  But that is not true, and it was clear error for the district court to assume that "the class definition is . . . objectively guided by federal antitrust standards." Mem. & Order at 67 (DE 7821/JA-7324).

The appellees fail to inform this Court that the class action complaint asserts claims not just under the federal Sherman and Clayton Acts, but also under the California Cartwright Act and the California Business and Professions Code

-8-

pursuant to §§ 16720 and 17200, *et seq*.[6]  The Cartwright Act expressly provides

that a private action "may be brought by any person who is injured in his or her

business or property by reason of anything forbidden or declared unlawful by this

chapter [the Cartwright Act], ***regardless of whether such injured person dealt***

***directly or indirectly with the defendant***." Cal. Bus. & Prof. Code § 16750(a).

Thus, indirect purchaser damage claims – *i.e.*, those based on antitrust overcharges

absorbed multiple levels down the payment chain – are permitted under the

Cartwright Act and the California Unfair Competition Law ("UCL").  *See*

*Clayworth v. Pfizer, Inc.*, 233 P.3d 1066 (Cal. 2010); *In re Processed Egg Prods.*

*Antitrust Litig*., 851 F. Supp. 2d 867, 895 (E.D. Pa. 2012). Class Plaintiffs sought

damages in their complaint pursuant to the fullest extent allowable under

"applicable law" (Complaint, at Prayer for Relief D), which would include those

for indirect purchases under the Cartwright Act. They also sought to enjoin

Defendants "from, in any manner, *directly or indirectly*, committing the violations

of the . . . Cartwright Acts." (*Id.* at Relief B). Cartwright Act claims are frequently

asserted in antitrust class actions to apply to nationwide indirect purchaser claims.

*See, e.g.*, *In re Qualcomm Antitrust Litig*., 328 F.R.D. 280, 312 (N.D. Cal. 2018).

---

[6] *See* Third Consolidated Amended Class Action Complaint ("Complaint"), ¶ 5
(DE 7123/JA-3107) (defendants' conduct is "illegal under Section 1 of the
Sherman Act and the California Cartwright Act"); *see also* ¶¶ 513-514.

The settling parties' failure even to mention the Cartwright Act and UCL claims is remarkable on its own, but the existence of those claims moots their argument that federal law should be used to interpret every word in the settlement. It also moots their reference to other Visa/MasterCard related litigation that used the term "accepted" in class definitions (*see* Class Br. at 45), because those cases did not include Cartwright Act, UCL, or state law claims. *See In re Visa Check/Mastermoney Antitrust Litig*., No. 96-CV-5238 (JG), 2003 WL 1712568, at *1 (E.D.N.Y. Apr. 1, 2003).

Similarly, the final judgment and settlement agreement release all claims brought in the complaint, ***or that could have been brought in the complaint***, for damages, "whenever incurred, whether directly, ***indirectly***, derivatively, or otherwise. . . ." Judgment, ¶ 16-C (a) (DE 7832/JA-7459); Settlement Agreement, ¶ 31(a) (DE 7257-2/JA-3305).[7] In other words, the release and final judgment expressly preclude any claimant from pursuing indirect purchaser claims under the Cartwright Act, the UCL, or any other state indirect purchaser law. The complaint

---

[7] The settlement and final judgment also release all "affiliates" of class members (Judgment, ¶ 16-A (DE 7832/JA-7459); Settlement Agreement, ¶ 29 (DE 7257-2/JA-3305)), a term Class Counsel has used to apply to Branded Operators. *See* Class Br. at 21. So, whether by operation of the terms "accepted" or "all," or the term "affiliates," Branded Operators and all franchisees will have their claims released through the settlement one way or another, almost certainly without any compensation.

and operative settlement papers demonstrate why indirect purchasers are ***included***
in – not excluded from –the class settlement.

*Third*, if Defendants' view is accepted, modifying the plain language of the
settlement to comport with federal antitrust law would lead to an absurd result,
with virtually no class members. The Defendants argue that only acquiring banks
pay interchange fees directly in the Visa and Mastercard systems (Defs. Br. at 32),
and that they compromised their indirect-purchaser defense in order to reach a
settlement. *Id.* In other words, Defendants claim that members of the settlement
class are not actually "direct" claimants; rather, they are just more direct than
perhaps other claimants. But that is not how federal antitrust law works. With
limited exceptions not applicable here, federal antitrust law prohibits *all* indirect
purchasers from pursuing monetary damages – not just those indirect purchasers
selected by the Defendants, and not just those highest in the chain.

*Fourth*, the litigation record demonstrates that this case was never just about
federal direct purchaser claims. Indeed, as early as 2014, the settling parties
referred to franchisees as class members. June 2014 Status Report at 5, (DE
6335/JA-2915) ("There are thousands, if not tens of thousands, of ***franchisees that***
***[are] members of the Rule 23(b)(3) Settlement Class***. Accordingly, the same
potential issue of duplicative claims covering the same transactions is virtually
certain to arise in that context as well, with franchisees filing claims for settlement

-11-

funds based on the same transactions that are the basis for franchisor claims.") The settling parties knew then that there was a conflict among class members, but did nothing to address it. Moreover, through the filing of this appeal, there was always one and only one class action that covered *all payors of interchange fees – direct and/or indirect.* Arguing now that franchisees were never class members is simply disingenuous.

### C.    The term "accepted" is not an industry-specific term

The settling parties argue that the term "accepted" does not actually mean "accepted" in the plain English sense, but rather that it has a history in the payment card industry and this litigation to mean the "process of agreeing to the networks' rules and paying their required fees." Class Br. at 44.  But the settling parties provide no evidence of that definition, and it certainly is not included in the settlement documents. And, what evidence does exist on this issue goes the other way. For example, according to the General Counsel of Objector Fikes Wholesale, Fikes believes that it "accepted' payment cards by allowing them as a form of payment in their retail establishments. Seideman Decl., ¶ 4 (DE 7559-1/JA-6592). Fikes believes that it is a class member according to the plain class definition.  *Id*.

The class complaint also repeatedly uses the term "accepted" in plain English to describe how retailers allow payment cards as a form of payment at retail

-12-

establishments; ***not*** the strained definition now given by Class Counsel.[8]  It strains

credulity to argue that the term "accepted" does not have a plain English definition

that can be understood by all class members.

## II.    The Class-Wide Release Cannot be Modified on a Retroactive and Individualized Basis

The settling parties argue that if a franchisee that "accepted" payment cards

is not entitled to compensation in the settlement, then that franchisee will not be a

class member and they will not be bound by the release and final judgment. Class

Br. at 40; Defs. Br. at 41.  Apart from the procedural infirmities under Rule 23 of

retroactively and extra-judiciously changing the class definition and release

through the settlement administration process – which should not be countenanced

– the settling parties offer no explanation for ***how*** those settlement documents will

retroactively be modified for more than 600,000 franchisees. The following

examples illustrate the individualized nature of the problem:

- **Example 1**: Owner of a Chevron station received a class notice and submits a claim in the settlement, believing he is a class member entitled to compensation because he "accepted" payment cards as a form of payment at

---

[8] *See, e.g.*, Complaint, ¶ 4 (DE 7123/JA-3107)("Plaintiffs represent a class of millions of Merchants that have ***accepted*** and currently accept Visa and MasterCard Credit and Signature Debit Cards and Interlink PIN-Debit Cards ***as forms of payment***"); *id.*, ¶ 8 ("Plaintiff Photos Etc. ***accept payment by Visa and MasterCard Payment Cards*** through, for example, e-commerce or telephone orders from Cardholders located in the Eastern District of New York."); *id.*, ¶ 9 (defining "Merchant" as "an individual, business, or other entity that ***accepts payments in exchange for goods or services rendered***"); *id.*, ¶¶ 3, 73, 77, 176, 192, 303; 379.

-13-

his retail location.  He processed his payment cards through Chevron, and so he did not have a contractual relationship with the payment cards.  His claim is denied by the settlement administrator because Chevron has the superior claim as "more direct."  When does he receive notice that he is no longer a class member, and no longer barred by the release?  Can he file a lawsuit against Visa and Mastercard today, or will they argue that he is bound by the release?  Was the statute of limitations on his claims tolled by the pending class action?  He believed for fifteen years that he was in the class because of the plain language in the complaint and settlement, but after waiting fifteen years for the case to settle, he is now told he was never in the class.

- **Example 2**: Owner of an Exxon-Mobil station, otherwise the same as the Chevron owner in Example 1, except Exxon-Mobil opted out of the class settlement, so it is no longer a class member.  The Exxon-Mobil gas station owner is the next most direct payor in the chain.  Is she a class member?  She is the most direct claimant left in the class, even though she is at the same transaction level as the Chevron owner in Example 1.  Does she get compensated through the class settlement?  Is she bound by the release?

- **Example 3**: Owner of a McDonald's restaurant ignores the class notices and never submits a claim form, so his claim never gets adjudicated by the special master.  But next year, he decides to sue Visa and Mastercard under state indirect purchaser law for overcharges on the interchange fees he paid, based on the same common nucleus of fact alleged in the class complaint.  Is he a class member bound by the release?  He "accepted" payment cards during the relevant time period – so he is indeed defined as a class member – but no determination is ever made about whether he "accepted" payment cards in the manner described in the settling parties' briefs. Is he bound by the class-wide release or not?

There are more than 600,000 franchisee owners that "accepted" payment cards during the relevant time period, many of whom will have similar permutations – but how, whether, and when they will be bound by the release is anyone's guess.  A class settlement is intended to be a final, clear, understandable resolution of claims.  This class settlement is not.

-14-

### III.    The Class Is Not Ascertainable

"'Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable.'" *See In re Petrobras Secs.*, 862 F.3d 250, 264 (2d Cir. 2017). The "touchstone" of this ascertainability requirement is whether the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.*

Because the settlement agreement does not define the term "accepted" – creating the impression that all merchants along the payment chain are included in the class – it is not objectively possible to determine who is *actually* in the class and who is not in the class based on the terms of the settlement itself.[9]

The district court erroneously held that the class definition is sufficient by relying on Class Counsel's word that they represent "only the first payer, [they] sued for the first payer, the direct purchaser."  Mem. & Order at 67 (DE 7821/JA-7324)) (quoting Hr'g Tr./JA-7048,[10] at 78:9-79:15; alteration in original). The district court concluded that the class definition would, therefore, be objectively

---

[9] The Plan of Administration and Distribution does not add clarity to this question. Under the Plan of Administration and Distribution, the class administrator in the first instance will estimate the interchange fees *paid* by each claimant during the class period, and each claimant will receive a *pro rata* share of the settlement fund based on the interchange fees it paid. Plan of Administration and Distribution I-2(DE 7257-2/JA-3566). The term "paid" is undefined, and does not distinguish between direct and indirect payments.

[10] "Hr'g Tr." refers to the Nov. 7, 2019 final approval hearing transcript.

-15-

guided by federal antitrust standards, even though the class settlement papers, the class definition, and the release say no such thing. *Id*.[11] Comments made by parties at the final approval hearing cannot be relied upon to clarify or alter the terms of the written settlement itself, and the district court erred by doing so.[12]

The Defendants' brief illustrates precisely why this class is not ascertainable by offering yet another view of the settlement class "properly understood." Defs. Br. at 51. The Defendants claim that "the members of the class are those merchants that accept Visa and Mastercard payment cards and thus are entitled to recover from the fund as the ***more direct payors*** of interchange fees." *Id*. (emphasis added). But this explanation adds even more confusion to an already muddled picture. As explained earlier, the federal antitrust laws do not provide for payment to a "more direct" payor, nor is such a category anywhere defined in the law.

_____

[11] Defendants' contention that Objectors did not preserve the ascertainability argument is meritless. Defs. Br. at 48. The district court specifically referenced Objectors' arguments in considering whether the Rule 23(a) criteria of ascertainability had been met. Mem. & Order at 64 (DE 7821/JA-7324) (including a full page of citations to the Fikes Wholesale Objectors' arguments).

[12] This error is especially harmful here because it allowed Class Counsel, after notice of the settlement had been issued, to jettison large swaths of class members that "accepted" payment cards and that relied on the pendency of this class action to protect their rights. If these class members are found to be indirect payors of interchange fees, they may be left without a class-wide remedy, or, even if their claims survive, they may lose the benefit of tolling.

Class Counsel and the Defendants rely extensively on this Court's decision in *Petrobras* to support their contention that the settlement class is ascertainable. Class Br. at 54-56; Defs. Br. at 49-50. However, the *Petrobras* decision does not permit the Court or parties to define a settlement class based on some but not all of the legal claims that are being settled, or based on oral statements made by Class Counsel about who is or who is not in the class. *Petrobras*, 862 F.3d at 264. Class Counsel is obligated to clearly define the class. They failed to do so and the class definition is indeterminate in a fundamental way, rendering class certification improper.

## IV.    Settlement Certification Was Improvidently Granted Because Multiple Mini-Trials Will Be Required to Determine Class Membership

Even if the class were ascertainable, which it is not, class certification was improper because multiple mini-trials will be required to adjudicate who is or is not in the class, causing individual issues to predominate over common issues.

"A district court may only certify a class under Federal Rule of Civil Procedure 23(b)(3) if 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Id.* at 270. "Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among putative class members 'make use of the class-action device inefficient or unfair.'" *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013)) (alteration in original).

-17-

In *Petrobras*, this Court held that a class settlement that involved numerous individual questions that needed to be answered to determine class membership, including "who sold [class members] the relevant securities, how those transactions were effectuated, and what forms of documentation might be offered in support of domesticity," would only satisfy the predominance requirement if plaintiffs could "show[] that, more often than not, they can provide common ***answers***" to these questions. *Id*. at 273 (emphasis in original). This Court remanded to the district court to evaluate whether such a determination could be made, and to conduct the "robust predominance inquiry" that Rule 23 required. *Id*. at 274.

Here, more than 600,000 franchisees received notice of the class settlement, as did their franchisors. 2019 Declaration of Nicole Hamann on Class Administrator's Implementation of Settlement Notice Plan at 9 (DE 7469-7/JA-5259). Accordingly, numerous individual mini-trials would be required to determine which of the competing claimants belongs in the class.

Class Counsel has repeatedly argued that a determination of class membership will require a detailed review of individual contracts governing the relationship between Branded Marketers and Oil Brands.[13] Class Br. at 56; Mem.

---

[13] According to Class Counsel, the "information upon which any dispute would be resolved could include franchise agreements, license agreements, card-

& Order at 10 (DE 7821/JA-7324). The district court accepted Class Counsel's representation, noting that the issues the special master would decide "will likely implicate who in a given situation or within a certain contractual or processing relationship or corporate structure might have standing under federal antitrust laws." Mem. & Order at 45 (DE 7821/JA-7324).

The district court did not weigh the predominance of any of the individual issues involved in a determination of which class member has standing under the federal antitrust laws, against the common issues in the class. The district court did not describe the process that the special master would follow, delineate the scope of his or her authority, identify the specific factual and/or legal issues that the special master would decide, or quantify the percentage of the class that would be impacted. The district court did not consider the complexity of an individualized analysis of standing, or whether these disputed issues of standing under the federal antitrust laws would "'prevail or fail in unison.'" *Petrobras*, 862 F.3d at 273. As a result, class certification was improvidently granted and should be vacated.

## V.   Class Counsel's Response Only Confirms the Inadequacy of Their Representation

Class Counsel created a fundamental intra-class conflict when they drafted a flawed class definition. They now assert "only one claimant may lay claim to

---

acceptance agreements, card-processing statements, or transaction data." Class Br. at 56 n.10.

-19-

settlement proceeds arising from any given transaction." Class Br. at 50. But their complaint broadly covers merchants that "accepted" the payment cards at issue and covers businesses that share overlapping transactional responsibilities like franchisors and franchisees. Class Counsel cannot avoid this conflict by asserting that the term "accepted" must be interpreted through the lens of federal antitrust law (Class Br. at 41), when their California Cartwright Act claims also cover indirect purchasers. Complaint, ¶ 5 (DE 7123/JA-3107); Cal. Bus. & Prof. Code § 16750(a). Indeed, Class Counsel's attempt to ignore this issue only underscores the underlying conflict of interests that necessitate the need for separate subclasses and counsel.

In *California v. Infineon Techs. AG*, No. C 06-4333 PJH, 2008 WL 4155665, at *11 (N.D. Cal. Sept. 5, 2008) the court denied class certification because "the proposed classes include both direct purchasers and indirect purchasers." As it noted, "[i]t seems inherent to the court that certification of a class that includes both types of purchasers –whose proof of impact will necessarily look different, and whose theories of recovery are widely different –is improper." Similarly, this conflict was noted in *In re Vitamin C Antitrust Litig*., 279 F.R.D. 90, 104 (E.D.N.Y. 2012) where the defendants argued that "by representing both direct and indirect purchasers, [plaintiff]'s lawyers [would] be forced to prioritize one class over another."

Here, competing class members are covered by the same class definition

and release and are entitled to compensation pursuant to claims that encompass

both direct and indirect purchasers. Thus, whether franchisees are direct

purchasers, indirect purchasers, or entitled to compensation under a cost-plus

contract theory,[14] Class Counsel has created a fundamental conflict between

franchisors and franchisees regarding claim ownership. More importantly, Class

Counsel settled all claims that arose "directly, indirectly, derivatively, or

otherwise." Settlement Agreement, ¶ 31(a) (DE 7257-2/JA-3305).  It is, therefore,

disingenuous for Class Counsel to claim that franchisees may now "seek redress

against the Defendants under several state laws that allow indirect purchasers to

receive antitrust damages." Class Br. at 40 n.8. Class Counsel cannot sweep this

conflict under the rug when the settlement agreement prevents further litigation of

these competing claims.

Indeed, Class Counsel's apparent abandonment of indirect purchaser claims

now, through their appellate brief – and despite having pursued indirect purchaser

claims in their complaint – only underscores the inadequacy of their representation.

---

[14] *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977). The Branded
Operators do not accept the assumption that franchisees are not the direct payors
because, for among other reasons, the interchange fee is paid out of the Operators'
sales proceeds. Branded Operators are the direct (and only) payors of interchange
fees for their locations.

As this Court previously stated, "[u]nitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order somehow to reach a settlement." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 234 (2d Cir. 2016). These same unacceptable incentives are once again at play and class members remain inadequately represented by Class Counsel.

## VI. The District Court Abused its Discretion in Delegating to a Special Master Core Issues Such as Standing and Class Membership

Appellees cite numerous cases saying that district courts have wide discretion to appoint special masters to assist with the administration of a class settlement. Class Br. at 75-79; Defs. Br. at 44-47. Objectors do not disagree. Objectors also do not disagree that special masters can be critically important to the administration of complex class settlements.

However, the discretion to appoint and utilize special masters in complex litigation is not without bounds. Rule 53(a), which governs the appointment of special masters, states in pertinent part that unless a statute provides otherwise, a court may appoint a master only to perform duties consented to by the parties, or to hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by "some exceptional condition." Reference to a master "'shall be the exception and not the rule.'"

-22-

*Burlington N. RR. Co. v.Dep't of Revenue, State of Wa.*, 934 F.2d 1064, 1071 (9th Cir. 1991).

The First Circuit in *Stauble v. Warrob, Inc.*, 977 F.2d 690 (1st Cir. 1992) explained that masters are most useful when determining complex quantitative issues, but "[w]hen the issues referred to a master go beyond hard-to-measure damages or an accounting . . . the waters grow more turbid." *Id*. at 694. The Court rejected the argument that appointment to a master was appropriate where issues of liability were inextricably intertwined with damages, concluding that this did not constitute an "exceptional condition" and was merely "the same old whine in a different bottle." *Id*. at 695. The Court explained that the "overriding consideration, applicable in this case, is that the Constitution prohibits us from allowing the nonconsensual reference of a fundamental issue of liability to an adjudicator who does not possess the attributes that Article III demands. Because Rule 53 cannot retreat from what Article III requires, a master cannot supplant the district judge. . . . Determining bottom-line legal questions is the responsibility of the court itself." *Id*.

Although appellees strive mightily to paint the issues that the district court delegated to the special master in this case as a "fact-bound, limited inquiry," it is nothing of the sort. Defs. Br. at 45. The issues that have been delegated to the special master include complex questions of standing, settlement interpretation,

and the nuances of federal antitrust law.  These are issues that will not only determine what portion of a settlement fund a claimant will receive, but issues that will instead determine whether a claimant receives anything at all.[15]  And despite the legal and factual complexity of these issues, the majority of franchisee claimants will not have the benefit of counsel to assist them (because Class Counsel is "agnostic" as to who owns the claim to be adjudicated).

Curiously, none of the many law firms representing the class or the Defendants has offered a consistent view of whether franchisees – who clearly fit within the definition of merchants who "accepted" debit and credit cards – will or will not be able to recover anything from the class settlement. Class Counsel has gone from stating that Objectors "appear to be in the class,"[16] to saying that the oil brands have the better argument that they are in the class (Hr'g Tr./JA-7048, at 63:10-11), to saying that they "hope" franchisees are in the class as they'd like to give them money (*id*. at 66:1-3). If Class Counsel cannot determine whether

---

[15] In *La Buy v. Howes Leather Co*., 352 U.S. 249, 259 (1957), the court refused to permit reference of antitrust cases to a master, emphasizing that "most litigation in the antitrust field is complex," requiring an "experienced trial judge" rather than a master.

[16] Rule 23(b)(3) Class Counsel's Response to Branded Operators' Letter of October 30 at 3 (DE 7294/JA-4147)  ("It appears that Branded Operators accept cards for payment thereby under the class definition owning the claims relating to the transactions they accept unless by contract they transferred those claims to oil companies.").

-24-

franchisees are going to recover in the class, then how are more than 600,000 individual unrepresented class members expected to adequately present legal and factual argument to a special master to convince him or her that each of them is deserving of relief?

Appellees also disregard the novelty of their position that the special master will have authority to relieve individual class members of the constrictions of the class-wide release if they cannot prove that they are entitled to a recovery. Appellees take this position even though it plainly contradicts the language of the very release they negotiated and that was finally approved. The release is not limited to claims brought, nor does it bind only class members who seek relief from the fund. *See* Settlement Agreement, ¶ 31(a) (DE 7257-2/JA-3305).

## VII. The Settling Parties Fail to Address the Inadequacy of Certain Class Members' Notice and Opt-Out Rights

Rule 23(c)(2)(B) requires a court to "direct to class members the best notice that is practicable under the circumstances, ***including individual notice to all members who can be identified through reasonable effort***." This individual notice requirement mandates that information be provided regarding the "time and manner for requesting exclusion." *Id.* Although the settling parties were fully aware of the identities of thousands of "Dismissed Plaintiff" franchisees, these franchisees were never provided with a reasonable opportunity to opt-out at any stage of the litigation. Instead, they were officially informed they were excluded

-25-

from the settlement and then informed again, after their rights had already expired, that they could consider themselves class members. Such notice is insufficient to meet the requirements of due process because due process requires "that the notice not be materially misleading." *Hege v. Aegon USA, LLC*, 780 F. Supp. 2d 416, 430 (D.S.C. 2011).

Contrary to Class Counsel's assertions, these franchisees are not seeking a discretionary second opt-out period under Rule 23(e)(4). Rather, they are seeking to enforce their basic procedural rights under Rule 23(c)(2)(B). This difference is fundamental. Because by modifying the scope of the settlement to cover parties that were previously not included, the court altered the class "to include members who ha[d] not been afforded notice and an opportunity to request exclusion." Fed. R. Civ. P. 23(c)(2)(2003 advisory committee notes). Under these circumstances, "notice—including an opportunity to request exclusion—must be directed to the new class members under Rule 23(c)(2)(B)." *Id.* This is particularly important in this case because "the opt-out procedure preserves the right of potential class members who feel that their interests are in conflict with or antagonistic to the other class members to bring their own actions." 7AA Fed. Prac. & Proc. Civ. § 1787 (3d ed.). Class Counsel's inadequate representation coupled with the competing claims of suppliers such as Valero ensure that the notice and exclusion rights of franchisees should not be discarded as a mere procedural afterthought. *See*

-26-

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848 (1999) ("'an absent plaintiff [must] be provided with an opportunity to remove himself from the class'") (alteration in original).

The appellees ignore these requirements and cite to cases addressing bankruptcy notice procedure or notices under Rule 23(e), but these cases are inapplicable to identifiable class members that never received adequate notice and an opportunity to exclude themselves under Rule 23(c)(2)(B). Class Br. at 58; Defs. Br. at 57. Moreover, Class Counsel cannot dismiss these procedural defects by citing the "absence of objections from actual merchants." Class Br. at 60. By the time the Court decided to send a supplemental notice regarding the exclusions, the July 23, 2019 deadline to file objections to the Superseding Settlement Agreement had already passed. Mem. & Order at 12, 71 (DE 7821/JA-7324). Thus, it is hardly surprising the record is relatively sparse. Additionally, "most class members have too little at stake to bother objecting, so the fact that they have not done so says little about the merits of the settlement." Newberg on Class Actions § 13:58 (5th ed.). In fact, "a low objection rate could be ascribed to a poor notice program." *Id.* Here, the lack of sufficient notice is exactly the issue. This Court must ensure all class members are provided with appropriate notice and the necessary procedural safeguards to ensure due process.

## **CONCLUSION**

The judgment and order approving the Settlement Agreement should be reversed.

DATED: January 5, 2021        Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
       STEVE W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Nathaniel A. Tarnor
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: (212) 752-5455
Facsimile: (917) 310-2980
nathant@hbsslaw.com

*Counsel for Appellants Fikes Wholesale, Inc., Midwest Petroleum Company, Slidell Oil Company, LLC, the Society of Independent Gasoline Marketers of America (SIGMA), the National Association of Shell Marketers, Inc. (NASM), and the Petroleum Marketers Association of America (PMAA) (collectively, "Branded Operators"), Case No. 20-344*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 6,790 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

_/s/ Steve W. Berman_
STEVE W. BERMAN
