# 20-339(L)

**20-304(CON), 20-340(CON), 20-341(CON), 20-342(CON), 20-343(CON), 20-344(CON)**

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT
DISCOUNT ANTITRUST LITIGATION

_____

On Appeal from the United States District Court
for the Eastern District of New York, No. 05-1720

_____

**PETITION FOR PANEL REHEARING OR EN BANC REHEARING BY
APPELLANTS GNARLYWOOD LLC AND QUINCY WOODRIGHTS,
LLC (20-341 CON), AND UNLIMITED VACATIONS AND CRUISES, INC.
AND USA PETS LLC (20-343 CON)**

_____

Kendrick Jan
Kendrick Jan, APC
225 Broadway, Suite 2220
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

John J. Pentz
18 Damon Street
Wayland, MA  01778
Tel: (978) 985-4668
jjpentz3@gmail.com

Pursuant to FRAP 35 and 40, Appellants Gnarlywood LLC, Quincy Woodrights, LLC, Unlimited Vacations and Cruises, Inc., and USA Pets LLC, hereby move for Panel and/or en banc rehearing. The Panel Opinion[1] in this appeal conflicts with two prior opinions of this Court, *see Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019) and *Hyland v. Navient Co.*, 48 F.4th 110 (2d Cir. 2022), and a decision of the United States Supreme Court. *See Trustees v Greenough*, 105 U.S. 527 (1881). Consideration of this appeal by the full Court is necessary to establish uniformity in this Circuit.

## ARGUMENT

### I. THE PANEL'S DECISION CONFLICTS WITH SUPREME COURT PRECEDENT AND PRIOR PANEL DECISIONS OF THIS CIRCUIT

The Panel in this case was unanimous in its opinion that *Trustees v. Greenough*, 105 U.S. 527 (1881) prohibits incentive or service awards in any amount. *See* Panel Opinion (attached hereto) at p. 34. Nonetheless, the Panel felt compelled by this Court's prior decisions in *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019) and *Hyland v. Navient Co.*, 48 F.4th 110 (2d Cir. 2022), to allow these prohibited awards on the grounds of *stare decisis*. *See* Panel Opinion at p. 35 ("But practice and usage seem to have superseded *Greenough* (if that is

---

[1] Panel Opinion refers to the March 15, 2023, opinion in this case.

1

possible)… And even if (as we think) practice and usage cannot undo a Supreme Court holding, *Melito* and *Navient* are precedents that we must follow.")

In his concurring opinion, Judge Jacobs made clear that the reasoning of this Court's prior decisions in *Melito* and *Hyland* is thin gruel and hardly an adequate basis for distinguishing *Greenough* in the Rule 23 context. *Melito*, in a scant paragraph, called *Greenough* "inapposite," citing only to an Eleventh Circuit decision that has since been reversed by *Johnson v. NPAS Solutions LLC*, 975 F.3d 1244 (11th Cir. 2020). *Hyland* merely mimicked *Melito* without further analysis. *See* Jacobs, concurring, at p. 6.

The Panel Opinion throws Second Circuit jurisprudence into chaos in light of its concomitant holding – springing from the fact there was never any authorization for incentive awards and that they are created out of whole cloth – that there are no standards that bound the discretion of district courts when making such awards. Panel Opinion at p. 39 ("basis for any service award in a class action is at best dubious under *Greenough* [and] calculation of such an award is standardless"). District courts are now free to reflexively follow the holdings of *Melito* and *Hyland*, or to adhere to the Panel's opinion that such awards are legally infirm. Without further guidance from the en banc Court, the Panel's holding leaves district courts without standards and unconstrained in choosing to grant or

2

not grant incentive awards – whether awarding nothing or, as here, hundreds of thousands of dollars.

The Panel Opinion makes necessary the guidance of the full Court of Appeals.  While the conflict between panels would be starker had the Panel distinguished the superficial reasoning of *Melito* and *Hyland* and reversed, the Panel's comments regarding *Greenough* have left Second Circuit incentive award jurisprudence in disarray.  Three judges of this Court have now opined that two prior Second Circuit panels erred by following the holding of a since-overturned Eleventh Circuit decision, but that they are compelled by *stare decisis* to repeat that error.  The next district court asked to approve an incentive award will be forced to guess what the next appellate panel might do.  If left to stand, the Panel Opinion effectively provides that there is no identifiable law in this Circuit on the permissibility of or limits on incentive awards.  At a minimum, the full Court should accept this matter to establish some uniform standards by which district courts may calculate these awards.

## II.    THE PANEL DECISION IS INTERNALLY INCONSISTENT IN ITS TREATMENT OF LOBBYING TIME

The Panel Opinion is also inconsistent in its treatment of time spent lobbying for changes to the laws governing credit card transaction fees.  Both Class Counsel and the lead plaintiffs spent enormous amounts of time seeking changes to the laws governing transaction fees and credit card competition.  As recognized by the Panel, this work had nothing to do with the damages class action now on appeal. With regard to the lead plaintiffs, the Panel held that "[t]he class should not pay for time spent lobbying for changes in law that do not benefit the class.  We direct the court to reduce the award to the extent its size was increased because of time spent lobbying." Panel Opinion at p. 39.  With respect to Class Counsel, however, who spent at least $24 million in lodestar time, and likely far more than that, lobbying for passage of the Durbin amendment and otherwise performing work unrelated to the recovery of damages on behalf of the (b)(3) class, the Panel held that "if the work done on behalf of the injunction class could all be teased apart from the work done for the damages class, the district court should have done so. But that was not an option.  The injunctive and monetary claims were interwoven…" Panel Opinion at p. 48.

This is not entirely correct.  While it may be that some aspects of the injunctive and monetary causes were interwoven, Class Counsel admit their

legislative lobbying did nothing to advance the interests of the (b)(3) class.[2]  If the legislative lobbying makes more difficult the recovery of damages, there is no reason the (b)(3) class should be ordered to pay for that lobbying.

As a factual matter, enormous blocks of Class Counsel's time, supporting several millions of dollars of lodestar, were spent *exclusively* on lobbying, and were clearly identified as such in their time records and declarations filed in support of their fee motions.  *See* JA A-2515-2516 and A-2554-2559.  Further, Appellants identified at least $17.8 million of lodestar spent exclusively on the easily identified non-(b)(3) pursuits of the ASR Group of no benefit to the (b)(3) class.  JA A-5956 and JA A-2495-2496.

Class Counsel bears the burden of establishing what portion of their claimed lodestar was actually spent in pursuit of redress for the damages suffered by the (b)(3) class.  *Cruz v. Local Union No. 3 of the Int'l Bhd. Of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994), citing *Hensley v. Eckkerhart*, 461 U.S. 424, 437 (1983).  Class Counsel did not make, and the district court did not require, any effort to

---

[2] Class Counsel argued at the fairness hearing that the passage of the Durbin Amendment, for example, *increased* the risk that they would not recover damages or would recover lower damages. Fairness Hearing Tr., JA A-7147. In other words, Class Counsel were actually working *against* the interest of their Rule 23(b)(3) clients when they were pursuing legislative and regulatory reforms.

apportion lodestar among efforts spent advocating *separately* for the distinct conflicted parties.

The Panel remanded with instructions to distinguish the lead plaintiffs' time spent lobbying from time spent pursuing a damages award – which will presumably require lead plaintiffs to file further details regarding their claimed hours sufficient to assist the court in distinguishing lobbying efforts from damages work. The Panel should have given the district court the same instruction regarding Class Counsel's time spent on legislative lobbying and other extraneous non-(b)(3) pursuits. *At the very least*, Class Counsel should be required to file sufficient additional lodestar detail to permit an accurate calculation of Class Counsel's lodestar, shorn of legislative lobbying work.

## III. THE PANEL FAILED TO CORRECTLY APPLY *SILBIGER* TO THE FACTS OF THIS CASE

The Panel erred in its application of *Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917 (2d Cir. 1950). The Panel purported to apply an exception to the forfeiture rule for conflicted representation where the fee is paid exclusively by a group that was not prejudiced by the attorney's divided allegiance. The Panel's assumption that the damages class was not "prejudiced" by the conflicted representation is clearly erroneous and ignores Appellants' arguments. To the contrary, Class Counsel themselves concede the (b)(3) litigation landscape post-2016 was less favorable specifically because of the Durbin Amendment, the passage of which was actively and extensively advocated by Class Counsel. The conflicted representation further prejudiced the damages class by forcing it to pay for tens of millions of dollars of legal work performed exclusively for the benefit of the injunctive class.[3]

Class Counsel should have obtained the current $5.6 billion settlement for fees of far less than $500 million, which would have resulted in substantially more money remaining in the net settlement fund. The conflicted representation permitted Class Counsel to run the meter on the (b)(3) damages class and overbill

---

[3] Paying excessive fees is indistinguishable from recovering less money in damages. The (b)(3) class members care only about their net recovery.

that class tens of millions of dollars due to the lack of separate representation and segregated billing.

There is ample evidence in Class Counsel's briefing of tens of thousands of hours spent on non-compensable tasks,[4] none of which was excluded from their claimed lodestar. Because Class Counsel was intentionally derelict in its duty to segregate pre-2016 (b)(2) time from pre-2016 (b)(3) time, they should, per *Silbiger,* receive credit for neither.

Refusing to consider any pre-2016 hours is a reasonable remedy for Class Counsel's failure to make any effort to eliminate from its lodestar those hours spent on activities that did not directly contribute to the (b)(3) class's monetary recovery, which directly prejudiced the (b)(3) class. If the Court is inclined to allow that some of Class Counsel's work served the interest of both the (b)(2) and (b)(3) classes, at the very least, Appellants seek to have excluded all pre-2016 time because of both Class Counsel's self-created conflict, and Class Counsel's failure to segregate hours spent *exclusively* on extra-judicial and injunctive relief.

---

[4] Class Counsel's fee memorandum describes pre-remand services that included "petition[ing] all three branches of the Federal Government and Monitor[ing] Foreign Governments," "draft[ing] an *amicus* brief" in third party litigation, filing "an additional *amicus* brief in that same third party matter, and providing "substantial assistance" to the DOJ. JA A-5917 – 5924. None of this activity contributed anything to the recovery of monetary damages.

## IV.    THE PANEL'S DECISION TO PUNT THE FUTURE RELEASE ISSUE TO A FUTURE COURT DENIES NEWER CLASS MEMBERS THE PROTECTIONS OF RULE 23

The Panel elected to leave to another time and court the matter of the inequitable impact of the settlement's future release, thus denying a substantial portion of the class a remedy for violations of rule 23(a)(4) and 23(e)(2)(D).  If the interests of recently-formed businesses[5] are to be afforded the protections of Rule 23, it must happen in this proceeding or not at all.

Appellants do not simply challenge the legality of a future release in the abstract.  Rather, they argue the interests of newer class members were not adequately advocated and – though the scope of the release applies uniformly to class members – the plan of allocation fails to correspond with the burdens of the release and to provide an equitable distribution among class members.  For example, a business started in January 2019 will receive compensation for one month of credit card transaction fees while releasing nine years of claims.[6]  The lead plaintiffs will all receive compensation for at least fifteen years of transaction

---

[5] This issue impacts not just recently-formed businesses but also those whose credit card sales are increasing year over year.

[6] The future release now runs through at least March 2028.

fees, while releasing twenty-four years of claims.[7]  The future release results in inequitable differential treatment of Class members holding released claims of the same legal merit.[8]  Appellants argued this constitutes a lack of adequate representation within the meaning of Rule 23(a)(4) and a violation of the 23(e)(2)(D) requirement that a settlement treat "class members equitably relative to each other."[9]

The Panel's determination that it "has no occasion to decide" questions regarding the protections of Rules 23(a)(4) and 23(e)(2)(D) in this case because the settlement's release "extend[s] to, but only to, the fullest extent permitted by federal law" overstates a future court's jurisdiction.  Left to stand, the district court's approval of the settlement – and its finding that Class Counsel and lead plaintiffs adequately represented the interests of all class members and that a pro

---

[7] Consider also that those class members who ceased doing business during the claims period will receive 100% of their claims' settlement value, while class members in business for only the last month of the claims period will receive just around 1%.

[8] The scope of the release applies uniformly to class members. The plan of allocation, however, does not correspond with the scope of the release and is neither pro rata nor equitable.

[9] The drafting committee regarded as a matter of particular concern "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and *whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.*" (Emphasis added)  Fed. R. Civ. P. 23 Committee Notes on Rules – 2018 Amendment, Subdivision (e)(2), paragraphs (C) and (D).

rata distribution for a period shorter than the release period is fair and reasonable – will be res judicata. Another court simply will not have occasion to rule on whether the class members were denied the protections of Rules 23(a)(4) and 23(e)(2)(D). The only question left would be whether a future claim stems from the same factual predicate as those compensated by this action. At best, a future court's consideration of lawfulness of the future release would be an incomplete analysis of the issues now presented to this Court.

Only this Panel or the full Court has the opportunity to address the issue of whether the future release, assuming its legality in the abstract, impacts certain class members in different ways that bear on the apportionment of relief. This Court must rule on this issue now, or else the newer businesses will be forever saddled with a settlement that shortchanges them. Leaving the matter to another court on another day will forever prejudice the interests of newer class members.

11

## **CONCLUSION**

For the foregoing reasons, this Court should: (1) grant this petition for en banc rehearing to clarify the current conflict in Second Circuit law; or (2) grant a Panel rehearing.

Respectfully submitted,

/s/ John J. Pentz
John J. Pentz, Esq.
18 Damon Street
Wayland, MA 01778
Phone: (978) 985-4668
jjpentz3@gmail.com
Attorney for Appellants
Unlimited Vacations and
Cruises Inc., and USA Pets LLC

/s/ Kendrick Jan
Kendrick Jan
Kendrick Jan, APC
225 Broadway, Suite 2220
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com
Attorney for Appellants
Gnarlywood LLC and
Quincy Woodrights, LLC

12

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32</u>
## <u>AND LOCAL RULE 28.1.1</u>

1.      This document complies with the type-volume limitation of FRAP 35(b)(2) because this document contains fewer than 3,900 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman.


Dated: March 27, 2023

<div style="margin-left:40%">

/s/ John J. Pentz
Attorney for Appellants
Unlimited Vacations and
Cruises Inc., and USA Pets LLC


/s/ Kendrick Jan
Attorney for Appellants
Gnarlywood LLC and
Quincy Woodrights, LLC

</div>

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2023, I filed the PETITION FOR PANEL

REHEARING OR EN BANC REHEARING via the ECF filing system for the

United States Court of Appeals for the Second Circuit, and that as a result each

counsel of record received an electronic copy of this Brief on March 27, 2023.

<u>/s/ John J. Pentz</u>

20-339-cv(L)
In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2021

(Argued: March 16, 2022                    Decided:      March 15, 2023)

Docket Nos. 20-339(L), 20-340(CON),
20-341(CON), 20-342(CON), 20-343(CON), 20-344(CON)

_____

Fikes Wholesale, Inc.,

Plaintiff - Appellant,


Plaintiffs in civil action Photos Etc. Corp. v. Visa U.S.A., Inc. 05-cv-5071JG-JO,
CHS Inc., Leons Transmission Service, Inc., Traditions, Ltd., Plaintiffs in civil
action Parkway Corp. v. Visa U.S.A., Inc. 05-cv-5077 JG-JO, Plaintiffs in civil
action Discount Optics, Inc., et al. v. Visa U.S.A., Inc., et al. 05-cv-5870 JG-JO,
Payless Shoe Source, Inc., Capital Audio Electronics, Inc.,

Plaintiffs - Appellees,


Plaintiffs in civil action Jetro Holding, Inc. et al v. Visa U.S.A., Inc. et al 05-cv-
4520 JG-JO, Plaintiffs in civil action National Association of Convenience Stores
et al v. Visa U.S.A., Inc. et al 05-cv-4521 JG-JO, Plaintiffs in civil action Supervalu
Inc. v. Visa U.S.A. Inc. et al 05-cv-4650 JG-JO, Plaintiffs in civil action Seaway Gas
& Petroleum, Inc. v. Visa U.S.A., Inc. et al 05-cv-4728-JG-JO, Plaintiffs in civil
action Raley's v. Visa U.S.A. Inc. et al 05-cv- 4799 JG-JO, Plaintiffs in civil action
East Goshen Pharmacy, Inc. v. Visa U.S.A., Inc. 05-cv-5073 JG-JO, Plaintiffs in

civil action National Grocers Association et al v. Visa U.S.A., Inc. et al 05-cv- 5207 JG-JO, Plaintiffs in civil action American Booksellers Association v. Visa U.S.A., Inc. et al 05-cv-5319 JG-JO, Plaintiffs in civil action Rookies, Inc. v. Visa U.S.A., Inc. 05-CV-5069 JG-JO, Plaintiffs in civil action Jasperson v. Visa U.S.A., Inc. 05-cv-5070 JG-JO, Plaintiffs in Civil action Animal Land, Inc. v. Visa U.S.A., Inc 05-cv-5074 JG-JO, Plaintiffs in civil action Bonte Wafflerie, LLC v. Visa U.S.A., Inc. 05-cv-5083 JG-JO, Plaintiffs in civil action Broken Ground, Inc. v. Visa U.S.A., Inc. 05-cv-5082 JG-JO, Plaintiffs in civil action Baltimore Avenue Foods, LLC v. Visa U.S.A., Inc. 05-cv-5080 JG-JO, Plaintiffs in civil action Fairmont Orthopedics & Sports Medicine, PA v. Visa U.S.A., Inc. 05-cv-5076 JG JO, Plaintiffs in civil action Tabu Salon & Spa, Inc. v. Visa U.S.A., Inc. 05-cv-5072 JG-JO, Plaintiffs in civil action Lakeshore Interiors v. Visa U.S.A., Inc. 05-cv-5081JG JO, Plaintiffs in civil action NuCity Publications, Inc. v. Visa U.S.A., Inc. 05-cv-5075 JG-JO, Plaintiffs in civil action Hyman v. VISA International Service Association, Inc. 05-cv-5866 JG-JO, Plaintiffs in civil action Lee et al v. Visa U.S.A. Inc. et al 05-cv-3800 JG-JO, Plaintiffs in civil action Resnick Amsterdam & Leshner P.C. v. Visa U.S.A., Inc. et al 05-cv-3924 JG-JO, Plaintiffs in civil action Hy-Vee, Inc. v. Visa U.S.A., Inc. et al 05-cv-3925-JG-JO, Plaintiffs in civil action Meijer, Inc. et al v. Visa U.S.A. Inc. et al 05-cv-4131-JG-JO, Plaintiffs in civil action Lepkowski v. Mastercard International Incorporated et al 05-cv-4974 JG-JO, Plaintiffs in civil action Kroger Co. v. Visa U.S.A., Inc. 05-cv-5078 JG-JO, Plaintiffs in civil action Fitlife Health Systems of Arcadia, Inc. v. Mastercard International Incorporated et al 05-cv-5153 JG-JO, Plaintiffs in civil action Harris Stationers, Inc., et al. v. Visa International Service Association, et al. 05-cv-5868 JG-JO, Plaintiffs in civil action Dr. Roy Hyman, et al v. Visa International Service Association, Inc., et al . 05-cv-5866 JG-JO, Plaintiffs in civil action Performance Labs, Inc. v. American Express Travel Related Services Co., Inc., et al. 05-cv-5869 JG-JO, Plaintiffs in civil action Leeber Cohen, M.D. v. Visa U.S.A., Inc., et al. 05-cv-5878 JG-JO, Plaintiffs in civil action G.E.S. Bakery, Inc. v. Visa U.S.A., Inc., et al. 05-cv-5879 JG-JO, Plaintiffs in civil action Connecticut Food Association, Inc., et al. v. Visa U.S.A., Inc., et al. 05-cv-5880 JG-JO, Plaintiffs in Twisted Spoke v. Visa U.S.A., Inc., et al. 05-cv-5881 JG-JO, Plaintiffs in civil action Lombardo Bros., Inc. v. Visa U.S.A., Inc. 05-5882 JG-JO, Plaintiffs in civil action Abdallah Bishara, etc. v. Visa U.S.A., Inc. 05-cv-5883 JG-JO, Plaintiffs in civil action 518 Restaurant Corp. v. American Express Travel Related Services Co., Inc., et al. 05-cv-5884 JG-JO, Plaintiffs in civil action JGSA,

2

Inc. v. Visa U.S.A., Inc., et al. 05-cv-5885 JG-JO, Plaintiffs in civil action The
Kroger Co., et al. v. MasterCard Inc., et al., 06-cv-0039 JG-JO, Plaintiffs in civil
action Rite Aid Corporation et al. v. Visa U.S.A., Inc. et al. 05-cv-5352 JG-JO,
Plaintiffs in civil action Fringe, Inc. v. Visa, U.S.A., Inc et al 05-cv-4194 JG-JO,
Plaintiffs in civil action Bi-Lo, LLC. et al v. Visa U.S.A., Inc. et al 06-cv-2532 JG-
JO, Plaintiffs in civil action Bi-Lo, LLC. et al v. Mastercard Incorporated et al 06-
cv-2534 JG-JO, Plaintiffs in civil action 06-cv-5583, Esdacy, INC. v. Visa USA,
INC. et al, QVC, Inc., GMRI, Inc., NATSO, Incorporated, Plaintiffs in civil action
BKS. v. Visa U.S.A., Inc. et al 09-cv-2264-JG-JO, Plaintiffs in civil action Gulfside
Casino Partnership. v. Visa U.S.A., Inc. et al 09-cv-03225 JG-JO, Keith
Superstores, BKS, INC., BKS of LA, Inc. d/b/a KEITH SUPERSTORES, and
KEITHCO PETROLEUM, INC., Keithco Petroleum, Inc., BKS, INC., BKS of LA,
Inc. d/b/a KEITH SUPERSTORES, and KEITHCO PETROLEUM, INC., National
Community Pharmacists Association, National Cooperative Grocers Association,
Coborn's Incorporated, D'Agostino Supermarkets, Inc., National Restaurant
Association, Affiliated Foods Midwest, Gielen Enterprises, Inc., Rice Palace, Inc.,
Tobacco Plus, Inc., CVS Pharmacy, Inc., Plaintiffs in Delta Airlines Inc et all v.
Visa Inc et al, 1:13-cv-04766-JG-JO, Cox Communications, Inc., Cox Enterprises,
Inc., Cox Media Group, Inc., G6 Hospitality LLC, Live Nation Entertainment,
Inc., Manheim Inc., Motel 6 Operating LP, E-Z Mart Stores, Inc., Jacksons Food
Stores, Inc./PacWest Energy LLC, Kum & Go, L.C., Sheetz, Inc., Susser Holdings
Corporation, The Pantry, Inc., Plaintiffs in Target Corporation, et al. v. Visa Inc.,
et al., 13-cv-03477, DSW Inc., Jetblue Airways Corporation, Plaintiffs in Civil
Action 7-Eleven Inc., et al. v. Visa Inc. et al, 1:13-cv-05746-JG-JO, Minnesota
Twins LLC, Crystal Rock LLC, Plaintiffs in Civil Action Target Corporation, et al.
v. Visa Inc. et al., 13-cv-4442, Plaintiffs in civil action Publix Supermarkets, Inc. v.
Visa U.S.A. Inc et al 05-cv-4677 - JG-JO, Plaintiffs in civil action LDC, Inc. v. Visa
U.S.A., Inc., et al 05-cv-5871 JG-JO, Robersons Fine Jewlery, Inc., Sunoco, Inc.
(RM), Einstein Noah Restaurant Group, Inc., Furniture Row BC, Inc., Google,
Inc., Google Payment Corporation, Bass Pro Group, LLC, American Sportsman
Holdings Co., Bass Pro Outdoor World, LLC, BPIP, LLC, BPS Direct, LLC, Big
Cedar, LLC, Fryingpan River Ranch, LLC,

Plaintiffs,

3

1                                          v.

2

3       HSBC Bank USA, N.A., Capital One Bank, Capital One, F.S.B., Capital One

4   Financial Corporation, Wells Fargo & Company, Juniper Financial Corporation,

5       National City Bank of Kentucky, National City Corporation, Mastercard

6   Incorporated, HSBC Finance Corporation, HSBC North America Holdings Inc.,

7    Citibank, N.A., Citigroup Inc., Chase Bank USA, N.A., JPMorgan Chase & Co.,

8     Fifth Third Bancorp, Bank of America, N.A., First National Bank of Omaha,

9   Barclays Financial Corp., Chase Paymentech Solutions, LLC, Visa International

10     Service Association, Visa U.S.A. Inc., Bank of America Corporation, Texas

11   Independent Bancshares, Inc., Wells Fargo Merchant Services, LLC, Visa Inc.,

12    Capital One Bank, (USA), N.A., JP Morgan Chase Bank, N.A., Barclays Bank

13    PLC, Barclays Bank Delaware, MBNA America Bank, N.A., HSBC Finance

14   Corporation, HSBC Holdings PLC, HSBC North America Holdings, Inc, PNC

15   Financial Services Group, Inc., SunTrust Bank, Suntrust Banks Inc, Wells Fargo

16   Bank, N.A., Wachovia Corporation, Wachovia Bank, National Association, BA

17   Merchant Services LLC, FKA National Processing, Inc., FIA Card Services, N.A.,

18              Mastercard International Incorporated,

19

20                   Defendants - Appellees,

21

22   Defendants in civil action Jetro Holding, Inc. et al v. Visa U.S.A., Inc. et al 05-cv-

23    4520 JG-JO, Defendants in civil action National Association of Convenience

24   Stores et al v. Visa U.S.A., Inc. et al 05-cv-4521 JG-JO, Defendants in civil action

25     Supervalu Inc. v. Visa U.S.A. Inc. et al 05-cv-4650 JG-JO, Defendants in civil

26     action Publix Supermarkets, Inc. v. Visa U.S.A. Inc. et al 05-cv-4677-JG-JO,

27   Defendants in civil action Seaway Gas & Petroleum, Inc. v. Visa U.S.A., Inc. et al

28   05--cv-4728 JG-JO, Defendants in civil action Raley's v. Visa U.S.A. Inc. et al 05-

29   cv-4799- JG-JO, Defendants in civil action East Goshen Pharmacy, Inc. v. Visa

30     U.S.A., Inc 05-cv-5073-JG-JO, Defendants iin civil action National Grocers

31   Association et al v. Visa U.S.A., Inc. et al 05-cv- 5207 JG -JO, Defendants in civil

32   action American Booksellers Association v. Visa U.S.A., Inc. et al 05-cv-5319 JG -

33   JO, Defendants in civil action Rookies, Inc. v. Visa U.S.A., Inc. 05-cv-5069-JG-JO,

34      Defendants in civil action Jasperson v. Visa U.S.A., Inc. 05-cv-5070-JG-JO,

35   Defendants in civil action Animal Land, Inc. v. Visa U.S.A., Inc. 05-cv-5074-JG-

4

JO, Defendants in civil action Bonte Wafflerie, LLC v. Visa U.S.A., Inc. 05-cv-5083
JG-JO, Defendants in civil action Broken Ground, Inc. v. Visa U.S.A., Inc. 05-cv-
5082 JG-JO, Defendants in civil action Baltimore Avenue Foods, LLC v. Visa
U.S.A., Inc. 05-cv-5080 JG-JO, Defendants in civil action Fairmont Orthopedics &
Sports Medicine, PA v. Visa U.S.A., Inc. 05-cv-5076-JG-JO, Defendants in civil
action Tabu Salon & Spa, Inc. v. Visa U.S.A., Inc. 05-cv-5072 -JG-JO, Defendants
in civil action Lakeshore Interiors v. Visa U.S.A., Inc. 05-cv-5081 JG-JO,
Defendants in civil action Parkway Corp. v. Visa U.S.A., Inc. 05-cv-5077-JG-JO,
Defendants in civil action Hyman v. VISA International Service Association, Inc.
05-cv-5866 JG -JO, Defendants in civil action Lee et al v. Visa U.S.A. Inc. et al 05-
cv-03800, Defendants in civil action Resnick Amsterdam & Leshner P.C. v. Visa
U.S. A, Inc. et al, 05-cv-3924 JG-JO, Defendants in civil action Hy-Vee, Inc. v. Visa
U.S.A., Inc. et al 05-cv-03925 JG-JO, Defendants in civil action Meijer, Inc. et al v.
Visa U.S.A. Inc. et al 05-cv-4131 JG-JO, Defendants in civil action Lepkowski v.
Mastercard International Incorporated et al 05-cv-4974-JG-JO, Defendants in civil
action Photos Etc. Corp. v. Visa U.S.A., Inc. 05-cv-5071-JG-JO, Defendants in
action Kroger Co. v. Visa U.S.A., Inc. 05-cv-5078 JG-JO, Defendants in civil case
Fitlife Health Systems of Arcadia, Inc. v. Mastercard International Incorporated
et a 05-cv-5153 JG -JO, Defendants in civil action Rite Aid Corporation et al. v.
Visa U.S.A., Inc. et al. 05-cv-5352 JG-JO, Defendants in civil action The Kroger
Co., et al. v. MasterCard Inc., et al., 06-cv-0039 JG-JO, Defendants in civil action
Harris Stationers, Inc., et al. v. Visa International Service Association, et al. 05-cv-
5868 JG-JO, Defendants in civil action Dr. Roy Hyman, et al. v. Visa International
Service Association, Inc., et al. 05-cv-5866, Defendants in civil action Performace
Labs, Inc. v. American Express Travel Related Services Co., Inc., et al 05-cv-5869
JG-JO, Defendants in civil action Discount Optics, Inc., et al. v. Visa U.S.A., Inc.,
et al. 05-cv-5870 JG-JO, Defendants in civil action LDC, Inc. v. Visa U.S.A., Inc. et
al. 05-cv-5871 JG-JO, Defendants in civil action G.E.S. Bakery, Inc. v. Visa U.S.A.,
Inc,. et al. 05-cv-5879 JG-JO, Defendants in civil action Leeber Cohen, M.D. v.
Visa U.S.A., Inc., et al. 05-cv-5878 JG-JO, Defendants in civil action Connecticut
Food Association, Inc., et al. v. Visa U.S.A., Inc., et al 05-cv-5880 JG-JO,
Defendants in civil action Twisted Spoke v. Visa U.S.A., Inc., et al. 05-cv-5881 JG-
JO, Defendants in civil action Lombardo Bros., Inc. v. Visa U.S.A., Inc. 05-cv-5882
JG-JO, Defendants in civil action Abdallah Bishara, etc. v. Visa U.S.A., Inc. 05-cv-
5883 JG-JO, Defendants in civil action 518 Restaurant Corp. v. American Express

1   Travel Related Services Co., et al. 05-cv-5884 JG-JO, Defendants in civil action
2   JGSA, Inc. v. Visa U.S.A., Inc., et al 05-cv-5885, Defendants in civil action Fringe,
3   Inc. v. Visa, U.S.A., Inc. et al 05-cv-4194 JG-JO, Defendants in civil action Bi-Lo,
4   LLC. et al v. Visa U.S.A., Inc. et al 06-cv-2532 JG-JO, Defendants in civil action Bi-
5   Lo, LLC. et al v. Visa U.S.A., Inc. et al 06-cv-2534 JG-JO, Defendants in civil action
6   06-cv-5583, Esdacy, INC. v. Visa USA, INC. et al, Washington Mutual, Inc.,
7   Defendants in civil action BKS. v. Visa U.S.A., Inc. et al 09-cv-2264-JG-JO,
8   Wachovia Corporation, Wachovia Bank, National Association, Defendants in
9   civil action Gulfside Casino Partnership. v. Visa U.S.A., Inc. et al 09-cv-03225 JG-
10  JO, Landers Harley-Davidson Little Rock, Sears Holdings Management
11  Corporation, Discover Financial Services, Newport European Motorcars, Ltd.
12  Newport Beach, California, Newport European Motorcars, Ltd. Newport Beach,
13  California, Dennis D Gibson, Unlimited Vacations and Cruises Inc., Top Gun
14  Wrecker, Orange County Bldg Materials, Bishop, DBA Hat & Gown, Enterprise
15  Holdings, Inc., Ragland Bros. Retail Cos., Inc., ABP Corporation, NJ Applebee's
16  (Paramus), River Valley Market, LLC, Durango Natural Foods, The Real Good
17  Fashion Store, Inc., Paymentech, LLC, LAJ, Inc., DBA Grapevine Wines an
18  Spirits, Lane Courkamp, Premier Enterprises Group, Class Action Recovery
19  Service, Discover, Refund Recovery Services, LLC, Electronic Payment Systems,
20  LLC, Daviss Donuts and Deli, Jonbro, Visa Europe Limited, Visa Europe Services
21  Inc., Chase Manhattan Bank USA, N.A., Citibank (South Dakota), N.A., BA
22  Merchant Services LLC, FKA National Processing, Inc., FIA Card Services, N.A.,
23  Bass Pro Shops White River Conference and Education Center, LLC, SunTrust
24  Bank Holding Company,

26                          Defendants,

28                               v.

30  Jack Rabbit LLC, Cahaba Heights Service Center, Inc., DBA Cahaba Heights
31  Chevron, R & M Objectors, Falls Auto Gallery, DBA Falls Car Collection,
32  Gnarlywood LLC, Quincy Woodrights, LLC, Kevan McLaughlin, Unlimited
33  Vacations and Cruises Inc., Pets USA LLC, Slidell Oil Company, LLC, National
34  Association of Shell Marketers, Inc., Petroleum Marketers Association of
35  America, Midwest Petroleum Company, Society of Independent Gasoline

Marketers of America,

Objectors - Appellants.

_____

Before: JACOBS, LEVAL, and PARK, <u>Circuit Judges</u>.

A putative class of over 12 million merchants brought this antitrust action under the Sherman Act against Visa U.S.A. Inc., MasterCard International Inc., and numerous banks that serve as payment-card issuers for those networks. Plaintiffs alleged that Visa and MasterCard adopted and enforced rules and practices relating to payment cards that had the combined effect of injuring merchants by allowing Visa and MasterCard to charge supracompetitive fees (known as "interchange fees") on each payment card transaction. After nearly fifteen years of litigation, the parties agreed to a settlement of roughly $5.6 billion, which was approved by the United States District Court for the Eastern District of New York (Brodie, <u>C.J.</u>) over numerous objections. In so doing, $900,000 in service awards was granted to lead plaintiffs, and roughly $523 million was granted in attorneys' fees.

1    The appellants are various objectors who argue that the district court erred

2    when it certified the class, approved the settlement, granted service awards and

3    computed attorneys' fees.

4    We conclude that these arguments are without merit and therefore

5    AFFIRM the district court's orders in all respects, except as noted below.

6    The opinion of the Court is unanimous.  Judge Jacobs and Judge Leval

7    each concur in separate opinions.

8    _____

9                                                  NATHANIEL A. TARNOR, Hagens
10                                                 Berman Sobol Shapiro LLP, New York, NY
11                                                 (Steve W. Berman, Hagens Berman Sobol
12                                                 Shapiro LLP, Seattle, WA, on the brief), for
13                                                 Objectors-Appellants Fikes Wholesale, Inc.,
14                                                 et al.
15
16                                                 N. ALBERT BACHARACH, JR. (Paul S.
17                                                 Rothstein, on the brief), Gainesville, FL, for
18                                                 Objectors-Appellants Jack Rabbit, LLC, et
19                                                 al.
20
21                                                 KENDRICK JAN, San Diego, CA, for
22                                                 Objectors-Appellants Gnarlywood LLC, et
23                                                 al.
24
25                                                 JOHN J. PENTZ, Sudbury, MA, for
26                                                 Objectors-Appellants Pets USA LLC, et al.
27

8

                              C. Benjamin Nutley, Pasadena, CA, and
                              John W. Davis, Tampa, FL, <u>for Objector-
                              Appellant Kevan McLaughlin</u>.

                              PATRICK J. COUGHLIN, (Joseph D. Daley,
                              Alexandra S. Bernay, and Carmen A.
                              Medici, <u>on the brief</u>) Robbins Geller
                              Rudman & Dowd LLP, San Diego, CA; K.
                              Craig Wildfang, Thomas J. Undlin, Ryan
                              W. Marth, Robins Kaplan LLP,
                              Minneapolis, MN; H. Laddie Montague, Jr.,
                              Merrill G. Davidoff, Michael J. Kane, Berger
                              Montague PC, Philadelphia, PA, <u>for
                              Plaintiffs-Appellees</u>.

                              KANNON K. SHANMUGAM (Kenneth A.
                              Gallo, Jessica Anne Morton, Stacie M.
                              Fahsel, <u>on the brief</u>) Paul, Weiss, Rifkind,
                              Wharton & Garrison LLP, Washington, DC;
                              Gary R. Carney, Elyssa E. Abuhoff, Paul,
                              Weiss, Rifkind, Wharton & Garrison LLP,
                              New York, NY, <u>for Defendants-Appellees</u>.

DENNIS JACOBS, <u>Circuit Judge</u>:

       A putative class of over 12 million merchants brought this antitrust action

under the Sherman Act against Visa U.S.A. Inc. ("Visa"), MasterCard

International Inc. ("MasterCard"), and numerous banks that serve as payment-

card issuers for those networks.  Plaintiffs alleged that Visa and MasterCard

adopted and enforced rules and practices relating to payment cards that had the

                              9

1    combined effect of injuring merchants by allowing Visa and MasterCard to

2    charge supracompetitive fees (known as "interchange fees") on each payment

3    card transaction. After nearly fifteen years of litigation, the parties agreed to a

4    settlement of roughly $5.6 billion, which was approved by the United States

5    District Court for the Eastern District of New York (Brodie, C.J.) over numerous

6    objections. In so doing, $900,000 in service awards was granted to lead plaintiffs,

7    and roughly $523 million was granted in attorneys' fees.

8        The appellants are various objectors who argue that the district court erred

9    when it certified the class, approved the settlement, granted service awards and

10    computed attorneys' fees.[1]

11        We conclude that these arguments are without merit and therefore

12    AFFIRM the district court's orders in all respects, except as noted below.

13

---

[1] We refer to "Appellants" plural, regardless of whether a point was advanced by one objector-appellant or more.

10

# BACKGROUND

# I

It is well known that Visa and MasterCard operate two of the world's largest payment-card networks. An understanding of this case requires some knowledge of how those networks operate. In brief: the customer presents a payment card to the merchant; the merchant relays the card information to its bank (the acquiring bank); the acquiring bank forwards that information to the appropriate network (Visa or MasterCard); the network relays the information to the bank that issued the customer's card (the issuing bank); and the issuing bank confirms that the customer has sufficient credit or funds to cover the purchase. . When these steps are completed, the issuing bank transmits its approval back through the chain to the acquiring bank, which relays it to the merchant at the point of sale.

Next, the issuing bank provides the funds via the appropriate network to the acquiring bank, less the "interchange fee" (the focus of this litigation) which the issuing bank – a member of the Visa or MasterCard network - keeps.    While the issuing and acquiring banks are contractually free to agree on an applicable interchange fee, Visa and MasterCard each set a default fee in the absence of such

1    an agreement.  The acquiring bank, in turn, pays the merchant while charging

2    what is known as a "merchant discount fee."   That fee covers the interchange

3    fee as well as an additional amount that compensates the acquiring bank for

4    processing the transaction.  The applicable default fee varies depending on

5    factors that include the type of payment card.

6         Merchants who accept Visa- and MasterCard-branded cards are bound by

7    the issuers' network rules, which in effect are identical to one another.   For

8    example, the "honor-all-cards" rules require any merchant that accepts a Visa- or

9    MasterCard-branded credit card to accept all credit cards of that brand,

10   regardless of the differences in interchange fees.   Further, multiple rules

11   prohibit merchants from influencing customers to use one type of payment over

12   another--such as a credit card with a lower interchange fee, or cash rather than

13   credit.  These "anti-steering" rules include the "no-surcharge" and "no-discount"

14   rules, which prohibit merchants from charging different prices at the point of

15   sale depending on the means of payment.

16

**II**

Numerous antitrust lawsuits were filed against Visa and MasterCard beginning in 2005.  The first consolidated complaint in this action (which was followed by several amended complaints) was filed the following year.   The then-operative complaints alleged that the Visa and MasterCard interchange fees, and associated rules, were anticompetitive and violated the Sherman Act, 15 U.S.C. §§ 1 and 2, and California's Cartwright Act, Bus. & Prof. Code § 16700 et seq.

Prolonged negotiation resulted in a "2012 Settlement Agreement." Consistent with the then-operative complaint, the proposed settlement divided the plaintiffs into two classes.  The first--the Rule 23(b)(3) damages class--covered merchants that accepted Visa and/or MasterCard from January 1, 2004 to November 27, 2012.  The second--the Rule 23(b)(2) injunction class--covered merchants that accepted (or would accept) Visa and/or MasterCard on or after November 27, 2012.  The 23(b)(3) class was set to receive roughly $5.3 billion, after opt-out payments.  The 23(b)(2) class would receive injunctive relief in the form of changes to Visa's and MasterCard's network rules.  While members of

the (b)(3) damages class could opt out, members of the (b)(2) injunction class

could not.  The same counsel represented both classes.

The settlement agreement was given preliminary approval in late 2012.

Final approval by the district court came roughly a year later.

**III**

On June 30, 2016, we held that the members of the (b)(2) injunction class

received inadequate representation, in violation of the Due Process Clause and

Rule 23(a)(4) of the Federal Rules of Civil Procedure, because, despite their

divergent interests, they were represented by the same counsel and lead

plaintiffs as the (b)(3) damages class.  See In re Payment Card Interchange Fee &

Merch. Disc. Antitrust Litig., 827 F.3d 223, 233-34 (2d Cir. 2016).  Specifically, we

explained that the interest of the (b)(3) class members was in "maximiz[ing] cash

compensation for past harm," while the interest of the (b)(2) class members was

in "maximiz[ing] restraints on network rules to prevent harm in the future."  Id.

at 233.  This conflict disadvantaged the (b)(2) injunction class, we concluded,

because "[t]he class counsel and class representatives who negotiated and

entered into the [2012] Settlement Agreement were in the position to trade

14

1   diminution of (b)(2) relief for increase of (b)(3) relief." <u>Id.</u> at 234.  Accordingly,

2   we vacated the district court's certification of the settlement class, reversed

3   approval of the 2012 Settlement Agreement, and remanded for further

4   proceedings.  <u>Id.</u> at 240.

5

6                                      **IV**

7        On remand, the district court appointed the three law firms that had

8   previously served as class counsel (together, "Class Counsel") to serve as interim

9   counsel only for the Rule 23(b)(3) damages class.[2]  About two years later, after

10   additional discovery and renegotiation, the parties executed this new settlement

11   agreement (the "Settlement Agreement"), which provides for a collective award

12   of $5.6 billion (as reduced in the amount of $700 million to reflect opt-outs).  The

13   district court granted preliminary approval on January 24, 2019, and final

14   approval on December 13, 2019.

---

[2] The district court also appointed separate counsel to represent a proposed injunctive-relief class seeking certification under Rule 23(b)(2).  The (b)(2) action is now proceeding as <u>DDMB, Inc. v. Visa, Inc.</u>, No. 05-md-1720.

1       The Settlement Agreement defines the class as "all persons, businesses,

2 and other entities that have accepted any Visa-Branded Cards and/or

3 Mastercard-Branded Cards in the United States at any time from January 1, 2004

4 to the Settlement Preliminary Approval Date [January 24, 2019]." App'x at 3324

5 ¶ 4. The definition expressly excludes, among others, the "Dismissed Plaintiffs,"

6 a defined term referring to roughly 200 merchants (and their related entities) that

7 had opted out of the initial settlement and separately settled their claims. Id. at

8 3316 ¶ 3(t), 3324-25 ¶ 4. The Settlement Agreement provides that each claimant

9 will receive a pro rata share of the monetary fund "in accordance with the

10 relative economic interests of the Claimants as measured by the Interchange Fee

11 amounts attributable to their Visa- and Mastercard-Branded Card transactions

12 during the Class Period." Id. at 3567.

13       In exchange for this cash, each class member released claims "arising out

14 of or relating to" any conduct or acts that were or could have been alleged in the

15 litigation. Id. at 3337 ¶ 31(a). That release covers all claims that have accrued

16 during the class period, or that will "accrue no later than five years after the

17 Settlement Final Date," id., which is defined as the date on which appeals from

18 the Settlement Agreement become final, id. at 3321-22 ¶ 3(ss).

16

The release "extend[s] to, but only to, the fullest extent permitted by
federal law." Id. at 3337 ¶ 31(a). The parties have stated, in the district court and
on appeal, that this language is intended to comport with the "identical factual
predicate" test, i.e., that a settlement may validly release claims "that would have
to be based on the identical factual predicate as that underlying the claims in the
settled class action." TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456,
460 (2d Cir. 1982). See Defendants-Appellees Br. at 52; Plaintiffs-Appellees Final
Approval Br. at 63; App'x at 4424. The district court so construed the Settlement
Agreement in granting approval. In re Payment Card Interchange Fee & Merch.
Disc. Antitrust Litig., No. 05-md-1720, 2019 WL 6875472, at *23-25 (E.D.N.Y. Dec.
16, 2019) ("Final Approval").

Because of the dispute described below between integrated oil companies
and their franchised service stations operating under the trademark of the
franchisor, contesting which should receive the settlement funds allocated to
customers using payment cards to purchase primarily gasoline, the district court
determined to appoint a special master to study and determine the question,
subject to de novo review by the district court.

17

1    After granting final approval of the Settlement Agreement, the district

2    court awarded Class Counsel 9.31% of the settlement fund in attorneys' fees,

3    approximately $523 million.  See In re Payment Card Interchange Fee & Merch.

4    Disc. Antitrust Litig., No. 05-md-1720, 2019 WL 6888488, at *25 (E.D.N.Y. Dec. 16,

5    2019).  This award was meant to reflect, among other things, the "enormous

6    number of hours and many years" devoted to the case, id. at *10, and the

7    "substantively risky" nature of the litigation, id. at *14.  The award for expenses

8    was $39 million.  See id. at *25.

9    Separately, the district court granted the class representatives $900,000 in

10   service awards, in addition to out-of-pocket expenses.  The district court

11   recognized that "[t]here is no indication that any Class Representative assumed

12   the position or undertook the time and labor they did in anticipation of being

13   compensated," but still granted the award because of the "enormous amount of

14   time and resources" they spent on the case.  App'x at 7456-57.

15   Appellants argue that the district court abused its discretion when it

16   certified the class, approved the settlement, granted service awards and

17   computed attorneys' fees.

18

18

# DISCUSSION

## I

The settlement-only class is defined to include (with limited exceptions) "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to [January 24, 2019]."  App'x at 3324 ¶ 4.  A controversy over the class definition exists between integrated oil companies (e.g., Shell, Chevron, and Valero) and their branded service stations--i.e., between franchisors and their franchisees--both of which claim to have been injured by the interchange fees imposed on gas sales and claim to "have accepted" Visa-Branded and MasterCard-Branded cards in payment for sales.  Appellants are representatives of the service stations, and raise challenges regarding: (A) ascertainability, (B) adequacy of representation, (C) claims administration, and (D) notice.


## A

The ascertainability challenge hinges on the interpretation of a single word: "accepted."  The word "accepted" creates ambiguity.  Both the franchisors and the franchisees claim to have "accepted" the payment card from the

19

1    customers at the service stations.  The franchisees claim to have "accepted" Visa

2    and/or MasterCard from consumers paying for the gasoline dispensed at their

3    stations, while the franchisors claim to have "accepted" the payment cards by,

4    inter alia, providing operating and processing services on the same set of

5    transactions.  The question of which ones accepted the payment cards was not

6    resolved by the district court but was instead set aside for determination by a

7    special master, subject to de novo review by the district court.  Appellants

8    contend that this failure of the settlement agreement renders the class

9    unascertainable, with dire consequences for the settlement.[3]  This is mistaken.

10        Ascertainability requires only that "a proposed class is defined using

11   objective criteria that establish a membership with definite boundaries."  In re

---

[3] There was a question as to whether this unresolved issue might impact
appellate jurisdiction.  To obviate any such complications, we remanded
pursuant to the procedure set out in United States v. Jacobson, 15 F.3d 19 (2d Cir.
1994), for the district court to consider whether, in the event its disposition of the
dispute between service stations and oil companies was deemed not a final
judgment, there was no just reason for delay in the appeal of all other issues.  On
July 18, 2022, the district court so concluded and certified that the judgment
previously entered and appealed from should be considered a partial final
judgment in accordance with Rule 54(b) of the Federal Rules of Civil Procedure.
In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., No. 05-md-
1720, 2022 WL 2803352 (E.D.N.Y. July 18, 2022).

1  Petrobras Sec., 862 F.3d 250, 269 (2d Cir. 2017).  This definition meets that

2  requirement by providing the timeframe (January 1, 2004 to January 24, 2019)

3  and place (the United States) in which a particular group (entities that have

4  accepted Visa and/or MasterCard) was allegedly harmed.  That is all that is

5  needed.

6      True, the word "accepted" lends itself to ambiguity.  But the district court

7  properly concluded that "the class definition is . . . objectively guided by federal

8  antitrust standards."[4]  Final Approval, No. 05-md-1720, 2019 WL 6875472, at *31;

9  see also In re Motorola Sec. Litig., 644 F.3d 511, 517 (7th Cir. 2011) ("[A]s a

10  general rule, a class definition is interpreted according to the substantive law that

11  provides the basis for the class action.").  In view of those standards, the district

12  court accepted Class Counsel's claim that "they represent only . . . the direct

---

[4] Appellants argue that it is not clear that federal antitrust law should guide the class definition, as the operative complaint also asserts claims under California's Cartwright Act, which expressly allows recovery for indirect payors.  Cal. Bus. & Prof. Code § 16750(a).  But Appellants raised this argument for the first time in their reply brief, thereby waiving it.  See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").

1  purchaser, and not every entity in the payment chain." <u>Final Approval</u>, No. 05-

2  md-1720, 2019 WL 6875472, at *31 (internal quotation marks omitted).[5]  Put

3  differently, the district court found that federal antitrust law clarified that the

4  only entities that could fall within the class definition were those deemed to be

5  direct payors of the challenged fees.

6        Appellants argue that it is not enough for the definition to be discernible:

7  the criteria for class membership must be "administratively feasible," such that

8  identifying the class members "would not require a mini-hearing on the merits of

9  each case." <u>Brecher v. Republic of Arg.</u>, 806 F.3d 22, 24-25 (2d Cir. 2015) (internal

10  quotation marks omitted).  Appellants contend that the administrative feasibility

11  requirement is not satisfied in this case, since the dispute over which entity was

12  the direct payor for any given transaction will lead to "hundreds of thousands of

13  mini trials."  Jack Rabbit Br. at 64.

---

[5] No party to this appeal disputes that "for any given transaction, only one interchange fee was paid and only one claimant is entitled to recover based on that fee."  Defendants' Br. at 31; <u>see also</u> Jack Rabbit Br. at 38, 55 ("Pursuant to <u>Illinois Brick</u>, there can only be one claim per antitrust injury.").  We therefore accept that interpretation of federal antitrust law for the purposes of this appeal, without opining on its soundness.

1    This argument rests on a faulty premise.  Requiring administrative

2    feasibility is "neither compelled by precedent nor consistent with Rule 23."

3    Petrobras, 862 F.3d at 264.  The only relevant inquiry is whether determinations

4    as to class membership are "objectively *possible*."  Id. at 270.  Appellants do not

5    contend that identifying the direct payor for each transaction is impossible.  So,

6    their ascertainability argument must fail.

7

8                                                **B**

9           Appellants next contend that the class definition gave rise to an intra-class

10   conflict that left the franchisees without adequate representation.  We are

11   unpersuaded.

12          "Class actions are an exception to the rule that only the named parties

13   conduct and are bound by litigation."  In re Payment Card Interchange Fee &

14   Merch. Disc. Antitrust Litig., 827 F.3d at 231.  "In order to justify a departure

15   from that rule, a class representative must be part of the class and possess the

16   same interest and suffer the same injury as the class members."  Wal-Mart Stores,

17   Inc. v. Dukes, 564 U.S. 338, 348-49 (2011) (internal quotation marks omitted).

18   That principle is secured in part by Rule 23(a)(4), which requires that "the

                                                23

1   representative parties . . . fairly and adequately protect the interests of the class."

2   Fed. R. Civ. P. 23(a)(4).

3          Appellants argue that the franchisees have been inadequately represented

4   because no class representative has a shared interest in the franchisees' dispute

5   with their franchisors.  Such shared interests are necessary to protect the

6   franchisees, Appellants contend, since the loser of the intra-class conflict will be

7   entitled to no recovery, but will still be bound by the settlement's release.

8          Appellants are confused.  The dispute is not over which group of class

9   members will get the recovery; the dispute is over which claimants are within the

10   class.  Whoever "accepted" the payment cards is by definition in the class, gets

11   compensation, and is bound by the release; an entity that did not accept the

12   payment is by definition excluded from the class and is not bound by the

13   settlement.  See Rothstein v. Am. Int'l Grp., 837 F.3d 195, 204 (2d Cir. 2016)

14   (noting that non-class members "cannot be bound by any orders or judgments

15   entered in respect to the settlement" (internal quotation marks omitted)).  The

16   class representatives owe nothing to the losing entities; outsiders are irrelevant.

17          The district court emphasized that point: "[B]ecause the conflict is not

18   between class members, but between entities disputing who has the right to

1   claim class status, there is no intra-class conflict or inadequate representation;

2   Class Counsel and Class Plaintiffs are not responsible to, and do not represent,

3   the entity that loses the dispute over the right to claim settlement funds." <u>In re</u>

4   <u>Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.</u>, 330 F.R.D. 11, 33

5   (E.D.N.Y. 2019) ("Preliminary Approval").  As a result, the district court

6   concluded, there "is a dispute that needs to be resolved," but it "need not be

7   resolved through creation of subclasses or appointing new class representatives

8   or counsel."  <u>Final Approval</u>, No. 05-md-1720, 2019 WL 6875472, at *18.

9         We agree with the district court that the arguments advanced by the

10   franchisees present no reason why the settlement affecting all claimants other

11   than the franchisors and franchisees of integrated oil companies should not be

12   consummated.

13         Until now, there has been no conflict between franchisors and franchisees.

14   To the contrary, they have shared an interest in maximizing the recovery for all

15   class members, which each claims to be.  Going forward, however, franchisors

16   and franchisees will become adverse to each other for resolution of the questions

17   regarding which should be deemed to have accepted the cards and therefore to

18   come within the class and receive settlement funds, and how those funds should

25

1    be allocated,. It appears that class counsel will be conflicted on those questions.

2    The district court should ensure that franchisors and franchisees will be

3    represented by counsel, enabling each side to present arguments to the special

4    master and the district court as to why they should be favored over the

5    adversary, and enabling them to negotiate toward settlements of the disputes

6    affecting each adverse pair.

7         Whether this will require designations of subclasses and appointment of

8    further counsel to represent them or whether their existing privately retained

9    counsel will adequately serve the needs, we leave to the good judgment of the

10   district court.

11

12                                        **C**

13        Appellants next challenge the district court's plan to refer the dispute over

14   class membership to a special master, subject to its <u>de novo</u> review. Appellants

15   raise three arguments on this score.

16        First: they contend this dispute should have been resolved before class

17   certification because "no class may be certified that contains members lacking

18   Article III standing," and "[t]he class must therefore be defined in such a way

1    that anyone within it would have standing." Denney v. Deutsche Bank AG, 443

2    F.3d 253, 264 (2d Cir. 2006).  This argument stems from the same mistaken belief

3    that this is a dispute between class members rather than a dispute over class

4    membership.  And there is nothing unusual about a special master identifying

5    that entity after settlement approval.  See Rothstein, 837 F.3d at 199, 201-02

6    (noting that class membership was determined after settlement approval);

7    Motorola, 644 F.3d at 515 (same).

8    　　Second: they contend that the claims process is fundamentally unfair

9    because it will necessarily result in one group receiving nothing and yet releasing

10   all its claims.  As discussed above, however, that is just not so.  Excluded entities

11   would not be bound by the settlement.

12   　　Third: they contend that the contemplated special master process is too

13   vague, complicated, and adversarial to be appropriate under Rule 23.  This

14   vagueness argument rests on a series of open questions as to how the special

15   master will go about identifying direct payors--e.g., whether the special master

16   will allow legal briefs or expert testimony.  But logistics can be worked out in

17   time.  The district court provided the only marching order that matters: that the

1   special master identify the direct payor or payors in any given transaction.[6]  That

2   is enough for now.

3        As to the complicated and adversarial nature of the impending special

4   master proceedings, special masters have been frequently tasked with deciding

5   antitrust standing issues at the summary judgment stage.  These are tough and

6   hotly disputed issues.  But district courts with loaded dockets may rely on

7   special masters to decide thorny things.  With respect to the restrictions imposed

8   by Rule 53(a)(1)(C) on circumstances in which special masters may be appointed,

9   limiting appointment to matters that "cannot be effectively and timely addressed

10  by an available district judge or magistrate judge," we have no reason to doubt

11  that the district court complied with its obligations.  Fed. R. Civ. P. 53(a)(1)(C).[7]

---

[6] This fact distinguishes this case from the one that Appellants rely upon, in which the Fifth Circuit held that that a mandatory limited-fund settlement of tort claims required decertification because the district court punted, *without any guidance*, "the difficult question of equitable distribution . . . to the special master."  In re Katrina Canal Breaches Litig., 628 F.3d 185, 194 (5th Cir. 2010).

[7] Appellants contend that special masters are most useful at determining quantitative issues, but "[w]hen the issues referred to a master go beyond hard-to-measure damages or an accounting . . . the waters grow more turbid."  Stauble v. Warrob, Inc., 977 F.2d 690, 694 (1st Cir. 1992).  That observation was made in reference to a prior version of Rule 53, which provided that "in actions to be tried

1    In affirming the district court's decision, of course, we are not granting blanket

2    approval to any future decision made by the special master.  Decisions by the

3    special master will be reviewable <u>de novo</u> by the district court and, in turn,

4    reviewable by us on appeal.

5

6                                      **D**

7         The final objection is raised on behalf of franchisees who had been

8    designated "Dismissed Plaintiffs," a term defined in the Settlement Agreement to

9    include entities that opted out via a separate agreement.  The problem first raised

10   at the preliminary settlement hearing was that some or all of the franchisors that

11   settled separately had included their franchisees in the release.  The franchisees

12   contested their dismissed status on the grounds that the franchisors lacked

13   authority to release their claims and that, in any event, some of them dealt with

---

without a jury, save in matters of account and of difficult computation of damages, a reference [to a special master] shall be made only upon a showing that some *exceptional condition* requires it."  Fed. R. Civ. P. 53(b) (as amended Apr. 30, 1991, effective Dec. 1, 1991) (emphasis added).  Under Rule 53, as revised, special masters may now address pretrial and post-trial matters without a showing of exceptional conditions, so long as the circumstances of the appointment respect the conditions imposed by subsection (a)(1)(C).  <u>See</u> Fed. R. Civ. P. 53(c).

1    more than one franchisor, not all of which had settled separately. The district

2    court did not address the first objection, but did direct issuance of a "notice of

3    exclusion," informing the franchisees that they were excluded from the class, and

4    that, because their claims had been settled, they would not be eligible for class

5    settlement funds unless they had also accepted payment in a capacity other than

6    as a Dismissed Plaintiff.

7         At the final approval stage, exclusion was again contested. In response to

8    the claim that separate settlements were entered without the consent of the

9    franchisees, the district court instructed Class Counsel to send supplemental

10   notice informing all entities that had received a "notice of exclusion" that that

11   they could "make a claim for class settlement funds if [the settling entity] did not

12   have authority to settle and release [their] claims." App'x at 7220. Appellants

13   contend that this supplemental notice violated the Due Process Clause because it

14   was sent only after final approval of the Settlement Agreement, thereby

15   preventing the franchisees from opting out of or objecting to the settlement. We

16   disagree.

17        "The standard for the adequacy of a settlement notice in a class action

18   under either the Due Process Clause or the Federal Rules is measured by

30

1    reasonableness." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 113 (2d

2    Cir. 2005). "There are no rigid rules to determine whether a settlement notice to

3    the class satisfies constitutional or Rule 23(e) requirements; the settlement notice

4    must fairly apprise the prospective members of the class of the terms of the

5    proposed settlement and of the options that are open to them in connection with

6    the proceedings." Id. at 114 (internal quotation marks omitted).

7            There was nothing unreasonable about the supplemental notice. The

8    district court ordered these notices out of caution, after an objection raised at the

9    final approval stage. There was no need then to provide an opt-out because all

10   entities receiving the notice were already presumed to be excluded from the

11   class.[8] Nor was the notice needed to provide these entities with the opportunity

12   to object; after all, it was the objection of a "Dismissed Plaintiff" that caused the

13   supplemental notices to be sent in the first place.

---

[8] All entities identified as Dismissed Plaintiffs would have presumably been
bound by the release contained in separate settlement agreements; but the
validity of those agreements could always be challenged in a separate action.

31

1    The district court acted (or reacted) reasonably in a sprawling case with

2    many interested parties, in which neither the district court nor class counsel can

3    be expected to predict and preempt every issue that might arise.

4

5                                              **II**

6        In exchange for the $5.6 billion, the settlement releases all claims that

7    "accrue no later than five years after" the date on which appeals from the

8    settlement become final.  App'x at 3337 ¶ 31(a); <u>see also</u> <u>id.</u> at 3321-22 ¶ 3(ss).

9    This feature of the release is said to violate two related rules.

10       **Rule 23(a)(4).**  Newer merchants, who started accepting payment cards

11   only toward the end of the class period, are said to be inadequately represented

12   in violation of Rule 23(a)(4) because their interests diverged from those of the

13   class representatives, all of which had accepted Visa and/or MasterCard for the

14   full fifteen-year class period, and therefore had incentive to forgo five years (or

15   more) of future claims in exchange for the cash that would afford newer

16   merchants no more than a marginal recovery.

17       **Rule 23(e)(2)(D).**  Relatedly, it is contended that the future release results

18   in inequitable treatment among the class members in violation of Rule 23(e)(2)(D)

                                              32

1  because it requires class members to forgo relief for the same length of time,

2  regardless of whether the class member was in business for fifteen years of the

3  class period, or for the final month only.

4      We have no occasion to decide these questions.  That is because the release

5  of claims provision contains a de-facto severability clause, providing that the

6  release "extend[s] to, but only to, the fullest extent permitted by federal law."

7  App'x at 3337 at ¶ 31(a).  This language ensures that the Settlement Agreement

8  will stand even if certain aspects of the release were to fall.  A holding as to the

9  proper scope of the release--i.e., whether the future release violates federal law--

10  can await a case in which the issue would directly affect the proceedings.

11

12                                   **III**

13      The district court granted $900,000 in service awards to the lead plaintiffs.

14  Appellants contend that such awards are prohibited by Supreme Court

15  precedent and that, even if they were generally permissible, the amount awarded

16  in this case was excessive.  We will address these two arguments in turn.

17

**A**

Service awards are likely impermissible under Supreme Court precedent. The Supreme Court has held that it was "decidedly objectionable" for cash allowances to be "made for the personal services and private expenses" of a creditor who brought suit on behalf of himself and other similarly situated bondholders. Trustees v. Greenough, 105 U.S. 527, 537 (1881). Such allowances, the Court reasoned, "would present too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interest of creditors, and that perhaps only to a small amount." Id. at 538.

Appellants argue that Greenough precludes the granting of service awards in this case, and in virtually all other cases[9]--as the Eleventh Circuit held in Johnson v. NPAS Solutions, LLC, 975 F.3d 1244 (11th Cir. 2020). True, Greenough's holding was not about persons designated as class representatives under the later-formulated class action rules; but it "involved an analogous litigation actor." Id. at 1259. Finally, appellants argue that although Rule 23

---

[9] Service awards are expressly allowed by statute for class representatives in private securities litigation. See 15 U.S.C. § 78u-4(a)(4).

34

post-dates <u>Greenough</u>, it makes no reference to service awards, and is thus

"irrelevant." <u>Id.</u>

But practice and usage seem to have superseded <u>Greenough</u> (if that is

possible). <u>See</u> <u>Melito v. Experian Mktg. Sols. Inc.</u>, 923 F.3d 85, 96 (2d Cir. 2019);

<u>Hyland v. Navient Co.</u>, 48 F.4th 110, 123-24 (2d Cir. 2022). And even if (as we

think) practice and usage cannot undo a Supreme Court holding, <u>Melito</u> and

<u>Navient</u> are precedents that we must follow.


**B**

Appellants contend that the service awards here are excessive, even if

service awards are otherwise deemed permissible, and must be reduced.

We have articulated no standard by which district courts can consider the

grant of service awards. District courts within this Circuit have generally relied

upon the following factors:

> [1] the existence of special circumstances including the
> personal risk (if any) incurred by the plaintiff-applicant
> in becoming and continuing as a litigant, [2] the time and
> effort expended by that plaintiff in assisting in the
> prosecution of the litigation or in bringing to bear added
> value (e.g., factual expertise), [3] any other burdens

35

1                sustained by that plaintiff . . . and, of course, [4] the

2                ultimate recovery.

3

4 Dial Corp. v. News Corp., 317 F.R.D. 426, 439 (S.D.N.Y. 2016) (ellipsis in original)

5 (quoting Roberts v. Texaco, 979 F. Supp. 185, 200 (S.D.N.Y. 1997)). District courts

6 also "often look to the sums awarded in similar cases, and compare the named

7 plaintiff's requested award to each class member's estimated pro rata share of

8 the monetary judgment or settlement." In re AOL Time Warner ERISA Litig.,

9 No. 02-cv-8853, 2007 WL 3145111, at *2 (S.D.N.Y. Oct. 26, 2007) (citations

10 omitted). Given the Supreme Court's precedent in apparent opposition to the

11 practice, and the standardless use of it nevertheless, it is unsurprising that, as has

12 been said, "the decision to grant the [service] award, and the amount thereof,

13 rests solely within the discretion of the Court." Dial, 317 F.R.D. at 439.

14       Here, the district court bestowed a total of $900,000 in service awards to

15 the eight lead plaintiffs, with the two highest awards in the amount of $200,000.

16 The district court justified these awards as follows:

17             •   "Courts have approved similarly-sized service awards, even in cases
18                 with smaller settlement fund sizes and for cases that proceeded for a
19                 shorter duration of time."

20

- "Class Representatives spent an enormous amount of time and resources in serving as named representatives in this complex litigation that has spanned well over a decade."

- "There is no indication that any Class Representative assumed the position or undertook the time and labor they did in anticipation of being compensated."

- "Class Counsel does not seek service awards in excess of the service awards requested and previously granted pursuant to the now-vacated 201[2] Settlement Agreement, despite significant additional efforts and time spent by the Class Plaintiffs in the six years since that time, including time spent as a result of another round of discovery."

App'x at 7455-56 (citations omitted).  Appellants challenge the amount of these awards on four grounds.

First: Appellants argue that the lead plaintiffs cannot adequately represent the class because the service awards dwarf the recovery for the lead plaintiffs and the average class member.  As Appellants point out, certain lead plaintiffs will receive service awards that are about 100 times as large as their expected settlement recovery.  Thus, Photos Etc., with an estimated claim of about $2,000, gets a service award of $200,000--more than 400 times the average recovery, which is less than $500.  We recognize that certain district courts have relied on

37

these sorts of comparisons;[10] but we have never required their use, and we

decline to do so now.

      Second: The district court credited each lead plaintiff for the full time it

spent on the litigation.  Appellants contend that, to avoid rewarding inefficiency,

the district court should have limited its consideration to the average number of

hours expended by the lead plaintiffs with the largest claims--CHS and Payless.

This idea is more creative than it is compelling, or workable.  We cannot say that

the district court's approach was an abuse of discretion.

      Third: Payless reported that participation in this case cost it $70,000 in

salary and wages; and CHS reported $39,000.  Appellants contend that service

awards should have been directly tied to those losses, and that the district court's

failure to do so amounted to an abuse of discretion.  Service awards have been

limited to lost wages and out-of-pocket expenses in the context of private federal

---

[10] In 2014, Judge Gleeson questioned the requested service awards based on the reasons that Appellants now articulate.  See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 991 F. Supp. 2d 437, 448-49 (E.D.N.Y. 2014).  But Judge Gleeson's reservations are not law of the case, and Chief Judge Brodie, to whom the case was reassigned after Judge Gleeson's retirement, had no obligation to follow suit.

1    securities litigation.  See 15 U.S.C. § 78u-4(a)(4) (limiting service awards to

2    "reasonable costs and expenses (including lost wages) directly relating to the

3    representation of the class").  The district court in this antitrust case was not

4    bound by the limitation.

5         Fourth: Appellants contend that much of the work that the lead plaintiffs

6    performed was geared toward obtaining legislative reform for the injunction

7    class, and that those efforts should have been excluded in arriving at a service

8    award for the damages class.  Given that the basis for any service award in a

9    class action is at best dubious under Greenough, and that, unsurprisingly,

10   calculation of such an award is standardless, it is difficult to find traction for a

11   ruling that this award is an abuse of discretion.  In any event, among the variety

12   of factors considered, the district court made no more than passing reference to

13   time that lead plaintiffs spent on legislative activities.  But the point here is valid.

14   The class should not pay for time spent lobbying for changes in law that do not

15   benefit the class.  We direct the district court to reduce the award to the extent its

16   size was increased because of time spent lobbying.

17

**IV**

The award of attorneys' fees exceeds half a billion dollars.  The district

court acknowledged that the "sheer size" of this award resulted in "apparent

unfairness," but found that "public policy interests weigh in favor of a

substantial award."  In re Payment Card Interchange Fee & Merch. Disc.

Antitrust Litig., No. 05-md-1720, 2019 WL 6888488, at *21 (E.D.N.Y. Dec. 16, 2019)

("Fee Opinion").  True, the amount is breathtaking; but the only question for us

is whether the district court abused its discretion in awarding such fees.  We

cannot say that it did.


**A**

It is well-established under the common fund doctrine that "attorneys who

create a fund for the benefit of a class of plaintiffs are entitled to reasonable

compensation from that fund."  Victor v. Argent Classic Convertible Arbitrage

Fund L.P., 623 F.3d 82, 84 (2d Cir. 2010).  This reasonableness principle has deep

roots in Supreme Court jurisprudence, stemming from the decisions in

Greenough and Central Railroad & Banking Co. v. Pettus, 113 U.S. 116 (1885).

While this Circuit's approach to calculating fees has "evolved in a somewhat

1    circuitous fashion," <u>Goldberger v. Integrated Res., Inc.</u>, 209 F.3d 43, 48 (2d Cir.

2    2000), we established at the turn of this century that district courts could

3    calculate fees using either the lodestar amount, which is the reasonable hourly

4    rate multiplied by the hours reasonably expended, or a percentage of the fund,

5    <u>see</u> <u>id.</u> at 50.

6        Regardless of which method is chosen, the analysis is effectively the same.

7    In calculating a reasonable common fund fee, district courts are to be guided by

8    the following factors: "(1) the time and labor expended by counsel; (2) the

9    magnitude and complexities of the litigation; (3) the risk of the litigation . . . ;

10   (4) the quality of representation; (5) the requested fee in relation to the

11   settlement; and (6) public policy considerations." <u>Id.</u> (alteration in original)

12   (citation omitted).  What is more, district courts that use the percentage method

13   routinely keep the lodestar in sight, heeding <u>Goldberger</u>'s advice to "requir[e]

14   documentation of hours as a cross check on the reasonableness of the requested

15   percentage." <u>Id.</u> (internal quotation marks omitted).

16       The district court here followed the trend in this Circuit by applying the

17   percentage method.  <u>See</u> <u>Fee Opinion</u>, No. 05-md-1720, 2019 WL 6888488, at *9,

18   *24.  Class Counsel had requested 9.56% of the settlement fund, which amounted

1    to about $537 million.  See id. at *3.  The district court found that the requested

2    award was supported by each of the Goldberger factors, except for the quality of

3    representation.  See id. at *10-21.  While the district court found that Class

4    Counsel did "a tremendous job in litigating this case," id. at *15, it explained that

5    "the low percentage of recovery in comparison to the total alleged damages

6    figure weighs slightly against granting the full amount of Class Counsel's

7    requested fee," id. at *17.[11]

8        The district court then conducted a lodestar cross-check, dividing the

9    percentage fee requested ($537 million) by the lodestar ($215 million).[12]  It

10   concluded that the resulting multiplier of 2.5 fell "well within a range of

11   multipliers that have been deemed acceptable, especially in complex actions."

12   Id. at *22 (citing Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 123 (2d

---

[11] The district court noted that the $5.6 billion settlement figure is less than the interchange fees that one retailer--Wal-Mart Stores, Inc.--paid in a single decade. See id. at *16.

[12] The district court ultimately adjusted the lodestar amount to about $213 million, after deducting time spent exclusively on injunctive relief after the remand.  See id. at *24.

42

1  Cir. 2005) (finding a multiplier of 3.5 to be reasonable in a megafund antitrust

2  action)).

3      The district court then decided to reduce the requested percentage by .25%

4  to account for the relatively small settlement figure, as a percentage of the

5  amount of damages reasonably claimed.  See id. at *24.  This resulted in an

6  award of 9.31% of the common fund, or roughly $523 million.  See id.  The final

7  lodestar multiplier was 2.45.  See id.

8

9                                      **B**

10     Appellants first challenge the roughly 630,000 hours that Class Counsel is

11  found to have expended on the case.  Specifically, Appellants contend that the

12  district court abused its discretion by failing to either: (1) exclude from its

13  analysis all pre-remand time--about 500,000 hours--because of Class Counsel's

14  conflicting representation of the damages and injunction class; or (2) limit pre-

15  remand time to exclude time that benefitted the injunction class only.  Appellants

16  argue that the district court's failure to adjust the pre-remand time in either of

17  these ways allowed inflated hours to distort its Goldberger review (specifically,

1  the time and labor factor) and its lodestar cross-check (by juicing up the

2  lodestar).

3

4                                    **1**

5       Appellants' first argument seeks a categorical exclusion.  That is,

6  Appellants claim that Class Counsel should not have received credit for <u>any</u> pre-

7  remand work, since attorneys cannot be compensated for their simultaneous

8  representation of competing parties.[13]  We are unpersuaded.

9       Appellants' argument hinges on <u>Silbiger v. Prudence Bonds Corp.</u>, 180

10  F.2d 917 (2d Cir. 1950) (L. Hand, <u>J.</u>), in which the district court awarded

11  attorney's fees from a bankruptcy reorganization in which the attorney

12  represented two classes of bondholders with directly opposing interests, such

13  that one class would be "certain to lose by the success of the [other]."  <u>Id.</u> at 920.

14  Judge Hand noted that the "usual consequence" of this sort of conflicting

_____

[13] Appellants also summarily state that even if the nature of the conflict alone does not preclude recovery for pre-remand work, "[o]f course, when an attorney creates a situation in which it is impossible to accurately bill separate clients . . . the remedy is to preclude the recovery of any attorney's fees from either client." Gnarlywood Br. at 43.  But Appellants cite no authority for this proposition.

44

representation was that the offending attorney would be "debarred from

receiving any fee from either [client], no matter how successful his labors."  Id.

It is unclear whether that rule applies in the class action context.  See In re

Austrian & German Bank Holocaust Litig., 317 F.3d 91, 104 n.17 (2d Cir. 2003)

("We do not believe that the strict approach taken in Silbiger, which was not a

class action, requiring forfeiture of at least one-third of the attorney's fee, is

applicable in the context of the pending litigation." (citation omitted)).[14]  In any

event, Silbiger noted an "exception" to the general rule: "it is reasonable not to

impose an entire forfeiture of the allowance," when the award "comes in no part

out of any group that [could] have been prejudiced by the attorney's divided

allegiance."  180 F.2d at 921.  This language provides the "salient distinguishing

feature relied upon in Silbiger."  New York, N.H. & H.R. Co. v. Iannotti, 567 F.2d

166, 176 (2d Cir. 1977).

---

[14] Silbiger concluded that there needed to be some "penalty" for the attorney's failure to notify the court of the conflict, and the case was remanded with instructions to reduce the fee by at least one-third.  180 F.2d at 919, 921. Appellants do not argue for a similar partial forfeiture--at least not as a penalty for conflicted representation.

1    The exception applies with full force to this case.  All fees will come out of

2    the common fund created for the damages class--i.e., the class which always

3    stood to benefit from Class Counsel's conflicted representation.  The injunction

4    class will pay none of it.  So total forfeiture is neither required nor appropriate.[15]

5

6                                        **2**

7    Alternatively, Appellants contend that if Class Counsel is compensated for

8    time spent prior to remand, there should be exclusion of hours spent pursuing

9    injunctive-related relief--e.g., time pursuing extra-judicial legislative changes,

10   and supporting third-party investigations and litigations.  This exclusion, we are

11   told, is not intended to be a penalty for conflicted representation; instead, it seeks

12   to ensure that the damages class does not pay more than its fair share.  This

---

[15] This analysis is unaffected by Appellants' attempt to cast Class Counsel's representation as an "ethical violation."  Gnarlywood Br. at 48.  Class Counsel never violated the New York Rules of Professional Conduct, see Fee Opinion, No. 05-md-1720, 2019 WL 6888488, at *18, and we expressly declined to "impugn the motives or acts of class counsel" on the last appeal, In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 827 F.3d at 234.  Indeed, it was only in the context of a settlement (where relief for one party could be used as a bargaining chip to enhance relief for another) that a conflict between the classes arose.  Class Counsel could have represented both classes without any conflict had the case proceeded to trial and to a final disposition.

argument has some appeal; but we conclude that the district court acted within

its discretion when it decided to include the pre-remand time in its entirety.

Appellants rely on Hensley v. Eckerhart, 461 U.S. 424 (1983), which

considered whether prevailing counsel can be compensated for time spent on

unsuccessful claims under a fee-shifting statute providing that "the court, in its

discretion, may allow the prevailing party . . . a reasonable attorney's fee." Id. at

426 (quoting 42 U.S.C. § 1988) (emphasis added). Hensley observed that when a

plaintiff "present[s] in one lawsuit distinctly different claims for relief that are

based on different facts and legal theories," id. at 434, "counsel's work on one

claim will be unrelated to his work on another claim" and, thus, "work on an

unsuccessful claim cannot be deemed to have been expended in pursuit of the

ultimate result achieved," id. at 435 (internal quotation marks omitted).

Appellants latch on to this statement.

But the Supreme Court went on to consider cases in which "the plaintiff's

claims for relief will involve a common core of facts or will be based on related

legal theories." Id. In those cases, the Court reasoned, "[m]uch of counsel's time

will be devoted generally to the litigation as a whole, making it difficult to divide

1  the hours expended on a claim-by-claim basis." Id.  As a result, attorneys in such

2  cases may still "recover a fully compensatory fee." Id.

3      Hensley's reasoning is instructive here.  In considering the time and labor

4  expended on litigation (the first Goldberger factor), it makes little sense to credit

5  counsel for work performed on behalf of a class that it no longer represents.  So if

6  the work done on behalf of the injunction class could all be teased apart from the

7  work done for the damages class, the district court should have done so.  But that

8  was not an option.  The injunctive and monetary claims were interwoven, such

9  that "the majority of Class Counsel's work leading up to the 201[2] Settlement

10  Agreement would have been aimed generally at proving antitrust violation,

11  regardless of the particular remedy sought or class represented." Fee Opinion,

12  No. 05-md-1720, 2019 WL 6888488, at *11.

13      Under the circumstances, "[t]here was simply no need for the district court

14  to engage in an artificial distribution of attorney time between [monetary] and

15  [injunctive] claims." Dague v. City of Burlington, 935 F.2d 1343, 1359 (2d Cir.

16  1991) (internal quotation marks omitted), rev'd in part, 505 U.S. 557 (1992).

17

48

1    **C**

2    Finally, Appellants raise three challenges to the lodestar multiplier, which

3    was pegged at 2.45.

4    First: Appellants contend that Class Counsel artificially inflated the

5    lodestar by failing to weed out the time spent working for injunctive-related

6    relief.  Had this time been excluded, and the lodestar lowered, the multiplier

7    would have exceeded 2.45 and might have fallen out of a range deemed

8    reasonable.  As explained above, however, the district court acted within its

9    discretion when it declined to exclude hours spent solely on behalf of the

10   injunction class, which was in any event small in number relative to the 630,000

11   total hours.

12   Second: Appellants challenged the district court's comparison of the

13   lodestar multiplier in this case to multipliers found reasonable in other similar

14   actions.  See Fee Opinion, No. 05-md-1720, 2019 WL 6888488, at *22.  But in Wal-

1    Mart, we endorsed the use of lodestar comparators, see 396 F.3d at 123, which

2    would seem necessary to avoid picking numbers arbitrarily.[16]

3          Third: The district court justified the lodestar multiplier by reference to the

4    "significant litigation risk."  Fee Opinion, No. 05-md-1720, 2019 WL 6888488, at

5    *22.  According to Appellants, that was an abuse of discretion because the risks

6    identified--e.g., the challenge of proving antitrust standing--are not of the sort

7    that we deemed applicable in Fresno County Employees' Retirement Association

8    v. Isaacson/Weaver Family Trust, 925 F.3d 63 (2d Cir. 2019).  That case,

9    Appellants posit, relied exclusively on the risk generated from counsel's

10   devotion of resources to a specific case while forgoing other paying work.

11         Appellants' reading of Fresno County is too narrow.  The true risk we

12   identified in Fresno County was the risk that a case taken on contingency will

13   fail:

---

[16] According to Appellants, such comparisons go beyond the factors laid out in
Goldberger, which characterized the practice of fixing a "benchmark" as an "all
too tempting substitute for the searching assessment that should properly be
performed in each case."  Goldberger, 209 F.3d at 52.  But Goldberger eschewed
benchmarks only for the percentage of the common fund--i.e., it counseled
against pegging the percentage at 25%.  It said nothing about applying
benchmarks to the lodestar multiplier.

> The plaintiff class is ... appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases. That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is limited *by the risk she has assumed that the class's cause will be unsuccessful.*

925 F.3d at 70 (emphasis added). The district court reasonably concluded that the significant litigation risk present in this case meant that class counsel had taken on a venture with a high risk of failure, and that the risk should be compensated.

Finally: Appellants argue that the straight lodestar--<u>i.e.</u>, the figure without any multiplier--is the presumptively reasonable fee in cases (such as this one) initiated under fee-shifting statutes.[17] But we rejected that same argument in <u>Fresno County</u>, explaining that "an attorney seeking a fee after establishing a common fund will receive a fee calculated using either the lodestar method or a percentage-of-the-fund method, which can yield a fee that is less than, equal to,

---

[17] The case was filed under the Sherman Act, which provides that persons "injured in [their] business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages . . . sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

1    or greater than the lodestar fee." Id. at 68.  We further explained that where, as

2    here, "statutory fees and the common-fund doctrine collide, the common-fund

3    doctrine operates autonomously from fee-shifting principles." Id. at 69.  The

4    district court therefore acted within its discretion when it granted Class Counsel

5    a fee award that more than doubled the lodestar.

6                                    **CONCLUSION**

7           For the foregoing reasons, we AFFIRM in all respects the district

8    court's orders, to the extent they constituted a final judgment, with the exception

9    that we direct the district court to reduce the service award to class

10   representatives to the extent that its size was increased by time spent in lobbying

11   efforts that would not increase the recovery of damages.  We make no ruling as

12   to how damages should be allocated as between branded oil companies and their

13   branded service station franchisees, the reasonableness of the special master's

14   ultimate findings, or the legality of releasing an as-of-yet hypothetical future

15   claim; such issues must wait for a developed factual record and a final judgment,

16   and, as to the breadth of the releases, the assertion by the defendants in a future

1    litigation of a claim of release which is challenged on the ground that

2    interpreting the release so broadly violates federal law.[18]

---

[18] This panel will retain jurisdiction over any further appeals in this case (though not any appeal from the grant or denial of injunctive relief).

1    DENNIS JACOBS, <u>Circuit Judge</u>, concurring:

2        Visa and MasterCard agreed to pay more than $5.6 billion to a class of

3    roughly 12 million merchants for alleged antitrust violations built into

4    contractual arrangements governing credit and debit cards.  In return, the

5    plaintiffs agreed to release any claims that were or could have been brought

6    during the class period of fifteen years, as well as any related claims that accrued

7    for an indeterminate number of years after the class period closed.

8        As the Opinion of the Court demonstrates, approval of the settlement in

9    this case did not constitute an abuse of discretion under controlling principles.

10    Nevertheless, several results produced by application of those principles in this

11    case are so remarkable as to prompt disquiet.

12

13                                     **I**

14        1. Lawyers for the plaintiffs billed 630,000 hours. That is over 300 lawyer

15    years. One of plaintiffs' lawyers billed over 14,000 hours; three others billed

16    between 10,800 and 12,000 hours; and no fewer than 38 lawyers lavished over

17    2,000 hours on this case.  They are to be richly rewarded: compensation to

18    Plaintiffs' counsel will be half a billion dollars.  The average hourly take-home

rate for all the lawyers (partners and rookies alike) exceeds $1,000.  The average

hourly compensation for all those who billed in the plaintiffs' cause, lawyers as

well as paralegals and such, is about $800.

2. The substantive issue in the case is whether a handful of standard-form

contracts between the card issuers and the merchants (and their banks) violated

the antitrust law. It would not seem that the question would entail heroic labors.

Even so, that issue — the merits -- was preempted by settlement and was never

decided.

3. As in many antitrust suits, there was here a preliminary question as to

whether certain plaintiffs are the persons who can sue to vindicate the claim that

is alleged. That was not settled either.  As to that, Judge Leval's concurrence

raises a pointed question.

4. Under this settlement, the card companies may continue the allegedly

anticompetitive conduct, while members of the class agree to forbear from suing

about it for five years. After five years, a new litigation over the same unresolved

issues can be started; and why would it not be?  A jaundiced observer might

view the case as a delivery system for attorneys' fees.

1    5. If, as is likely, there is to be injunctive relief, it will be the subject of

2    further litigation by other teams of lawyers who even now are beavering away,

3    taking the 80 depositions they have noticed and reviewing the millions of

4    documents they have demanded. Compensation for that work will be extra.

5    6. The average award, if every class member claims every dollar, will be

6    $325.  But no one knows how much of the $5 billion settlement amount will be

7    claimed and actually paid out. Whatever is left over, the trial judge will be

8    authorized to donate for unspecified good causes, defined as the "next best

9    compensation use, e.g., for the aggregate, indirect, prospective benefit of the

10   class."  <u>Masters v. Wilhelmina Model Agency, Inc.</u>, 473 F.3d 423, 436 (2d Cir.

11   2007) (quoting 2 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON

12   CLASS ACTIONS § 10:17 (4th ed.2002)).  The judge may become one of that

13   year's most munificent philanthropists.  A lesser payment to the class itself will

14   not, however, impair the lawyers' fees.

15

16                                           **II**

17   The half billion in legal fees is roughly ten percent of the class recovery,

18   and thus appears plausible, prudent and restrained.  But the principles for

3

1   computing attorney's fees in a class action operate reciprocally to drive up the

2   total.

3        The trend in this Circuit is to award fees based on the percentage-of-the-

4   fund method, which nearly always results in an award that exceeds the lodestar

5   method: i.e., the number of hours times the billing rate.  Here, the percentage

6   award exceeded the lodestar by more than $300 million.  It is thought that the

7   percentage method "directly aligns the interests of the class and its counsel and

8   provides a powerful incentive for the efficient prosecution and early resolution

9   of litigation."  Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir.

10  2005) (citation omitted).  As this case demonstrates, however, the benefit can be

11  illusory.

12       The problem is that fee awards are usually computed at the end of a case,

13  which prevents counsel from knowing which method of compensation will be

14  used.  This uncertainty can be an incentive for class counsel to maximize the time

15  expended, as a hedge against the possibility that the lodestar method will be

16  used.  And the incentive to maximize the recovery for the class is diminished

1      since counsel does not know what percentage (if any) of the increment will be

2      awarded.

3            The lodestar cross-check is supposed to correct the incentive, but does not.

4      If the percentage award exceeds the lodestar figure by too high a multiple,

5      district courts will reduce the award to shrink the gap.  See, e.g., In re Visa

6      Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 522 (E.D.N.Y. 2003)

7      (reducing multiplier to 3.5 after finding the requested multiple of 10 to be

8      "absurd").  The cross-check is thus an incentive for counsel to prolong litigation

9      and maximize billable hours to arrive at a lodestar that does not operate as a cap

10     on a percentage award.  It is only fair to add that I am not in a position to know

11     whether these or any abuses occurred in this case.

12

13                                **III**

14            The named plaintiffs in this case are deemed private attorneys general.

15     Yet they are getting a total of $900,000 as a kind of tip.  That is $900,000 more

16     than permitted under Supreme Court authority.  See Trustees v. Greenough, 105

17     U.S. 527 (1882).  The Eleventh Circuit held as much in Johnson v. NPAS

18     Solutions, LLC, 975 F.3d 1244 (11th Cir. 2020), and I am in accord with the views

19     set forth in that thorough and well-reasoned opinion.

5

1        But this Court has twice come out the opposite way.  First, <u>Melito v.</u>

2  <u>Experian Marketing Solutions, Inc.</u>, 923 F.3d 85 (2d Cir. 2019) affirmed the grant

3  of so-called service awards, stating, without elaboration, that <u>Greenough</u> (and

4  the Supreme Court's less relevant decision in <u>Central Railroad & Banking Co. v.</u>

5  <u>Pettus</u>, 113 U.S. 116 (1885)) did not "provide factual settings akin to those here."

6  <u>Id.</u> at 96.  Then, recently, <u>Hyland v. Navient Corp.</u>, 48 F.4th 110, 124 (2d Cir. 2022)

7  over-read <u>Melito</u> to hold that "Rule 23 does not <u>per se</u> prohibit service awards

8  like the one at issue here."

9        <u>Melito</u> can be best understood as an attempt to avoid a split with the

10  Eleventh Circuit, which had held – in an opinion later vacated – that <u>Greenough</u>

11  did *not* categorically prohibit service awards.  See <u>Muransky v. Godiva</u>

12  <u>Chocolatier, Inc.</u>, 922 F.3d 1175, 1196 (11th Cir. 2019), <u>reh'g en banc granted,</u>

13  <u>opinion vacated,</u> 939 F.3d 1278 (11th Cir. 2019), and <u>on reh'g en banc,</u> 979 F.3d

14  917 (11th Cir. 2020).  But because the Eleventh Circuit changed course in <u>Johnson</u>,

15  we now find ourselves on the wrong side of a circuit split.

16        Some fear that to do away with service awards would "do away with the

17  incentive for people to bring class actions."  <u>Johnson</u>, 975 F.3d at 1264 (Martin, <u>J.</u>,

18  concurring in part and dissenting in part).  But the district court in this case

1    found that "[t]here is no indication that any Class Representative assumed the

2    position or undertook the time and labor they did in anticipation of being

3    compensated." App'x at 7455-56.  That may not always be the case.  Perhaps

4    class actions that plaintiffs lack incentive to bring are class actions that need not

5    be brought.

6

7                                            **IV**

8            For all the attorneys' fees, one would hope that this case vindicated the

9    public interest in antitrust enforcement.  But it is just the opposite.  Subject only

10   to a possible future injunction, Defendants can continue their allegedly

11   anticompetitive behavior, with Plaintiffs releasing all claims that will "accrue no

12   later than five years" after all appeals from the settlement become final.  App'x

13   3321, 3367-68.

14           For the class representatives, the release of claims accruing after the class

15   period may well be a sacrifice worth making; all of them were in business for the

16   full fifteen-year class period.  But the same cannot be said for the newer

17   merchants--i.e., those that started accepting Visa and/or MasterCard toward the

18   end of that period.  These newer merchants stood to gain only marginally from

1    the settlement and are now releasing claims for a period that may far exceed

2    their period of recovery.

3          It is arguable that the future release: (A) resulted in newer merchants

4    receiving inadequate representation from the class representatives; (B) caused

5    class members to be treated inequitably relative to each other; and therefore (C)

6    should be stricken from the settlement agreement.

7          Ordinarily, we would reject a settlement which involved inadequate

8    representation or inequitable treatment.  That is what we did on the last appeal.

9    But no such action need be considered this time around because the settlement

10   agreement contains a safety valve: the release of claims extends "to, but only to,

11   the fullest extent permitted by federal law."  App'x 3336-37.

12         A holding as to the legality of the future release will therefore await the

13   day that a class member brings suit based on claims that accrued after the close

14   of the class period.  (I suspect there will be a line of counsel willing to assist.)

15   When such a case is brought, Visa and MasterCard will undoubtedly raise the

16   future release as an affirmative defense.  And the district court will have to make

17   a ruling.

LEVAL, *Circuit Judge*, concurring:

I concur in Judge Jacobs's majority opinion and write separately to address an important question, which appears to have been overlooked in the litigation. In considering the dispute between the oil companies and their branded service stations over settlement funds paid by the defendants on account of customer payments by payment card for gas purchased at the service stations, the parties, and perhaps also the district court, appear to be making an unquestioned assumption that, under the rule of *Illinois Brick*, only one of the oil company or its branded service station may be deemed to have accepted a card payment. The participants appear to assume that only one of the two can have standing to win any part of the settlement funds attributable to a card payment, so that a division between them of those settlement funds would violate the *Illinois Brick* rule. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720, 2019 WL 6875472, at *30–31 (E.D.N.Y. Dec. 16, 2019). In my opinion, this assumption is ill founded.

*Illinois Brick* holds only that an *indirect purchaser* from the antitrust violator, *i.e.,* one whose purchase was downstream from the direct purchaser, may not recover for an antitrust injury. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 727–29

1    (1977). In *Hanover Shoe*, the Supreme Court had held that the direct purchaser

2    from the antitrust violator, who buys at a price inflated by the antitrust violation,

3    is deemed to suffer the full brunt of the antitrust injury, even if the direct

4    purchaser raised his price to the next purchaser down the line (an "indirect"

5    purchaser) so as to pass on the brunt of the injury. *See Hanover Shoe, Inc. v. United*

6    *Shoe Machinery Corp.*, 392 U.S. 481, 488–89 (1968). *Hanover Shoe* thus established

7    that the antitrust violator cannot avoid liability to the direct purchaser by

8    showing that the direct purchaser, by raising its price to the next purchaser in

9    line, had avoided any loss. *See id.* In *Illinois Brick*, the Court espoused a corollary

10   rule to the effect that, in the same scenario of a chain of purchases, it is only the

11   direct purchaser from the antitrust violator (the one that is deemed to have borne

12   the full brunt of the harm), and not indirect purchasers further down the line,

13   who may sue the violator. *Illinois Brick*, 431 U.S. at 735–36. Accordingly, when

14   illegal overcharges are passed down the "chain" of successive purchases, *id.* at

15   729, (absent specified exceptions)[1] only the first purchaser may sue. Simply put,

---

[1] There are limited exceptions to the *Illinois Brick* rule. For example, an indirect purchaser may recover for its antitrust injury if it owns or controls the direct purchaser or if there was an explicit cost-plus contract between the direct and indirect purchaser, such that the full antitrust injury is clearly traceable to the indirect purchaser. *See California v. ARC Am. Corp.*, 490 U.S. 93, 97 & n.2 (1989) (citing *Illinois Brick*, 431 U.S. at 732 n.12, 736 n.16).

1  *Illinois Brick* provides that, where antitrust violator (A) has sold to direct

2  purchaser (B) who then sold to another customer (C), B may sue A for the

3  violation, but C may not. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019).

4      Nowhere, however, does *Illinois Brick* state the wider proposition that

5  there can be only one antitrust plaintiff. Nor does its logic support that

6  conclusion. While *Illinois Brick*'s prohibition of recovery by an indirect purchaser

7  who purchased from the direct purchaser commonly results in there being only

8  one purchaser who is qualified to sue for the injury inflicted in that sale, it does

9  not follow that, in the unusual circumstance in which two entities share a direct

10  purchase, the two may not share the recovery that would have gone to one of

11  them if that one had been the sole purchaser.

12      Consider a circumstance in which farmers, A and B, jointly purchase an

13  expensive crop-processing machine (too expensive for either of them to afford on

14  their own), sharing the cost of the purchase and agreeing to divide equally

15  between them the use of the machine and share equally the costs of its

16  maintenance. If the seller of the machine violated the antitrust laws, inflicting an

17  antitrust injury on its direct purchasers, then A and B, having purchased the

18  machine jointly, have equal claim to being a direct purchaser. Neither one is

1      more a direct purchaser from the violator than the other, and neither one is an

2      indirect purchaser, who bought from the direct purchaser. It cannot logically be

3      that only one of the two would be eligible to sue, and would win 100% of the

4      damages, to the exclusion of the other. If *Illinois Brick* meant (despite having said

5      no such thing) that only one entity may sue as the direct purchaser,[2] a court

---

[2] Although a recent Seventh Circuit case has some language suggesting that only one entity may sue, *see Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 840 (7th Cir. 2020) ("The central point of *Illinois Brick* is to allocate the right to recover to one and only one entity in the market."), in making that statement, the Seventh Circuit was considering successive purchasers in a chain, and was not contemplating whether two or more entities might be considered to have acted jointly in making the direct purchase from the violator. That case concerned a typical chain of manufacture, where healthcare companies, the plaintiffs, used "Group Purchasing Organizations" to purchase medical devices from manufacturers. *Id.* at 836–37. The healthcare companies sued both the intermediary purchasing organizations and the more remote manufacturer, on the theory that those two groups of defendants had conspired together to jointly violate the antitrust laws, so that the plaintiffs purchased directly from the conspiracy. *Id.* The district court dismissed the suit, concluding that it violated the *Illinois Brick* rule. *Id.* at 837. The Seventh Circuit vacated that decision, concluding that if the complaint alleged a plausible conspiracy between the two groups of defendants, the plaintiffs' suit against both the intermediaries and the remote co-conspirators was permissible under *Illinois Brick*, because the plaintiffs had purchased directly from the conspiracy. *Id.* at 840–41, 843. Thus, while the Seventh Circuit has said that *Illinois Brick* allows only one plaintiff, it meant that in a chain of successive purchasers, each claiming to have suffered a part of the injury caused by the defendant's antitrust violation, only the direct purchaser from the defendant may sue. The court was not considering the question posed here—whether, consistent with *Illinois Brick*, two plaintiffs may share a recovery for an injury suffered by them on jointly making a direct purchase from the violator. The Seventh Circuit's statement that *Illinois Brick* allows "one and only

4

1   would have no principled way of determining whether A or B is the one entitled

2   to sue. The ruling of *Illinois Brick*, like the ruling of *Hanover Shoe*, which it

3   extended, applied to successive purchasers in a sequential chain. That ruling did

4   not address and has no application to the unusual, and very different,

5   circumstance in which two entities act jointly in making a direct purchase. When

6   this occurs, the rule of *Illinois Brick*, as I read it, is not an obstacle to both of the

7   joint direct purchasers suing to vindicate their shared antitrust injury. That

8   circumstance was outside the scope of the *Illinois Brick* ruling.

9       Furthermore, to the extent that the Supreme Court was concerned, in

10  fashioning the *Illinois Brick* rule, about multiplication of claims for treble

11  damages, *see Illinois Brick*, 431 U.S. at 730–31 ("[A]llowing offensive but not

12  defensive use of pass-on would create a serious risk of multiple liability for

13  defendants. . . . [W]e are unwilling to open the door to duplicative recoveries . . .

14  ." (internal quotation marks omitted)), allowing joint direct purchasers to sue for

15  their shared injury would not undermine that concern. They would not be

16  adding claims, but rather dividing between them the damages attributable to a

17  single direct purchase.

---

one" plaintiff per antitrust violation appears to be another instance of
misconstruing that opinion as going far beyond the question it was considering.

1    As of yet, so far as we are aware, the district court has not addressed the

2    relationships between the integrated oil companies and their branded service

3    stations. The district court has stated an intention to appoint a special master to

4    study that question and decide (subject to the district court's *de novo* review) how

5    to distribute the settlement monies paid by the defendants on account of the

6    retail sales at the service stations that were paid by payment card. Because this

7    issue has not yet been explored in the district court, we do not have information

8    that illuminates the relationship between the oil companies and their branded

9    service stations. Furthermore, that relationship may vary from company to

10   company, and perhaps also from service station to service station. Nonetheless, it

11   appears likely that at least some of the relationships between the oil companies

12   and their branded service stations (with respect to the question of who accepted

13   the retail customers' payment cards, thereby purchasing the card-payment

14   service rendered by the defendants) are not the sequential direct and indirect

15   purchases addressed by *Illinois Brick*, but are more in the nature of a shared joint

16   purchase of the defendants' payment card service. It appears at least plausible

17   that, in buying gas at the pump with a payment card, the retail customers were

18   buying a portion of the goods and services involved in the transaction from the

1  oil company and a portion from the service station, so that, under the agreement

2  between oil company and service station, a portion of the payment would

3  ultimately go to each of them. If so, it may be that the oil company and service

4  station have jointly sold gas to their retail customer, have jointly accepted the

5  customer's payment card, and have jointly made a direct purchase from the

6  defendant card company of the payment service it rendered. If that proves to be

7  true, the two may stand in shared status as joint direct purchasers of the card

8  payment service, each entitled to sue for its share of the antitrust injury.

9      Not knowing the facts that define each of the relationships between oil

10  companies and their service stations with respect to gas sales at the pump (which

11  have not yet been determined in the district court), I can express no view how

12  the settlement payments on account of those sales should be distributed. I can

13  only say that, in my view, it would be a mistake for the court or the parties to

14  assume (as some appear to have done) that, under *Illinois Brick,* there can be no

15  more than one direct purchaser per transaction. The parties, the special master,

16  and the district court should carefully study the precedents to explore whether

17  the *Illinois Brick* rule, which unquestionably denies standing to an indirect

18  purchaser from the violator, similarly denies standing to one of two entities

1   when the two have joined in making a direct purchase from the violator,

2   notwithstanding the absence of any persuasive reason for choosing one over the

3   other as the authorized plaintiff.[3]

4          Furthermore, should any oil company-service station pairs reach a

5   settlement between them, agreeing to a formula for division between them of the

6   settlement funds, I can see no reason why a court would not give effect to that

7   settlement.

---

[3] Judge Jacobs agrees that the inquiry suggested in this paragraph is appropriate.